GOVERNMENT
EXHIBIT

X

**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE OF HEARINGS AND APPEALS**

| | | |
|---|---|---|
| *In the Matter of* | ) | Docket No. 22-58-SP |
| | ) | |
| **Ashland University,** | ) | **Federal Student Aid** |
| | ) | **Proceeding** |
| **Respondent.** | ) | |
| | ) | **PRCN: 2021-4-05-30426** |

---

**RESPONDENT ASHLAND UNIVERSITY'S EXHIBIT LIST FOR**
**BRIEF IN SUPPORT OF APPEAL**

---

| EXHIBIT NUMBERS | EXHIBIT TITLE | EXHIBIT ATTACHMENT(S) (as applicable) | EXHIBIT PAGE RANGES (exclusive of initial cover pages) |
|---|---|---|---|
| R1 | Respondent's Exhibit 1 - Declaration of Carlos Campo, with Attachment A | R1 Attachment A - Ohio Department of Higher Education - Certificate of Authorization | R1 – 1-21 |
| R2 | Respondent's Exhibit 2 – Declaration of Todd Marshall | R2 Attachment A – Incomplete SCP Sections 2019-2020 | R2 – 1-6 |
| R3 | Respondent's Exhibit 3 – Declaration of Amiel Jarstfer, with Attachments A and B | R3 Attachment A - Guidelines and Procedures for Academic Program Review (GDPR)  R3 Attachment B - Email from Matt Exline to Dr. Amiel Jarstfer dated February 10, 2022 | R3 – 1-92 |
| R4 | Respondent's Exhibit 4 – Declaration of Stephen Howell, with Attachment A | R4 Attachment A - Federal Student Aid Handbook | R4 – 1-9 |
| R5 | Respondent's Exhibit 5 – Declaration of Mary Deloe | | R5 – 1-3 |
| R6 | Respondent's Exhibit 6 – Declaration of James Hayes | | R6 – 1-4 |
| R7 | Respondent's Exhibit 7 – Ashland University's Response to the Program Review Report | | R7 – 1-27 |
| R8 | Respondent's Exhibit 8 – 2019 Federal Student Aid Handbook Page 3-7 | | R8 – 1 |

EDU000932

| R9 | Respondent's Exhibit 9 – "Dear Colleague Letter" dated December 18, 2014, GEN-14-23 | | R9 – 1-13 |

EDU000933

# RESPONDENT'S EXHIBIT 1

# DECLARATION OF CARLOS CAMPO WITH ATTACHMENT A

EDU000934

**U.S. DEPARTMENT OF EDUCATION**
**FEDERAL STUDENT AID**
**SCHOOL PARTICIPATION DIVISION – CHICAGO/DENVER**

|  |  |
|---|---|
| *In re: Ashland University Program Review Report dated January 3, 2022 OPE ID: 00301200 PRCN: 2021-4-05-30426* | **DECLARATION OF CARLOS CAMPO, Ph.D., IN SUPPORT OF ASHLAND UNIVERSITY'S RESPONSE TO PROGRAM REVIEW REPORT DATED JANUARY 3, 2022** |

I, Carlos Campo, declare as follows:

1.      I make this declaration based on personal knowledge. If called to testify, I would and could testify competently as set forth below.

2.      I submit this declaration in support of Ashland University's ("Ashland") response to the Program Review Report ("PRR") issued by U.S. Department of Education's Office of Federal Student Aid ("Department") dated January 3, 2022.

3.      On June 1, 2015, I began my term as Ashland's President, a role I currently serve. Prior to Ashland, I previously served as a dean of the College of Arts and Letters from 2005-2007 at the College of Southern Nevada in Las Vegas, and then served as the school's chief academic officer from 2007 until 2008. From 2008 until 2010, I was the chief academic officer and provost at Regent University, eventually becoming the President of Regent University in 2010 until 2013. Before joining Ashland as President in 2015, I served as an educational consultant for the Gates Foundation and serving as chair of the Alliance for Hispanic Education

Page **1** of **2**

**R1 - 1 of 21**

EDU000935

for the National Hispanic Christian Leadership Conference in Sacramento, California, from 2013 until 2015.

4.     I received my Ph.D. in English, my Master of Arts Degree in English, with honors, and Bachelor of Arts Degree in Theater, each from the University of Nevada in Las Vegas, Nevada.

5.     Ashland is a private, nonprofit university. Ashland was founded in 1878 as Ashland College, as a result of its growth over the years and the diversification of its academic programs, its name later changed to Ashland University in 1989. Ashland is fully accredited by the Higher Learning Commission, as well as by an assortment of programmatic accreditors, including the Accreditation Council for Business Schools and Programs which accredits Ashland's academic business programs. Ashland is licensed as an institution of higher education by the Ohio Department of Higher Education ("ODHE").[1]

6.     Ashland began its corrections education program in 1964 and is proud to be home of the nation's longest continually running corrections education program.

7.     I have closely reviewed the Department's Findings contained in the PRR. In my capacity as President, I can attest that Ashland has taken applicable corrective actions in response to the PRR and we remain committed to the Department and our students.

8.     As it relates to the Department's Finding 4, on June 14, 2021, I sent a letter dated June 9, 2021, to the ESI Team, responding to allegation of overspending by Ashland explaining that while the funds had been marked as "disbursed" in the ESI Team's system, Ashland had not actually drawn those funds from G5 and that any final disbursements would be made from award year 2020 ("AY20") when the final AY20 funding was determined, with remaining

---

[1] Attachment A - <u>Ohio Department of Higher Education Certificate of Authorization.</u>

Page **2** of **2**

R1 - 2 of 21

EDU000936

obligations to students being funded from Ashland's award year 2021 ("AY21") allocation. In addition, I requested $2,855,000 in additional funding to meet student needs in AY20.[2]

9.     As it relates to the Department's Finding 4, Ashland and I appreciate and understand the seriousness of this finding, including the risk that future recurrences of this nature could result in fines or other sanctions, including the suspension or termination of all Title IV programs to Ashland. In response to Finding 4 and as part of our commitment to being both an institution for the betterment of our students and a good steward of federal funds, Ashland has adopted the necessary policies and procedures to prevent any such reoccurrence.

10.     I am fully committed to operating Ashland's financial aid program in a manner that is consistent with both its institutional values and applicable law.  Ashland does not want any of its future actions to even appear to be questionable, and to that end, Ashland has begun the process of adopting an institution-wide Compliance and Ethics Policy which is designed to strengthen not only Ashland's financial aid compliance, but also its compliance with applicable law and standards throughout its operations

I, Carlos Campo, Ph.D., declare under penalty of perjury that the foregoing is true and correct. Executed on this 2nd day of March, 2022, in Ashland, Ohio.

Carlos A. Campo, Ph.D.
President, Ashland University

---

[2] Attachment B - Letter from Dr. Carlos Campo dated June 9, 2021.

Page **3** of **2**

R1 - 3 of 21

EDU000937

# RESPONDENT'S EXHIBIT 1

# ATTACHMENT A

R1 - 4 of 21

EDU000938



**Ohio** | **Department of Higher Education**

**Mike DeWine**, Governor
**Randy Gardner**, Chancellor

# State of Ohio
# Certificate of Authorization

## ASHLAND UNIVERSITY
## ASHLAND, OHIO

Associate of Arts

Bachelor of Arts, Bachelor of Fine Arts, Bachelor of Music, Bachelor of Science,
Bachelor of Science in Business Administration, Bachelor of Science in Nursing,
Bachelor of Social Work

Master of American History and Government, Master of Arts, Master of Business
Administration, Master of Divinity, Master of Education, Master of Fine Arts, Master of
Science

Doctor of Education, Doctor of Ministry, Doctor of Nursing Practice

Please see the attached sheet for the programs of study offered, delivery formats and options
available, and off-site locations.

Ashland University demonstrated compliance with requirements established pursuant to Chapter
1713 of the Ohio Revised Code for the courses, credentials, and sites specified.

Authorization continues through December 31, 2029
Dates of Authorization

Randy Gardner
Chancellor

25 South Front Street
Columbus, Ohio 43215

phone  614.466.6000
fax       614.466.5866
web     **www.OhioHigherEd.org**

**R1 - 5 of 21**

EDU000939

**Degrees and Programs Offered**

*denotes program in teach-out

| Degree: **Associate of Arts** | | | | | | | |
|---|---|---|---|---|---|---|---|
| Program of study | Major | Minor | Concentration | Specialization | Accelerated | Distance Education | Hybrid/ blended |
| Art | | | X | | | | |
| Criminal Justice | | | X | | | | |
| General Studies | | | X | | | | |

| Degree: **Bachelor of Arts** | | | | | | | |
|---|---|---|---|---|---|---|---|
| Program of study | Major | Minor | Concentration | Specialization | Accelerated | Distance Education | Hybrid/ blended |
| Applied Music | X | X | | | | | |
| Broadcast Communication | X | X | | | | | |
| Business Administration | X | | | | | | |
| Commercial Art | X | | | | | | |
| Art History | | X | | | | | |
| Studio Art | | X | | | | | |
| Classical Civilization | | X | | | | | |
| Computer Science | X | X | | | | | |
| Communication Studies | X | | | | | | |
| Creative Writing | X | X | | | | | |
| Economics | X | X | | | | | |
| English | X | X | | | | | |
| Fine Art | X | | | | | | |
| Global Studies | | X | | | | | |
| French | X | X | | | | | |
| History | X | X | | | | | |
| Interdisciplinary Studies | X | | | | | | |
| International Political Studies | X | | | | | | |

2

**R1 - 6 of 21**

EDU000940

| | Major | Minor | | | | | |
|---|---|---|---|---|---|---|---|
| Digital Media Journalism | X | X | | | | | |
| Mathematics | X | X | | | | | |
| Philosophy | X | | | | | | |
| Ethics | | X | | | | | |
| Humanities | | X | | | | | |
| Political Economy | X | X | | | | | |
| Political Science | X | X | | | | | |
| Psychology | X | X | | | | | |
| Public Relations | | X | | | | | |
| Public Relations and Risk Communication | X | X | | | | | |
| Religion | X | X | | | | | |
| Spanish | X | X | | | | | |
| Foreign Studies | | X | | | | | |
| Software Design and Development | X | | | | | | |
| Spanish | X | X | | | | | |
| Sport Communication | X | X | | | | | |
| Theatre | X | X | | | | | |

Degree: **Bachelor of Fine Arts**

| Program of study | Major | Minor | Concentration | Specialization | Accelerated | Distance Education | Hybrid/ blended |
|---|---|---|---|---|---|---|---|
| Fine Arts | X | | | | | | |

Degree: **Bachelor of Music**

| Program of study | Major | Minor | Concentration | Specialization | Accelerated | Distance Education | Hybrid/ blended |
|---|---|---|---|---|---|---|---|
| Performance | X | | | | | | |

3

**R1 - 7 of 21**

EDU000941

| Degree: **Bachelor of Science** | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Program of study | Major | Minor | Concentration | Specialization | Accelerated | Distance Education | Hybrid/ blended |
| Actuarial Science | X | | | | | | |
| Athletic Training | X | | | | | | |
| Biology | X | X | | | | | |
| Biochemistry | X | | | | | | |
| Chemistry | X | X | | | | | |
| Commercial Art* | X | | | | | | |
| Computer Art and Graphic Programming | X | | | | | | |
| Computer Science | X | X | | | | | |
| Criminal Justice | X | X | | | | | |
| Education | X | | | | | | |
| Art Education | | | X | | | | |
| Chemistry Education | | | X | | | | |
| Early Childhood Education | | | X | | | | |
| Earth Science | | | X | | | | |
| French Education | | | X | | | | |
| Integrated Language Arts | | | X | | | | |
| Integrated Mathematics | | | X | | | | |
| Integrated Science | | | X | | | | |
| Integrated Social Studies | | | X | | | | |
| Intervention Specialist – Early Childhood | | | X | | | | |
| Intervention Specialist – Mild to Moderate | | | X | | | | |

4

**R1 - 8 of 21**

EDU000942

| Program of study | Major | Minor | Concentration | Specialization | Accelerated | Distance Education | Hybrid/blended |
|---|---|---|---|---|---|---|---|
| Intervention Specialist – Moderate to Intensive | | | X | | | | |
| Life Science | | | X | | | | |
| Middle Childhood | | | X | | | | |
| Physical Science | | | X | | | | |
| Spanish Education | | | X | | | | |
| Interdisciplinary Studies | X | | | | | | |
| Manufacturing Management | X | | | | | | |
| Mathematics | X | X | | | | | |
| Physics | X | X | | | | | |
| Psychology | X | | | | | | |
| Gerontology | | X | | | | | X |
| Public Health | X | | | | | | |
| Sport Management | X | X | | | | | |
| Coaching | | X | | | | | |
| Recreation Management | | X | | | | | |
| Recreation Ministry | | X | | | | | |
| Therapeutic Recreation | | X | | | | | |
| Toxicology | X | | | | | | |

| Degree: **Bachelor of Science in Business Administration** | | | | | | | |
|---|---|---|---|---|---|---|---|
| Program of study | Major | Minor | Concentration | Specialization | Accelerated | Distance Education | Hybrid/blended |
| Accounting | X | X | | | | | |
| Business Analytics | | X | | | | | |
| Business Law | | X | | | | | |
| Business Management | X | X | | | | | |
| Economics | X | X | | | | | |
| Entrepreneurship | X | X | | | | | |
| Fashion Merchandising | X | X | | | | | |

5

EDU000943

| | Major | Minor | | | | | |
|---|---|---|---|---|---|---|---|
| Finance - Asset Management | X | | | | | | |
| Finance - Corporate | X | | | | | | |
| Finance | | X | | | | | |
| Hospitality Management | X | X | | | | | |
| International Business | X | X | | | | | |
| Management Information Systems | X | X | | | | | |
| Marketing | X | X | | | | | |
| Risk Management and Insurance | | X | | | | | |
| Sport Management | X | | | | | | |
| Supply Chain Management | X | | | | | | |

Degree: **Bachelor of Science in Nursing**

| Program of study | Major | Minor | Concentration | Specialization | Accelerated | Distance Education | Hybrid/ blended |
|---|---|---|---|---|---|---|---|
| Nursing | X | | | | | | X |

Degree: **Bachelor of Social Work**

| Program of study | Major | Minor | Concentration | Specialization | Accelerated | Distance Education | Hybrid/ blended |
|---|---|---|---|---|---|---|---|
| Social Work | X | | | | | | |

Degree: **Master of Arts**

| Program of study | Major | Minor | Concentration | Specialization | Accelerated | Distance Education | Hybrid/ blended |
|---|---|---|---|---|---|---|---|
| Biblical Studies | X | | | | | | |
| Old Testament | | | X | | | | |
| New Testament | | | X | | | | |

6

**R1 - 10 of 21**

EDU000944

| | | | | | | |
|---|---|---|---|---|---|---|
| Christian Ministries | X | | | | | |
| Clinical Counseling | X | | | | | |
| Counseling | X | | | | | |
| Corporate and Strategic Communication | X | | | | | |
| Historical and Theological Studies | X | | | | | |
| Anabaptism and Pietism | | | X | | | |
| Church History | | | X | | | |
| Church Theology | | | X | | | |
| Practical Theology* | X | | | | | |
| Black Church Studies | | | X | | | |
| Christian Formation | | | X | | | |
| Christian Worship | | | X | | | |
| Evangelism, Church Religion and Missions | | | X | | | |
| General Ministry | | | X | | | |
| Homiletics | | | X | | | |
| Pastoral Counseling and Care* | | | X | | | |
| Spiritual Formation | | | X | | | |
| Religion* | X | | | | | |
| American History and Government | X | | | | | |
| Teaching English | | | | X | | |

7

**R1 - 11 of 21**

EDU000945

Degree: **Master of Business Administration**

| Program of study | Major | Minor | Concentration | Specialization | Accelerated | Distance Education | Hybrid/ blended |
|---|---|---|---|---|---|---|---|
| Executive Management | X | | | | | X | X |
| Accounting | | | | X | | X | X |
| Business Analytics | | | | X | | X | X |
| Entrepreneurship | | | | X | | X | X |
| Finance | | | | X | | X | X |
| Global Management | | | | X | | X | X |
| Health Care Management and Leadership | | | | X | | X | X |
| Human Resource Management | | | | X | | X | X |
| Management Information Systems | | | | X | | X | X |
| Project Management | | | | X | | X | X |
| Sport Management | | | | X | | X | X |
| Supply Chain Management | | | | X | | X | X |

Degree: **Master of Divinity**

| Program of study | Major | Minor | Concentration | Specialization | Accelerated | Distance Education | Hybrid/ blended |
|---|---|---|---|---|---|---|---|
| Black Church Studies* | | | X | | | | |
| Christian Formation* | | | X | | | | |
| Christian Theology* | | | X | | | | |
| Christian Worship* | | | X | | | | |
| Church History* | | | X | | | | |

8

**R1 - 12 of 21**

EDU000946

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Clinical Counseling* | | | X | | | | |
| Counseling* | | | X | | | | |
| Evangelism Church Renewal* | | | X | | | | |
| General Biblical Studies* | | | X | | | | |
| General Ministry* | | | X | | | | |
| New Testament* | | | X | | | | |
| Old Testament* | | | X | | | | |
| Pastoral Counseling and Care* | | | X | | | | |
| Spiritual Formation | | | X | | | | |

| Degree: **Master of Education** | | | | | | | |
|---|---|---|---|---|---|---|---|
| Program of study | Major | Minor | Concentration | Specialization | Accelerated | Distance Education | Hybrid/ blended |
| Adult Education | X | | | | | | |
| Curriculum and Instruction | X | | | | | | |
| Intervention Specialist – Mild to Moderate | | | X | | | | |
| Intervention Specialist – Moderate to Intensive | | | X | | | | |
| Reading and Literacy | | | X | | | | |
| Talent Development Education | | | X | | | | |
| Technology Director | | | X | | | | |

9

**R1 - 13 of 21**

EDU000947

| Educational Leadership | | | X | | | | |
|---|---|---|---|---|---|---|---|

---

Degree: **Master of Fine Arts**

| Program of study | Major | Minor | Concentration | Specialization | Accelerated | Distance Education | Hybrid/ blended |
|---|---|---|---|---|---|---|---|
| Creative Writing | X | | | | | | |

---

Degree: **Master of Science**

| Program of study | Major | Minor | Concentration | Specialization | Accelerated | Distance Education | Hybrid/ blended |
|---|---|---|---|---|---|---|---|
| Applied Exercise Science | X | | | | | | |

---

Degree: **Doctor of Education**

| Program of study | Major | Minor | Concentration | Specialization | Accelerated | Distance Education | Hybrid/ blended |
|---|---|---|---|---|---|---|---|
| Leadership Studies | X | | | | | | |

---

Degree: **Doctor of Ministry**

| Program of study | Major | Minor | Concentration | Specialization | Accelerated | Distance Education | Hybrid/ blended |
|---|---|---|---|---|---|---|---|
| Black Church Studies | X | | | | | | |
| Canadian Church Studies | X | | | | | | |
| Formational Counseling | X | | | | | | |
| Independent Design | X | | | | | | |
| Spiritual Formation | X | | | | | | |
| Transformational Leadership | X | | | | | | |

10

**R1 - 14 of 21**

EDU000948

Degree: **Doctor of Nursing Practice**

| Program of study | Major | Minor | Concentration | Specialization | Accelerated | Distance Education | Hybrid/ blended |
|---|---|---|---|---|---|---|---|
| Advanced Nurse Practitioner | X | | | | | | |
| Family Nurse Practitioner | X | | | | | | |
| Health Systems Leadership | X | | | | | | |

**Programs Offered (Educator Preparation)**

| License/Endorsement | U | PB | G | PM | Accelerated | Distance Education | Hybrid/ blended |
|---|---|---|---|---|---|---|---|
| Computer/Technology Endorsement | | | X | | | | |
| Curriculum, Instruction, Professional Development License | | | X | | | | X |
| Early Childhood License | X | X | | | | | |
| Early Childhood Generalist Endorsement | X | X | X | | | | |
| Early Childhood Intervention Specialist License | X | | | | | | |
| Earth Sciences License | X | X | | | | | |
| French License | X | X | | | | | |
| Gifted Intervention Specialist License | | | X | | | | |
| Integrated Language Arts License | X | X | | | | | |
| Integrated Mathematics License | X | X | | | | | |
| Integrated Science License | X | X | | | | | |
| Integrated Social Studies License | X | X | | | | | |
| Life Sciences License | X | X | | | | | |
| Middle Childhood License (all content areas) | X | X | | | | | |
| Mild/Moderate Intervention Specialist License | X | X | X | | | | |
| Moderate/Intensive Intervention Specialist License | X | | X | | | | |

11

EDU000949

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Music License | X | X | | | | | |
| Physical Science (Physics and Chemistry) License | X | X | | | | | |
| Physical Science: Chemistry License | X | X | | | | | |
| Principal (PK-6, 4-9, 5-12) License | | | X | | | | X |
| Reading Endorsement | | | X | | | | |
| School Nurse License | | | X | | | | |
| Spanish License | X | X | | | | | |
| Superintendent License | | | X | | | | |
| Teaching English to Speakers of Other Languages Endorsement | | | X | | | | |
| Visual Arts License | X | X | | | | | |

**Degrees and Program Offered (Offsite Locations)**

| Site name:  **Cleveland Center (Seminary)** |
|---|

| Address: 6500 Rockside Road Suite 130  Independence, OH 44131 |
|---|

| Degree | Program of Study | Percentage of degree/program that can be completed at the site | Accelerated | Hybrid/ blended |
|---|---|---|---|---|
| Master of Divinity | Chaplaincy* | 100% | | X |
| Doctor of Ministry | Ministry | 100% | | X |

| Site name:  **Cleveland Center (COBE MBA)** |
|---|

| Address: 6393 Oak Tree Boulevard, Second Floor, Independence, OH 44131 |
|---|

| Degree | Program of Study | Percentage of degree/program that can be completed at the site | Accelerated | Hybrid/ blended |
|---|---|---|---|---|
| Master of Business Administration | Various Specializations | 100% | X | X |

12

**R1 - 16 of 21**

EDU000950

Site name:  **Columbus Center (ED, NBA, and Seminary)**

Address: 1900 East Dublin-Granville Road, Columbus, OH 43229

| Degree | Program of Study | Percentage of degree/program that can be completed at the site | Accelerated | Hybrid/ blended |
|---|---|---|---|---|
| Bachelor of Science | Early Childhood Education | 100% | | X |
| Bachelor of Science | Early Childhood Intervention Specialist | 100% | | X |
| Bachelor of Science | 4-9 Middle Childhood Education (all content areas) | 100% | | X |
| Bachelor of Science | Intervention Specialist K-12 Mild/Moderate | 100% | | X |
| Post-baccalaureate | Multiage Art | 100% | | X |
| Post-baccalaureate | Multiage Music | 100% | | X |
| Post-baccalaureate | Multiage World Languages (French, Spanish) | 100% | | X |
| Post-baccalaureate | Intervention Specialist K-12 Mild/Moderate | 100% | | X |
| Post-baccalaureate | Middle Childhood Education (all content areas) | 100% | | X |
| Post-baccalaureate | Adolescence/Young Adult Sciences (Chemistry, Earth Science, Integrated Science, Life Science, Physical Science) | 100% | | X |

13

**R1 - 17 of 21**

EDU000951

| Post-baccalaureate | Adolescence/Young Adult Integrated Language Arts | 100% | | X |
|---|---|---|---|---|
| Post-baccalaureate | Adolescence/Young Adult Integrated Social Studies | 100% | | X |
| Post-baccalaureate | Adolescence/Young Adult Integrated Mathematics | 100% | | X |
| Master of Education in Curriculum and Instruction | Teaching and Learning in the 21st Century | 100% | | X |
| Master of Education in Curriculum and Instruction | Intervention Specialist Mild/Moderate | 100% | | X |
| Master of Education in Curriculum and Instruction | Reading & Literacy | 100% | | X |
| Master of Education in Curriculum and Instruction | Talent Development | 100% | | X |
| Graduate | Curriculum, Instruction & Professional Development | 100% | | X |
| Graduate | Principal (PK-6, 4-9, 5-12) | 100% | | X |
| Graduate | Superintendent | 100% | | X |
| Graduate | Intervention Specialist Mild/Moderate | 100% | | X |
| Endorsement | 4-5 Early Childhood Generalist | 100% | | X |
| Endorsement | Gifted Intervention Specialist | 100% | | X |

14

**R1 - 18 of 21**

EDU000952

| Endorsement | 4-5 Early Childhood Generalist, Graduate, , Gifted Intervention Specialist) | 100% | | X |
|---|---|---|---|---|
| Endorsement | Reading K-12 | 100% | | X |
| Master of Business Administration | Various Specializations | 100% | X | X |
| Master of Divinity | Chaplaincy* | 100% | | X |
| Master of Arts | Clinical Mental Health Counseling | 100% | | X |

**Site name:  Dwight Schar College of Nursing and Health Sciences**

Address: 1020 Trimble Road, Mansfield, OH 44906

| Degree | Program of Study | Percentage of degree/program that can be completed at the site | Accelerated | Hybrid/ blended |
|---|---|---|---|---|
| Bachelor of Science | Athletic Training | 100% | | |
| Bachelor of Science | Dietetics | 100% | | |
| Bachelor of Science | Exercise Science | 100% | | |
| Bachelor of Science | Public Health | 100% | | |
| Bachelor of Science in Nursing | Nursing | 100% | X | |
| Bachelor of Science in Nursing | RN-BSN | 100% | | X |
| Master of Science | Applied Exercise Science | 100% | | X |
| Doctor of Nursing Practice | Nursing Practice | 100% | | |

15

**R1 - 19 of 21**

EDU000953

Site name:  **Elyria Center LCCC Ed**

Address: 1005 North Abbe Road, Elyria, OH 44035

| Degree | Program of Study | Percentage of degree/program that can be completed at the site | Accelerated | Hybrid/ blended |
|---|---|---|---|---|
| Bachelor of Science | Early Childhood Education | 100% | | X |
| Bachelor of Science | Early Childhood Intervention Specialist | 100% | | X |
| Bachelor of Science | 4-9 Middle Childhood Education (all content areas) | 100% | | X |
| Bachelor of Science | Intervention Specialist K-12 Mild/Moderate | 100% | | X |
| Post-baccalaureate | Multiage Art | 100% | | X |
| Post-baccalaureate | Multiage Music | 100% | | X |
| Post-baccalaureate | Multiage World Languages (French, Spanish) | 100% | | X |
| Post-baccalaureate | Intervention Specialist K-12 Mild/Moderate | 100% | | X |
| Post-baccalaureate | Middle Childhood Education (all content areas) | 100% | | X |
| Post-baccalaureate | Adolescence/Young Adult Sciences (Chemistry, Integrated Science, Life Science, Physical Science) | 100% | | X |

16

**R1 - 20 of 21**

EDU000954

| Post-baccalaureate | Adolescence/Young Adult Integrated Language Arts | 100% | | X |
|---|---|---|---|---|
| Post-baccalaureate | Adolescence/Young Adult Integrated Social Studies | 100% | | X |
| Post-baccalaureate | Adolescence/Young Adult Integrated Mathematics | 100% | | X |
| Master of Education in Curriculum and Instruction | Teaching and Learning in the 21st Century | 100% | | X |
| Master of Education in Curriculum and Instruction | Intervention Specialist Mild/Moderate | 100% | | X |
| Master of Education in Curriculum and Instruction | Reading & Literacy | 100% | | X |
| Graduate | Curriculum, Instruction & Professional Development | 100% | | X |
| Graduate | Principal (PK-6, 4-9, 5-12) | 100% | | X |
| Graduate | Superintendent | 100% | | X |
| Graduate | Intervention Specialist Mild/Moderate | 100% | | X |
| Endorsement | 4-5 Early Childhood Generalist | 100% | | X |
| Endorsement | Reading K-12 | 100% | | X |

17

R1 - 21 of 21

EDU000955

# RESPONDENT'S EXHIBIT 2

# DECLARATION OF TODD MARSHALL WITH ATTACHMENT A

EDU000956

U.S. DEPARTMENT OF EDUCATION
FEDERAL STUDENT AID
SCHOOL PARTICIPATION DIVISION – CHICAGO/DENVER

In re: Ashland University Program
Review Report dated January 3, 2022
OPE ID: 00301200          PRCN:
2021-4-05-30426

DECLARATION OF TODD
MARSHALL, Ph.D.

I, Todd Marshall, declare as follows:

1.      I make this declaration based on personal knowledge. If called to testify, I would and could testify competently as set forth below.

2.      I submit this declaration in support of Ashland University's ("Ashland") response to the Program Review Report ("PRR") issued by U.S. Department of Education's Office of Federal Student Aid ("Department") dated January 3, 2022.

3.      I currently serve as the Vice President of Correctional Education and Innovation at Ashland. I have served in this role since February 2020. Before that I served as the Vice President for Continuing and Adult Studies (2019-2020), Interim Provost (2016 and 2019), and Associate Provost (2015-2019).

4.      I earned my Bachelor of Arts in Pastoral Studies from Maranatha University in 1997; three (3) Masters' degrees in Theology, Art, and Divinity, from Missio Seminary, in 1997 and 1994, respectively; two (2) Masters' degrees in from Syracuse University, in Philosophy in

Page 1 of 5

R2 - 1 of 6

EDU000957

2008, and Library and Information Science in 2004; and a Doctor of Philosophy from Syracuse University in Information Science and Technology in 2011

5. Prior to beginning my career at Ashland, I served as Director of Technology at Teach Every Nation.

6. My responsibilities as Vice President of Correctional Education and Innovation at Ashland involve the oversight of university technology and correctional education operations.

7. As Vice President of Correctional Education and Innovation at Ashland I have completed the following trainings including but not limited to: Peer Reviewer Training for the Higher Learning Commission, participation in various conferences held by the American Correctional Association and the Correctional Education Association. Training, and annual compliance training for Family Educational Rights and Privacy Act (FERPA) and Title IX.

8. My responsibilities in the Experimental Sites Initiative ("ES!") Second Chance Pell ("SCP") program include: communication and interactions with the Department of Correction(s) and Ashland's relationship with the correctional facilities; development of a strategic vision; oversight of the correctional education budget and program operations in the facilities, enrollment, and admissions of SCP students in conjunction with the university registrar; transition and alumni services of SCP students; and facilitation of academics offered in the program and technology used in the program.

9. Ashland's SCP students are enrolled in the same academic program as Ashland's traditional students, though the course delivery is accelerated. SCP students' courses are required to have the same quality, assessment, learning outcomes, and requirements of the traditional semester offering of the course, using the same credit hour calculations and awards as the corresponding traditional 15-week course.

R2 - 2 of 6

EDU000958

10. Ashland's SCP student courses are required to be consistent with Ashland's Credit Hour Policy regarding accelerated formats, which states in relevant part as follows:

"According to the Higher Learning Commission, an institution that awards credit hours must adhere to commonly accepted practices in higher education. The federal definition of a credit hour is the "... amount of work represented in intended learning outcomes and verified by evidence of student achievement that is institutionally established equivalency that reasonably approximates not less than:

- one hour of classroom or direct faculty instruction and a minimum of two hours of out-of-class student work for approximately fifteen weeks for one semester ... or the equivalent amount of work over a different amount of time; or
- at least an equivalent amount of work as required [above] of this definition for other academic activities as established by the institution, including laboratory work, internships, practice, studio work, and other academic work leading to the award of academic hours."

In compliance with federal regulations and mandates from the Higher Learning Commission in July 2013, Ashland University awards semester credit hours based on the following: ...

...courses offered in on-line, hybrid, or accelerated formats shall be consistent in quality, assessment, learning outcomes, and requirements as courses of the same departmental prefix, number, credit hours, and title taught in a traditional semester structure."

11. Consistent with the above-stated policy provisions, SCP students are required to receive the same number of credit hours and instruction time in their accelerated format as traditional students, equaling "1,500 minutes of out-of-classroom work by the student, or 150 to 180 minutes of independent or directed work per week for 15 weeks," consistent with the aforementioned policy.

12. There are opportunities for academic engagement during the 15 weeks SCP students have their devices.

13. For example, SCP students with incomplete grades have access to instructors, resource materials, and other resources necessary to complete the course objectives, and

Page 3 of 5

**R2 - 3 of 6**

EDU000959

Ashland expects those students to use those resources to complete their coursework during the time they have access to the course materials.

14. As to the inadvertent errors cited in Finding 7, during the week of January 31, 2022, Ashland conducted a review with its academic advisors related to Finding 7 to ensure there is no future noncompliance related to Pell Grant packaging.

15. The Director of Records and Advising reports to my office and as it relates to the Experimental Sites Initiative ("ES!") Second Chance Pell ("SCP") students, the Director of records and Advising, is responsible for managing the admissions processing, student data, and student academic advising of SCP students, including course registration in keeping with their declared degree, in collaboration with the Ashland Registrar's Office.

16. As of February 2022, Ashland has approximately 2,200 SCP students pursuing degrees in five (5) areas of study.

17. According to the Office of the Director of Records and Advising, in academic year(s) 2019-2020 and 2020-2021 the total number of SCP course sections with incompletes grades ranged from 30.73% (Fall 2019) to 74.31% (Fall 2020).'

18. According to the information and records of the Office of the Director of Records and Advising, SCP students who met Ashland's academic admissions standards, who were within five (5) years of release, and had funding in place, were registered for classes in academic year(s) 2019-2020 and 2020-2021.

19. The Office of the Director of Records and Advising's information reflects that the student identified in the PRR as "Student 24" applied for transfer admission to Ashland and was admitted. Student 24 self-disclosed on their application that they earned a high school

| Attachment A - Incomplete SCP Sections List

Page 4 of 5

**R2 - 4 of 6**

EDU000960

diploma or General Educational Development certificate ("GED") and attended two other institutions of higher education. The Office of the Director of Records and Advising confirmed with through National Student Clearinghouse ("NSC") that Student 24 was enrolled in the disclosed institutions.[2]

20.    According to the records of the Office of the Records and Advising, Student 24 earned their GED in 2008, prior to their transfer to Ashland in 2021.[3]

21.    The Office of the Director of Records and Advising is required to adhere to Ashland's Admissions Policy and has revised its ESI Admissions Procedures relating to prioritization of those SCP students who would be released from incarceration within five (5) years, based on information received from Financial Aid. Under my oversight, the Office of the Director of Records and Advising will continue to adhere to Ashland's procedure of receipt and retention of documents of admissions eligibility.[4]

I, Todd Marshall, declare under penalty of perjury that the foregoing is true and correct. Executed on this _10th_ day of March, 2022, in _Ashland, Ohio_.

Dr. Todd Marshall
Vice President of Correctional Education and Innovation,
Ashland University

---

[2] Attachment B - Student 24 Clearinghouse Report
[3] Attachment C - Student 24 GED
[4] Attachment D - Revised Corrections Education ESI Admissions Procedures

Page 5 of 5

R2 - 5 of 6

EDU000961

**INCOMPLETE SCP SECTIONS 2019-2021**

| TERM | TOTAL NUMBER OF COURSE SECTIONS | TOTAL OF ALL CE STUDENTS ENROLLED AT EOT | TOTAL PELL FUNDED STUDENTS AT EOT | TOTAL OF CE STUDENT INCOMPLETE GRADES | TOTAL PELL FUNDED STUDENTS WITH INCOMPLETE GRADES | TOTAL NUMBER OF SECTIONS WITH STUDENTS WHO HAVE INCOMPLETE GRADES EOT | % OF SECTIONS WITH INCOMPLETE GRADES EOT | % OF ALL CE STUDENTS WITH AN INCOMPLETE GRADE EOT | % OF PELL STUDENTS WITH AN INCOMPLETE GRADE EOT | # of completed incomplets to a letter grade other than F* | % of students completed with a non F grade |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 19SU | 267 | 1802 | 1428 | 227 | 224 | 133 | 49.81 | 12.60 | 15.69 | 132 | 58% |
| 19FA | 397 | 2204 | 1728 | 416 | 396 | 122 | 30.73 | 18.87 | 22.92 | 273 | 66% |
| 20SP | 466 | 2871 | 2278 | 1260 | 1039 | 340 | 72.96 | 43.89 | 45.61 | 619 | 49% |
| 20SU | 368 | 2407 | 2365 | 642 | 367 | 278 | 75.54 | 26.67 | 15.52 | 354 | 55% |
| 20FA | 397 | 3001 | 2417 | 872 | 683 | 295 | 74.31 | 29.06 | 28.26 | 418 | 48% |
| 21SP | 424 | 3263 | 2950 | 472 | 426 | 236 | 55.66 | 14.47 | 14.44 | 254 | 54% |
| 21SU | 493 | 3836 | 1728 | 494 | 396 | 266 | 53.96 | 12.88 | 22.92 | 275 | 56% |
| 21FA | 412 | 3023 | 1428 | 293 | 248 | 162 | 39.32 | 9.69 | 17.37 | 146 | 50% |

* Incomplete grades move to an F grade after the alotted time period expires. However, a student could complete an incomplete and earn the F on their own. There is no way to quantify that number.

**R2 - 6 of 6**

EDU000962

# RESPONDENT'S EXHIBIT 3

# DECLARATION OF AMIEL JARSTFER WITH ATTACHMENTS A AND B

EDU000963

**U.S. DEPARTMENT OF EDUCATION**
**FEDERAL STUDENT AID**
**SCHOOL PARTICIPATION DIVISION – CHICAGO/DENVER**

| | |
|---|---|
| *In re: Ashland University Program Review Report dated January 3, 2022*<br>*OPE ID: 00301200*<br>*PRCN: 2021-4-05-30426* | **DECLARATION OF AMIEL JARSTER, Ph.D., IN SUPPORT OF ASHLAND UNIVERSITY'S RESPONSE TO PROGRAM REVIEW REPORT DATED JANUARY 3, 2022** |

I, Dr. Amiel Jarstfer declare as follows:

1.      I make this declaration based on personal knowledge. If called to testify, I would and could testify competently as set forth below.

2.      I submit this declaration in support of Ashland University's ("Ashland") response to the Program Review Report ("PRR") issued by U.S. Department of Education's Office of Federal Student Aid ("Department") dated January 3, 2022.

3.      I am the Provost of Ashland and served in this role since July 1, 2019.

4.      I earned Doctor of Philosophy degree from the University of Florida May 1, 1993, in the Plant Pathology department. I also earned a Management and Leadership in Education Certificate from Harvard University in 2006.

5.      Prior to serving in my current role at Ashland, I served at Lincoln Memorial University from 2010 until 2019, as Assistant Vice President for Student Success and Dean of the School of Arts and Sciences (2010-2012), Dean of the School of Mathematics and Sciences (2012-

Page **1** of **5**

EDU000964

2017) and Vice President for Academic Affair (2017-2019). I have also served as an offsite and onsite accreditation reviewer for the Southern Association of Colleges and Schools, Commission on Colleges.

6. My responsibilities in my role as Ashland's Provost are to oversee the Academic Affairs division as the Chief Academic Officer and to serve the institution in the absence of the President. Through the academic deans, my responsibilities are generally, 1) to faculty who create curriculum for all academic programs, 2) to those who serve as supervisors to adjunct faculty for all academic programs, and 3) to faculty who serve as Subject Matter Experts for all online programs. I also supervise the Assistant Provost for Instruction, the Assistant Provost for Student Success, the Director of Library Services and the University Registrar all who serve every academic program and the University community at large. I am a member of the Executive Leadership Team of the University.

7. In my role as Ashland's Provost, I have completed the following trainings, including but not limited to participation in workshops on faculty evaluation and conflict resolution during professional meetings of the Council of Independent Colleges and Universities.

8. My responsibilities related to the Experimental Sites Initiative (ESI) Second Chance Pell ("SCP") program at Ashland are indirect, and mirror those same responsibilities identified above in Paragraph 6, which I provide to all Ashland faculty and students.

9. All of Ashland's academic programs must be and are approved by Ohio Department of Higher Education ("ODHE").[1]

---

[1] https://www.ohiohighered.org/academic-program-approval

Page **2** of **5**

R3 - 2 of 92

EDU000965

10. To be approved by ODHE, any institution's academic program must undergo significant scrutiny as set forth in Guidelines and Procedures for Academic Program Review ("GPAPR").[2]

11. The GPAPR requires all Ohio colleges and universities to follow certain institutional and program standards specified in the guidelines.[3]  The GPAPR requires Ohio institutions of higher education to have academic policies consistent with ODHE's definition of "academic year."[4]

12. The following academic programs were in the published Ashland catalog when ODHE reauthorization was given as dated November 26, 2019: Bachelor of Arts in Applied Communication, Bachelor of Science in Interdisciplinary Studies, Bachelor of Arts in Business Administration, Associate of Arts in General Studies, and Associate of Arts in General Studies with concentration in Business. These academic programs were also part of the academic offerings when Ashland University successfully completed a Higher Learning Commission ("HLC") Focused Visit in 2020. While no SCP students are currently enrolled in Ashland's Bachelor of Science in Multidisciplinary Studies program, it is likewise available.[5]

13. All five programs are offered through telecommunications have been part of the academic offerings of the institution when reauthorized by ODHE and when HLC reaffirmed accreditation as noted above. The institution does not set aside or distinguish modality (i.e., "telecommunications") of instruction to be the creation of a separate academic program.

---

[2] https://www.ohiohighered.org/sites/ohiohighered.org/files/uploads/program-approval/Academic-Program-Review-Guidelines_070516.pdf
[3] Attachment A, GPAPR, pp. 4-14.
[4] Id, at p. 5.
[5] In the 2018-2019 and 2019-2020 catalogs, Ashland's Bachelor of Science in Multidisciplinary Studies program was offered as either a Bachelor of Science or Bachelor of Art. Since 2020-2021, however, it is only offered as a Bachelor of Science.

EDU000966

14.     On February 10, 2022, an ODHE staff member likened the phrase "compressed term" to ODHE's concept of "accelerated delivery."[6]  The ODHE staff member has advised Ashland that ODHE considers an accelerated program delivery model to include "courses that do not meet during the institution's regular academic term as well as courses that meet during the regular academic term but are offered in a substantially different manner than a fixed number of meeting times per week for all the weeks of the term."

15.     Currently, Ashland serves more than 3,000 incarcerated students in thirteen (13) states and the District of Colombia. Since 2016, over 1,500 incarcerated SCP students have earned undergraduate degrees from Ashland. Several SCP students have later earned graduate degrees.

16.     SCP students are enrolled in the same aforementioned academic programs with the other Ashland undergraduate students enrolled in those same programs.[7] As such, SCP students are eligible to earn degrees in those same academic programs with Ashland undergraduate students.

17.     According to the Office of the Registrar's records and information, a total of four (4) SCP students have graduated Valedictorian, earning the highest-grade point average ("GPA") in their academic program's graduating class, which is comprised of Ashland SCP and non-SCP undergraduate students. Since 2017, 1,008 SCP students have graduated from their program with a GPA of 3.00 or higher.

18.     SCP students, due to the nature of their incarceration, have an alternative course modality of instruction than non-SCP students in the same academic program and courses.

19.     Regardless of the modality of instruction for SCP students compared to non-SCP students, the content, the student learning objectives, the amount of class time, the resulting

---

[6] Attachment B - Email from Matt Exline to Dr. Amiel Jarstfer dated February 10, 2022
[7] *See* academic programs listed in ¶12.

EDU000967

transcript entries, and the degrees earned by students are the same for both SCP and non-SCP students.

20.     The Office of the Registrar conducted a full file review of all enrollment reporting for the 2019-2020 and 2020-2021 award years, which resides in NSLDS as uploaded through the National Student Clearinghouse ("NSC") interface.[8]

21.     The Office of the Registrar established effective enrollment dates for SCP students consistent with the start date of their academic program, as reported in the original effective dates. The Registrar included in the full file review the corrected effective dates consistent with the Department's instructions and the Office of the Registrar will await further instruction from the Department.

22.     The Office of the Registrar has revised its "NSLDS Enrollment Reporting" policies and procedures.[9]  The Office of the Registrar reported that the Registrar and two (2) staff members completed training as required by Finding 3 of the PRR, during the week of February 10, 2022, by completing four (4) webinars available online through the Clearinghouse Academy.[10]

I, Amiel Jarstfer, declare under penalty of perjury that the foregoing is true and correct. Executed on this ∂nd day of March, 2022, in Ashland, Ohio.

Amiel Jarstfer, Ph.D.,
Provost, Ashland University

---

[8] Attachment C – NSLDS Full File Review (2019-2020 and 2020-2021).
[9] Attachment D – Revised Policies and Procedures
[10] https://www.studentclearinghouse.org/academy/?course_catid=879#courses (last viewed on 02/23/2022)

EDU000968

# RESPONDENT'S EXHIBIT 3 ATTACHMENT A

**R3 - 6 of 92**

EDU000969



**Ohio** | **Board of Regents**
University System of Ohio

**Guidelines & Procedures for**

# Academic Program Review

*April 2015*

R3 – 7 of 92

EDU000970



R3 - 8 of 92

EDU000971

# TABLE OF CONTENTS

**Chapter 1: Purpose of the Manual.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **1**

**Chapter 2: Guiding Principles.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **2**

**Chapter 3: The Relationship of the Ohio Board of Regents
to Accreditors & State Agencies.** . . . . . . . . . . . . . . . . . . . . . . . . . . .  **3**

   1.  Regional, National and Professional Accreditors

   2.  Approval of Education Programs Leading to a License or an Endorsement

   3.  State Board of Career Colleges and Schools

**Chapter 4: Requirements.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **4**

   1.  **General Standards for Academic Programs**

      a.  Accreditation

      b.  Mission and Governance

      c.  Resources and Facilities

      d.  Academic Policies

      e.  Student Support Services

      f.  General Education

      g.  Program Operations

      h.  Faculty Credentials

      i.  Faculty Capacity

      j.  Program Curriculum

      k.  Assessment

      l.  Distance Learning

      m.  Evidence of Workforce Need and Student Interest

      n.  Program Budget, Resources and Facilities

      o.  Dual Enrollment

   2.  **Additional Requirements for Ohio Public Colleges and Universities**

   3.  **Additional Requirements for Programs Leading to an Education License or Endorsement (Educator Preparation)**

**R3 - 9 of 92**

EDU000972

*Table of Contents*

**Chapter 5: Procedures for Requests Requiring the Chancellor's Approval. . . .    16**

   1. **Request for Initial Authorization**

   2. **Requests for New Degrees**

      a.  New Undergraduate Degrees at Ohio Public Colleges and Universities

      b.  New Graduate Degrees at Ohio Public Universities and the University of Dayton and Case Western Reserve University

      c.  New Undergraduate and Graduate Degrees at Authorized Institutions

      d.  New Undergraduate and Graduate Degrees at Authorized Institutions (Option for Continuously Authorized Institutions)

   3. **Requests for New Majors or Degree Programs within Approved Degrees**

      a.  New Undergraduate Majors or Degree Programs at Ohio Public Colleges and Universities

      b.  New Graduate Majors or Degree Programs at Ohio Public Universities and the University of Dayton and Case Western Reserve University

      c.  New Undergraduate or Graduate Majors or Degree Programs at Authorized Institutions

      d.  New Undergraduate or Graduate Majors or Degree Programs at Authorized Institutions (Option for Continuously Authorized Institutions)

   4. **Requests for New Programs Leading to Education Licenses or Endorsements when Awarded Independently from a Degree (all public and private institutions)**

   5. **Requests for Ohio On-Ground Field and Clinical Experiences for Students Enrolled in Out-of-State Institutions**

   6. **Requests for Solicitation of Ohio Students by Out-of-State For-Profit Institutions**


**Chapter 6: Procedures for Requests Requiring Administrative Approval (Change Requests). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    43**

   1. Requests to Change Undergraduate Degrees or Majors at Ohio Public Colleges and Universities

   2. Requests to Change Graduate Degrees or Majors at Ohio Public Universities and the University of Dayton and Case Western Reserve University

   3. Requests to Change Undergraduate or Graduate Degrees at Authorized Institutions

   4. Requests to Change Programs that Lead to Education Licenses and Endorsements

R3 - 10 of 92

EDU000973

*Table of Contents*

**Chapter 7: Procedures for Maintaining Approval. . . . . . . . . . . . . . . . . . . . . . .   47**

1. **Periodic Review**
    a. Periodic Review of Ohio Public Institutions
    b. Periodic Review of Authorized Institutions
    c. Periodic Review of Authorized Institutions (Option for Continuously Authorized Institutions)
    d. Periodic Review of Educator Preparation Programs

2. **Reporting Regional, National and Specialized Accreditation Outcomes (all public and private institutions)**
3. **Requirements for Authorized Institutions Undergoing a Major Change**
4. **Chancellor-Initiated Review of Authorization**


**Appendices. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   53**

- Appendix A: Definitions
- Appendix B: Terminology and Requirements for Degrees, Certificates and Educator Preparation Licenses and Endorsements Offered by Colleges and Universities
- Appendix C: General Education Guidelines
- Appendix D: Institutions Operating As "Bible Colleges" And "Bible Institutes"
- Appendix E: Required Actions for Institutional Closure
- Appendix F: SARA Guidelines
- Appendix G: Program Approval Forms and Staff Contact Information
- Appendix H: Links to Related Documents and Sites
- Appendix I: Program Approval and Authorization Records Retention Policy

**R3 - 11 of 92**

EDU000974



R3 - 12 of 92

EDU000975

# Chapter 1: Purpose of the Manual

The Chancellor of the Ohio Board of Regents is charged by the Ohio General Assembly with approving academic programs at public institutions of higher education and authorizing independent (not-for-profit and for-profit) institutions and out-of-state institutions to provide academic credit in Ohio. Links to the relevant sections of the Ohio Revised Code and Ohio Administrative Code are included in the appendix materials.

The manual provides institutions of higher education with guidelines and procedures for academic program approval. It describes the minimum requirements that must be met to ensure that students are participating in academic programs that meet basic standards of academic quality. The manual also describes the conditions requiring approval and the associated processes used to obtain approval for academic programs.

The review process is designed to allow institutions to demonstrate alignment with the general standards of academic programs through descriptive information and supporting documentation. The process of review and approval is complementary to the institution's own academic review processes. The process is also complementary to accreditation review by a United States Department of Education (USDOE)-recognized or Council for Higher Education Accreditation (CHEA)-recognized regional or national accrediting agency and to the reviews of professional accreditors.

EDU000976

# Chapter 2: Guiding Principles

The program review and approval process is based on the following guiding principles.

1. Institutions seeking approval must have obtained or be in the process of obtaining regional or national accreditation from an accreditor approved by the U.S. Department of Education or the Council for Higher Education Accreditation. Out-of-state institutions must also have state approval in the home state.

2. All colleges and universities operating in the state must meet the academic standards outlined in this document. Institutions must provide evidence through the proposal process that all standards are met or will be met within a reasonable time as determined by the Chancellor.

3. Ohio's approval process is designed as a consumer-protection mechanism to ensure that minimum expectations for academic programs are met and are consistent across all colleges and universities operating under the Chancellor's purview.

4. Institutions are responsible for maintaining all academic programs in accordance with the standards and for notifying the Chancellor of the Ohio Board of Regents of any substantive changes.

5. Ohio public institutions are expected to maximize collaboration and assure that public resources are being used in an efficient and effective manner to educate more Ohioans in fields that lead to employment.

6. Ohio public institutions are expected to maintain academic programs and courses that are consistent with Ohio's articulation and transfer policies. Ohio public institutions are expected to maximize the opportunities for students to begin study anywhere in the University System of Ohio with guaranteed transfer and articulation within the system.

7. Students at off-site locations, in flexibly delivered programs, or in academic programs offered online must have access to appropriate academic and student support services.

8. The review process for all institutions is designed to be transparent and to provide opportunities for substantive independent expert comment. Public comment is solicited prior to a final decision by the Chancellor of the Ohio Board of Regents.

R3 - 14 of 92

EDU000977

# Chapter 3: The Relationship of the Ohio Board of Regents to Accreditors & Other State Agencies

1. **Regional, National and Professional Accreditors**

   Regional and national accreditation use a peer review and quality improvement model for the evaluation of governance and administration, financial stability, student services, resources, student academic achievement, organizational effectiveness, and relationships with outside constituencies.

   Ohio's approval process is intended to be complementary to regional or national accreditation by focusing on the specific degree program being proposed rather than on the institution as a whole. Reports for and by regional and national accrediting associations are part of the review process.

   Professional accreditation, where available, focuses on nationally recognized standards for the discipline and the specific knowledge and skill requirements of the field. Professional accreditation is encouraged as an additional assurance that faculty credentials and the learning outcomes established for students are consistent with national standards.

2. **Approval of Educator Preparation Programs Leading to a License or Endorsement**

   The Chancellor has the authority to approve all educator preparation programs, including degree programs, licensure programs and endorsement programs. This includes the approval of two-year, four-year and graduate programs leading to a license in teaching, administration and other school personnel.

   The Chancellor works in collaboration with the Ohio Department of Education on all P-16 initiatives. This includes serving on advisory committees related to educator preparation and residency programs. As the Board of Education adopts new educator standards and licensure requirements, the Chancellor adopts program approval requirements to address those changes.

3. **The State Board of Career Colleges and Schools**

   The State Board of Career Colleges and Schools (SBCCS) issues certificates of registration to proprietary institutions offering training, certificates, diplomas and degree programs within the state of Ohio. SBCCS also regulates the advertising of these programs to Ohio residents. The Chancellor and SBCCS share dual authority for the approval of proprietary institutions that offer programming in the state at the baccalaureate level or higher, or advertise to Ohio residents for such programs. In addition, SBCCS-approved institutions may request a certificate of authorization from the Chancellor to allow students enrolled in associate degree programs to be eligible to use certain needs-based state grants at the institution.

**R3 - 15 of 92**

EDU000978

# Chapter 4: Requirements

## 1. General Standards for Academic Programs

All colleges and universities seeking approval or authorization to offer instruction must demonstrate that the following institutional and program standards are met.

a. **Accreditation**

- The institution is accredited and in good standing with the Higher Learning Commission (HLC) or other regional accrediting agency, or a national accrediting agency recognized by the U.S. Department of Education (USDOE) or Council for Higher Education Accreditation (CHEA).

- Institutions offering programs that lead to Ohio educator licenses and endorsements are accredited and in good standing with the Council for the Accreditation of Educator Preparation (CAEP) (formerly National Council for the Accreditation of Teacher Education or Teacher Education Accreditation Council) or a successor organization.

- Institutions that are not accredited at the time of the initial request must provide evidence that the process for obtaining regional or national accreditation has been initiated and must also provide a plan and timeline for completing the steps required for accreditation.

- Professional accreditation is encouraged when available for the program area.

b. **Mission and Governance**

- The institution has a clearly articulated mission.

- The institution has an organizational structure that supports the achievement of its mission and the success of its students, faculty and staff.

- The institution's policies and practices are described clearly and consistently in all publications.

- Policies regarding the resolution of student, faculty and staff grievances are readily available to students, faculty and staff and are consistently followed.

- The institution follows applicable local, state and federal laws.

- The institution has mechanisms for assessment and evaluation of success and provides evidence of how data informs institutional success.

**R3 - 16 of 92**

EDU000979

c. **Resources and Facilities**

- The institution's financial resources are sufficient to support its mission.

- The institution has the human resources needed to meet its mission.

- The institution's physical facilities (e.g., classrooms, laboratories) are adequate to support the student population and the programs offered.

- The institution's library resources and services support the academic programs offered and are consistent with the Association of College and Research Libraries' (ACRL's) Standards for Libraries in Higher Education: (**http://www.ala.org/ala/mgrps/divs/acrl/standards/standardslibraries.cfm**).

- The institution's technology resources (e.g., hardware, software and professional development) advance teaching and learning, including distance education.

- Policies are in place to ensure the safety and security of students, faculty and staff.

- Services are in place to assist students, faculty and staff in the responsible and lawful implementation of research activities.

d. **Academic Policies**

- Academic planning includes input from faculty and other stakeholders (trustees, advisory boards, expert consultants, staff, students, faculty councils, faculty committees, department/college committees, etc.).

- Academic policies for the delivery of instruction are clearly articulated and are consistent with the Chancellor's guidelines and definitions provided in the appendix, including:

  ≫ Required credit, where specified, for degrees, degree programs, majors, certificates; if professional accreditation and licensing requirements exceed these general expectations, those requirements supersede the general requirements.

  ≫ Semester credit hour definition (or the equivalent for quarters)

  ≫ Length of semester and academic year (or the equivalent for quarters)

  ≫ Ohio's Articulation and Transfer Policy (for Ohio public institutions)

- Policies for the appointment and evaluation of faculty and administrators are clear and consistently followed. At a minimum, policies address the following subjects:

  ≫ Definitions of faculty type (full-time, part-time/adjunct, tenure-track/non tenure-track, supervisory, clinical, etc.)

  ≫ Appointment

  ≫ Orientation and mentoring

  ≫ Evaluation, including promotion and tenure guidelines, as appropriate

  ≫ Termination

  ≫ Definitions of faculty load

e. **Student Support Services**

- The institution provides student administrative services according to established policies in the following areas:
  - ≫ Student recruitment
  - ≫ Admissions and matriculation
  - ≫ Financial aid, scholarship and grant applications, coordination of awards and counseling regarding repayment options
  - ≫ Transfer credit and prior learning evaluations
  - ≫ Graduation audits
  - ≫ Student records management

- The institution provides student support services, including:
  - ≫ Advising and assessment as needed for placement[1] into college-level courses
  - ≫ Student advising related to the successful completion of developmental education courses, college-level courses and degree programs
  - ≫ Student advising related to the transferability of credits earned at the institution
  - ≫ Advising and assessment for students seeking academic credit for prior learning
  - ≫ Academic support for students with disabilities and other learning needs
  - ≫ Physical or mental health counseling and/or external referrals
  - ≫ Environmental support on-site or through external referrals (e.g., for transportation, child care, personal finance)
  - ≫ Career services

f. **General Education**

- General education is required within every undergraduate degree and is guided by a mission and specific learning outcomes

- General education requirements reflect the degree designation (e.g., applied associate degree vs. associate of arts or associate of science; bachelor of arts vs. bachelor of science)

- At a minimum, general education comprises no fewer than 36 semester hours for baccalaureate degrees and associate of arts and associate of science degrees and no fewer than 15 semester hours for applied associate degrees

- The general education curriculum reflects a breadth of study (the minimum number of hours in each general education area for baccalaureate, associate of arts, associate of science and applied associate degrees is outlined in Appendix C)

---

1  Public institution placement policies must be consistent with the statewide placement policy: **https://www.ohiohighered.org/college-readiness**

**R3 – 18 of 92**

EDU000981

- General education includes a focus on "21st century" skills and knowledge[2], including:

  ≫ Knowledge of human cultures and the physical and natural world

  ≫ Intellectual and practical skills, including inquiry and analysis; critical and creative thinking; oral and written communication; quantitative literacy; information literacy; teamwork; and problem solving

  ≫ Personal and social responsibility, including civic knowledge and engagement; intercultural knowledge and competence; ethical reasoning and action; and foundations and skills for lifelong learning

- Remedial or developmental education courses are not considered part of general education and are not counted toward degree requirements.

g. **Program Operations**

- The administrative structure for the proposed program is clearly defined

- Cooperative arrangements for the delivery of the proposed program are clearly described and approved by the identified partners

h. **Faculty Credentials**

The following expectations apply to all full-time and part-time instructors, including graduate teaching assistants and high school teachers who serve as adjunct faculty members for dual enrollment courses.

1. For general education courses:

- Faculty members teaching general education courses must hold a minimum of a master's degree in the discipline or a master's degree and a cohesive set[3] of at least 18 semester credit hours of graduate coursework relevant to the discipline.

- Individuals who are making substantial progress toward meeting the faculty credentialing requirements and who are mentored by a faculty member who does meet the minimum credentialing requirements may serve as instructors while enrolled in a program to meet credentialing requirements. Examples of such individuals include graduate teaching assistants (GTAs), adjunct faculty members and dual enrollment faculty members

---

2  The Essential Learning Outcomes from the LEAP initiative: **http://www.aacu.org/leap/vision.cfm**

3  A "cohesive set" of courses is a program of study that includes disciplinary content comparable to that which would be obtained in a master's degree program in the discipline. The program of study should be planned in collaboration with experts in the discipline and preferably completed at a single institution.

*Chapter 4: Requirements*

2. <u>For courses other than general education courses</u>:
   - Faculty members must hold a terminal degree or a degree at least one level above the degree level in which they are teaching:
     ≫ At least a bachelor's degree if teaching in an associate degree program
     ≫ At least a master's degree if teaching in a bachelor's degree program
     ≫ A terminal degree if teaching in a graduate program.
   - Individuals who are making substantial progress toward meeting the faculty credentialing requirements and who are mentored by a faculty member who does meet the minimum credentialing requirements may serve as instructors during their educational programs. Examples of such individuals include graduate teaching assistants (GTAs) or adjunct faculty members who are working toward meeting the faculty credentialing requirements.
   - Faculty members teaching technically- or practice-oriented courses must have practical experience in the field and hold current licenses and/or certifications, as applicable.
   - For programs involving clinical faculty (e.g., student teaching supervisors, clinical practicum supervisors), the credentials and involvement of clinical faculty are described and meet applicable professional standards for the delivery of the educational experiences.

3. <u>The following expectations apply to all faculty members</u>:
   - Faculty members must hold a degree from a regionally or nationally accredited institution recognized by the U.S. Department of Education or the Council for Higher Education Accreditation or equivalent as verified by a member of the National Association of Credential Evaluation Services.
   - Where professional accreditation or licensing standards for faculty differ from the Chancellor's standards, faculty members are expected to meet the higher standards.
   - Faculty members must show evidence of continuing professional development in the discipline.
   - Faculty members who teach online courses must be prepared for teaching in an online environment.
   - Faculty members within a program should have received their degrees from a variety of institutions. Faculty members who received their degrees from a single institution should not constitute the majority of the program's faculty.

R3 – 20 of 92

EDU000983

*Chapter 4: Requirements*

4. <u>The following expectations apply to faculty members teaching developmental education courses</u>:

  - Faculty must possess one of the following
    - ≫ at least a bachelor's degree in education, with an emphasis on teaching mathematics or reading or composition
    - ≫ a bachelor's or master's degree and experience teaching literacy or numeracy to adolescents or adults

5. <u>Exceptions</u>

  Certain individuals may be qualified to teach college-level courses yet not meet the faculty qualification criteria presented here. In such circumstances, it is the responsibility of each institution's chief academic officer to make decisions in consultation with program faculty regarding exceptions and to maintain a record of the justification of those exceptions. Documentation that could be used to support exceptions may include, but is not limited to publications, licensure, certification, evidence of years of professional experience and/or professional reputation.

  Examples of individuals meriting an exception and institutional justification would include:
  - A faculty member who has extraordinary practical or tested experience in a field that has been validated through publication and/or public recognition (such as in creative writing, painting, music, foreign language, or other areas of performance)
  - In instances where a degree one level above the degree that students are seeking is not widely available (e.g., for instructors of certain technically-, professionally-, or occupationally-related courses), the chief academic officer, in collaboration with the faculty, determines appropriate qualifications and applies them consistently.
  - Faculty members who possess the appropriate credential in their discipline but who teach in related disciplines; for example, engineering faculty members teaching math or business faculty members teaching economics
  - Faculty members with extraordinary professional experience brought in to teach a single course in a professional or technical area; for example, a successful entrepreneur teaching a course on commercialization

6. <u>Responsibility for determining faculty qualifications</u>

  Chief academic officers are ultimately responsible for ensuring the following: a) that faculty credentialing requirements are met; b) that instructors who are working toward meeting credentialing requirements are appropriately mentored and making substantial progress in their coursework; c) that exceptions to the requirements are carefully considered and justified; and d) that exceptions are reserved for a small number of uniquely qualified individuals.

*Chapter 4: Requirements*

i. **Faculty Capacity**

- Faculty resources are sufficient to meet the teaching, scholarship, service and advising needs of the program and the expectations of the institution.

- Each degree program is led by a full-time faculty member.

- Students have access to full-time faculty members at each location where more than 50% of an academic program can be completed (e.g., main campus, regional campus, additional locations) and in online programs.

- At a minimum, the equivalent of one full-time faculty member (one FTE) is required for the equivalent of every 30 full–time students (30 FTE) in a degree program.

- Reasonable attempts are made to recruit faculty members who reflect the racial, ethnic and gender diversity of the community and the student body.

- Students interact with numerous faculty members within the degree program to encourage exposure to a diversity of experiences and perspectives.

Exceptions to Faculty Capacity Requirements

Although institutions are expected to meet the standards outlined above, instances where the expectations of faculty capacity are not being met do exist (e.g., newly formed programs with limited student enrollment, existing programs that historically have not met the standards, programs that have experienced unexpected increases in student population). In such cases, the Chancellor's staff members will work with institutional staff members to develop a plan to move the institution toward compliance with the standards.

The requirements for faculty capacity are not intended to deter colleges and universities from piloting new models of instruction that enhance efficiency and show promise for saving students time and money. When such models are piloted, it is the Chancellor's expectation that the institution will be studying student outcomes to ensure that program quality and integrity is maintained.  It is also the Chancellor's expectation that time and cost efficiencies generated using the new model will be measured and reported to the Chancellor's staff members.

j. **Program Curriculum**

- Alignment between the proposed program and the institution's mission is clearly articulated.

- Planning for new academic programs includes input from faculty and other stakeholders (e.g., business leaders, trustees, advisory boards, consultants, staff, students, faculty councils, faculty committees, department/college committees).

- The academic program has specific learning outcomes that are designed to meet the program's intended purpose and, where applicable, meet state and national standards.

R3 - 22 of 92

EDU000985

> ≫ Learning outcomes are appropriate for the degree designation (i.e., associate degree vs. bachelor's degree vs. master's degree vs. doctoral degree).
>
> ≫ Course requirements and delivery mechanisms provide sufficient opportunities for students to meet learning outcomes.
>
> ≫ The learning outcomes address the major issues and concerns in the discipline or professional area.

- All field and clinical experiences are overseen by faculty members in the program.

- Where appropriate, programs include the following:

  > ≫ A capstone experience or a culminating project that reflects both the preparation of the student and an understanding of the needs of the workforce
  >
  > ≫ Internship/co-op opportunities that provide opportunities for students to combine knowledge and skill acquisition with real-world practice
  >
  > ≫ Experience with a variety of new and emerging technologies relevant to the course of study and their profession

k. **Assessment**

- Multiple assessments are used to inform continuous program improvement.

  > ≫ Assessments are linked to the program's mission and purpose.
  >
  > ≫ Faculty members are involved in defining the expected outcomes for the program and in determining whether the outcomes are achieved.
  >
  > ≫ Assessments include multiple direct and indirect measures and provide faculty with the opportunity to examine student performance in the context of progressively more challenging problems, projects, and standards for performance.
  >
  > ≫ Student performance on professional credentialing examinations, when available, should be used as one measure of program success.
  >
  > ≫ Faculty and administrators regularly review the effectiveness of the assessment system, including student performance in courses, labs and clinical experiences, and alumni performance in the workforce.
  >
  > ≫ Assessment results are available to stakeholders, including faculty members and students.

- Assessments inform faculty members and students of student progress in the program.

  > ≫ Multiple formative assessments (e.g., pre-collegiate; course examinations; lab, practicum and internship evaluations) are used at various points throughout the student's program.
  >
  > ≫ Summative assessments (e.g., capstone projects, portfolios, comprehensive examinations) provide feedback to students and faculty.
  >
  > ≫ Professional credentialing examinations, when available, should be used as one measure of student success.

**R3 - 23 of 92**

EDU000986

> ≫ Results are communicated regularly to students in ways that enable the student to improve.

> ≫ Results are communicated to others as appropriate (e.g., faculty, advisors).

l. **Online Learning**

- Institutions have written technology plans for online education, which include components such as:

  > ≫ A description of the institution's processes and procedures for developing and supporting the technology infrastructure for online education

  > ≫ Evidence that electronic security measures (including failsafe backup systems) are in place to support the integrity and security of data

  > ≫ Mechanisms to ensure that faculty have the appropriate hardware, software and IT support to be successful

- Institutions ensure successful online experiences for students and faculty by:

  > ≫ Ensuring that courses meet contemporary instructional design standards for synchronous, asynchronous, fully online and/or hybrid experiences

  > ≫ Offering ongoing professional development for faculty members who teach online courses

  > ≫ Offering ongoing academic and technology support for students, including availability of the support services beyond the normal 40-hour work week

  > ≫ Employing processes to ensure that students are aware of the technology, competencies and costs associated with online education

  > ≫ Providing necessary ADA accommodations to ensure the success of all learners

m. **Evidence of Workforce Relevance, Need and Student Interest**

All institutions are required to provide evidence of the need for the proposed program in Ohio. Proposals or change requests should include data-driven market research that addresses collaboration with employers, potential for employment upon graduation, competitive advantage of the submitting institution, reasonable non-duplication[4] with other programs (for public institutions), and alignment with the University System of Ohio initiatives (for public institutions). Ohio's public institutions are also expected to investigate opportunities for sharing programs through the University System of Ohio ProgramShare initiative[5] when it makes economic sense to do so.

---

4  Duplication of programs is not in and of itself unreasonable. In fact, duplication of programs may be necessary in response to state and local workforce needs and economic development initiatives. Institutions are encouraged to investigate and pursue avenues of student-centered collaboration.

5  **https://www.ohiohighered.org/programshare**

**R3 - 24 of 92**

EDU000987

*Chapter 4: Requirements*

**Evidence may include but is not limited to**:

- Local, state and national labor market research

- Local, state and national demographic information demonstrating trends linked to education

- Evidence of partnerships with business and industry, e.g.,

  - ≫ collaboration in the development of curriculum

  - ≫ enrollment guarantees

  - ≫ opportunities for co-ops and internships

  - ≫ provision of adjunct faculty or mentors for students

- Reengineering of an existing program to meet changing market needs based on workforce shifts, licensure or certification changes from external organizations, or alignment with specialized accrediting agencies or organizations

- Partnerships, including program sharing, with other colleges and universities to leverage the strengths of each and serve multiple locations in the state

- Longitudinal data demonstrating the need for a higher-level degree (e.g., a proven associate degree leading to a bachelor's degree)

- Pilot courses or certificate programs with a history of success, demonstrating the need and opportunity for a full degree

- Establishment of an endowed chair, addition of nationally recognized faculty or other parallel staffing that indicates a competitive "attraction" to the proposed program

n. **Program Budget, Resources and Facilities**

- The program budget supports the implementation of the program and its continuing operation, including laboratory, field and clinical work.

- The program budget provides information on 1) projected enrollment; 2) program income; and 3) projected program expenses for a four-year time span. The budget includes sufficient explanation of income and expenses for evaluation.

- The program facilities (classrooms, offices, clinical space, equipment, and research laboratories) are accessible, appropriate, safe and sufficient to achieve the program's mission and purpose.

- Information technology services are current and available to students, faculty and staff.

- Library resources are sufficient to provide students and faculty with access to the materials and information needed to meet the program's mission and purpose.

- Library staffing is sufficient to provide instruction in the use of library materials and information.

- Each institution must have a plan in place to address closures due to natural disasters or other unanticipated catastrophic events. At a minimum, the plan must address:
  - ≫ a plan for the protection of student records
  - ≫ a plan to provide students with opportunities to complete their educational programs

o. **Dual Enrollment**

Courses offered to high school students for college credit, whether offered in the high school, on the college or university campus, or via distance education must adhere to the following principles:

- The student who participates in a dual enrollment learning experience is academically prepared to begin college-level (non-remedial) work in the area in which credit is to be awarded.
- The course is delivered at the college level, as indicated by the rigor of course content, the level of the textbook and the level of the assessments used to ensure the mastery of learning outcomes.
- The faculty member teaching the course possesses the credential required for a faculty member teaching the course at a college or university (see section " h" on faculty credentials).
- The courses offered are those that could reasonably be expected to count toward a student's post-secondary degree or certificate.

**R3 – 26 of 92**

EDU000989

## 2. Additional Requirements for Ohio Public Colleges & Universities

- **Ohio's Articulation and Transfer Policy**

The University System of Ohio's Articulation and Transfer Policy guides the transfer of courses and the application of those courses to degrees. Academic programs should maximize the number of courses guaranteed for transfer in the curriculum, as appropriate to the proposed major. Currently (2014) only public institutions are required to abide by the Articulation and Transfer Policy. Ohio independent institutions may have the opportunity to join the statewide guaranteed articulation system at some point in the future.

- **Evidence of Workforce Need and Student Interest**

Ohio public institutions must provide sufficient market research to demonstrate the need for the proposed program and that student interest in the program has been fully assessed.

- **Collaboration, Coordination and Program Duplication**

Ohio public institutions are encouraged to collaborate with other institutions through the University System of Ohio Program Sharing Initiative[6] or other mechanisms to effectively and efficiently use state resources and to maximize the talents and resources of faculty and programs at all University System of Ohio schools.

## 3. Additional Requirements for Programs Leading to an Education License or Endorsement (Educator Preparation)

In addition to the *General Standards for Academic Programs*, any institution that is seeking approval for an educator license preparation program or endorsement preparation program must meet the applicable standards set forth by Ohio statute and the Ohio Department of Education. Education units within the institution must be accredited or hold candidacy for accreditation by the Council for the Accreditation of Educator Preparation (CAEP).

---

6    **https://www.ohiohighered.org/programshare**

# Chapter 5: Procedures for Requests Requiring the Chancellor's Approval

1. Requests for Initial Authorization by Ohio Independent Institutions and Out-Of-State Institutions

2. Requests for New Degrees by All Institutions, to Include:
   - Academic degrees (e.g., PhD, MA, MS, BA, BS, AS, AA)
   - Professional degrees (e.g., EdD, DBA, DPT, AuD, DNP, MSN, MBA, LLM)
   - Technical degrees (e.g., BAS, AAB, AAS, ATS)

3. Requests for New Majors or Degree Programs Within an Approved Degree by All Institutions

4. Requests for Education Licenses or Endorsements When Awarded Independent of a Degree or Degree Program by All Institutions

5. Requests for On-Ground Field and Clinical Experiences by Out-Of-State Institutions

6. Requests for Solicitation by Out-Of-State For-Profit Institutions

Procedures for seeking the Chancellor's approval vary by program type: undergraduate programs in public institutions; graduate programs in public institutions, the University of Dayton and Case Western Reserve University; or undergraduate and graduate programs in Ohio independent institutions or out-of-state institutions. Educator preparation programs leading to an Ohio license or endorsement have additional requirements. Approval procedures are described in the following pages.

R3 - 28 of 92

EDU000991

## 1. Initial Authorization

Independent institutions (for-profit or not-for-profit) and out-of-state public or independent institutions with a physical presence in Ohio must seek a certificate of authorization from the Chancellor of the Ohio Board of Regents to operate in the state.

≫ **Initial Inquiry**. The institution completes an *Initial Inquiry* to begin the authorization process.

- The link to the *Initial Inquiry* is included in Appendix G.

- If the institution will be offering programs that lead to Ohio educator licensure or endorsement, the completed Inquiry must include that information.

- Once the completed *Inquiry* is received, an institutional mentor will be assigned to assist the institution through the authorization process.

- The institutional mentor will contact the institution to clarify the request, identify the fees and information needed to complete the review, and discuss the steps in the authorization process. The institutional mentor will summarize these discussions in a letter to the institution called a **Program Review Plan**.

≫ **Posting of Request**. Once the review fees are received, the institution and names of proposed degree programs are posted on the Ohio Board of Regents' website: (**https://www.ohiohighered.org/academic-program-approval/preliminary-requests**).

≫ **Proposal**. The institution's president or chief academic officer submits a *Proposal* at least six months prior to offering programming in Ohio. The *Proposal* provides information to demonstrate that the program meets the General Standards for Academic Programs.

- The institutional mentor will assist the institution through the proposal development process and review the submission for completeness prior to scheduling a site visit.

- If any of the programs offered lead to an Ohio educator license or endorsement, the *Proposal* must also include the materials required for review of the educator licensure or endorsement program.

- A *Proposal* must be submitted within one year of receiving a Program Review Plan.

≫ **Site Visit and Preparation of Consultant's Report**.

- The proposing institution, in consultation with the Chancellor's staff, identifies dates for the review.

EDU000992

- A team of consultants selected by the Chancellor's staff visits the institution to ensure that the institution and proposed degree programs meet the *General Standards for Academic Programs*. If the institution offers programs that lead to Ohio educator licensure or endorsement, the license or endorsement preparation program will be reviewed by content experts according to the process for submitting a new educator license or endorsement preparation program (see item four of this section). One or more members of the Chancellor's staff also attend the review.

- The fees and expenses for the consultants are paid by the proposing institution. The Chancellor's staff will invoice the institution for these costs.

- During the site visit, consultants determine suggestions and recommendations for the institution and prepare a *Consultants' Report*; the consultants present the report during the exit interview.

≫ **Institutional Response**. The proposing institution prepares an *Institutional Response* to the recommendations in the *Consultants' Report*.

- Institutions have up to 90 days to prepare an *Institutional Response*, but the response must be received by the Chancellor's staff at least three months prior to the institution's planned start date.

- The *Institutional Response* must demonstrate compliance with the consultants' recommendations, which are binding items; in the case of recommendations that can only be complied with over time, the institution must present a plan and a timeline for compliance as part of the *Institutional Response*.

- The Chancellor's staff, with input from the consultants as needed, reviews the Institutional Response to determine whether all recommendations have been satisfied.

≫ **Public Comment Period**. Once the recommendations have been satisfied, a background summary is posted on the Ohio Board of Regents' website (**https://www. ohiohighered.org/academic-program-approval/programs-pending**) for a 10-day public comment period.

≫ **Chancellor's Approval**. The request and public comments are forwarded to the Chancellor for final consideration and approval; the length and conditions of approval are stipulated in the background summary.

≫ **Certificate of Authorization Issued**. A *Certificate of Authorization* is issued to the institution; if the institution is incorporated, the institution shall file a copy of the certificate of authorization with the secretary of state as required by section 1713.02 of the Revised Code.

R3 – 30 of 92

EDU000993

≫ **Progress Reports**. Initial authorization is typically granted for a three-year period with an annual progress report due each year. The Chancellor's staff will contact the institution to discuss the information needed, fees, and due date to submit the report.

## 2. Requests for New Degrees

a. **New Undergraduate Degrees at Ohio Public Colleges and Universities**

- **Initial Inquiry**. The institution completes an *Initial Inquiry* to begin the approval process.

  ≫ The link to the *Initial Inquiry* is included in Appendix G.

  ≫ If the institution will be offering programs that lead to Ohio educator licensure or endorsement preparation program, the completed Inquiry must include that information.

  ≫ Once the completed *Inquiry* is received, an institutional mentor will be assigned to assist the institution through the approval process.

  ≫ The institutional mentor will contact the institution to clarify the request, identify the information needed to complete the review, and discuss the steps in the approval process. The institutional mentor will summarize these discussions in a letter to the institution called a **Program Review Plan**.

  ≫ The institutional mentor also shares the information with the individuals charged with oversight of the Ohio Board of Regents Course and Program Sharing Network.

- **Posting of Request**. Once the **Program Review Plan** is sent to the institution, the institution and name of proposed degree is posted on the Ohio Board of Regents' website:  (**https://www.ohiohighered.org/academic-program-approval/preliminary-requests**).

- **Proposal**. After the new degree has received all required internal approvals, the institution's president or chief academic officer submits a *Proposal* to the Chancellor at least four months prior to the planned implementation of the new degree. The *Proposal* provides information to demonstrate that the program meets the General Standards for Academic Programs.

  ≫ The institutional mentor will assist the institution through the proposal development process and review the submission for completeness prior to presentation for expert comment from peer institutions.

  ≫ Any programs leading to an Ohio educator license or endorsement also will be reviewed according to the process for submitting a new educator license or endorsement preparation program.

EDU000994

&gt;&gt; A *Proposal* must be submitted within one year of receiving a Program Review Plan.

• **Peer Review of Proposal**.

&gt;&gt; Content experts from Ohio public colleges and universities may provide peer review for proposals. The peer review will focus on the qualifications, experience and sufficiency of faculty, the curriculum and its alignment with expectations for the discipline, the need for the degree and the resources (e.g., classrooms, libraries, technology, laboratory, equipment) available to support the degree.

&gt;&gt; Peer institutions have 30 days to submit comments.

• **Consultant Review of Educator Preparation Programs**.

&gt;&gt; If the degree includes new educator licensure or endorsement programs, the licensure and endorsement programs may be reviewed by external consultants according to the process for submitting a new educator license or endorsement (see item four of this section).

• **Resolution of Concerns**. The institutional mentor works with the institution proposing the program to address questions or concerns raised during the peer comment period.

• **Public Comment Period**. If the program is recommended to the Chancellor for approval, a background summary is posted on the Ohio Board of Regents' website (**https://www.ohiohighered.org/academic-program-approval/programs-pending**) for a 10-day public comment period.

• **Chancellor's Approval**. The request and public comments are forwarded to the Chancellor for final approval.

b. **New Graduate Degrees at Ohio Public Universities and the University of Dayton and Case Western Reserve University**

The Regents' Advisory Committee on Graduate Studies (RACGS) oversees the peer review of new graduate degree requests. The members of RACGS are the graduate deans (or designees) of each of Ohio's public research institutions and the University of Dayton and Case Western Reserve University.

The process for the approval of new graduate degrees at Ohio public universities and at the University of Dayton and Case Western Reserve University are described in the *Guidelines and Procedures for the Review and Approval of Graduate Degree Programs*, adopted by RACGS, which are available online at: **https://www.ohiohighered.org/sites/ohiohighered.org/files/uploads/racgs/documents/RACGS_Guidelines_113012.pdf**.

EDU000995

Individuals at Ohio public universities and the University of Dayton and Case Western Reserve University interested in seeking approval for new graduate degrees should begin by contacting the institution's representative to RACGS. A listing of current RACGS members is available online at: **https://www.ohiohighered.org/racgs/roster**.

c. **New Undergraduate and Graduate Degrees at Authorized[7] Institutions**

- **Initial Inquiry**. The institution completes an Initial Inquiry to begin the authorization process.

  ≫ The link to the *Initial Inquiry* is included in Appendix G.

  ≫ If the institution will be offering programs that lead to Ohio educator licensure or endorsement, the completed *Inquiry* must include that information.

  ≫ Once the completed *Inquiry* is received, an institutional mentor will be assigned to assist the institution through the authorization process.

  ≫ The institutional mentor will contact the institution to clarify the request, identify the fees and information needed to complete the review, and discuss the steps in the authorization process. The institutional mentor will summarize these discussions in a letter to the institution called a **Program Review Plan**.

- **Posting of Request**. Once the review fees are received, the institution and names of proposed degree programs are posted on the Ohio Board of Regents' website: (**https://www.ohiohighered.org/academic-program-approval/preliminary-requests**).

- **Proposal**. The institution's president or chief academic officer submits a *Proposal* at least six months prior to offering programming in Ohio. The *Proposal* provides information to demonstrate that the program meets the General Standards for Academic Programs.

  ≫ The institutional mentor will assist the institution through the proposal development process and review the submission for completeness prior to scheduling a site visit.

  ≫ If any of the programs offered lead to an Ohio educator license or endorsement, the *Proposal* must also include the materials required for review of the educator licensure or endorsement program.

  ≫ A *Proposal* must be submitted within one year of receiving a **Program Review Plan**.

---

7  As noted in Ohio Administrative Code Rule 3333-1-08, a non-profit institution that has been continuously authorized by the Chancellor and continuously accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools (HLC) for more than 20 years may choose to follow the approval process described in section 2.d., *Option For Continually Authorized Institutions*

- **Site Visit and Preparation of Consultant's Report**.

  ≫ The proposing institution, in consultation with the Chancellor's staff, identifies dates for the review.

  ≫ A team of consultants selected by the Chancellor's staff visits the institution to ensure that the institution and proposed degree programs meet the *General Standards for Academic Programs*. If the institution offers programs that lead to Ohio educator licensure or endorsement, the license or endorsement will be reviewed by experts in the area of the license or endorsement according to the process for submitting a new educator license or endorsement (see item four of this section). One or more members of the Chancellor's staff also attend the review.

  ≫ The fees and expenses for the consultants are paid by the proposing institution. The Chancellor's staff will invoice the institution for these costs.

  ≫ During the site visit, consultants determine suggestions and recommendations for the institution and prepare a *Consultants' Report*; the consultants present the report during the exit interview.

- **Institutional Response**. The proposing institution prepares an *Institutional Response* to the recommendations in the *Consultants' Report*.

  ≫ Institutions have up to 90 days to prepare an *Institutional Response*, but the response must be received by the Chancellor's staff at least three months prior to the planned start date.

  ≫ The *Institutional Response* must demonstrate compliance with the consultants' recommendations, which are binding items; in the case of recommendations that can only be complied with over time, the institution must present a plan and a timeline for compliance as part of the *Institutional Response*.

  ≫ The Chancellors' staff, with input from the consultants as needed, reviews the *Institutional Response* to determine whether all recommendations have been satisfied.

- **Public Comment Period**. Once the recommendations have been satisfied, a background summary is posted on the Ohio Board of Regents' website (**https://www.ohiohighered.org/academic-program-approval/programs-pending**) for a 10-day public comment period.

- **Chancellor's Approval**. The request and public comments are forwarded to the Chancellor for final consideration and approval; the length and conditions of approval are stipulated in the background summary.

EDU000997

- **Certificate of Authorization Issued**. An amended *Certificate of Authorization* is issued to the institution; if the institution is incorporated, the institution shall file a copy of the certificate of authorization with the secretary of state as required by section 1713.02 of the Revised Code.

- **Progress Reports**. New degree authorization is typically granted for a three-year period with an annual progress report due each year. The Chancellor's staff will contact the institution to discuss the information needed, fees, and due date to submit the report.

   d. **Option for New Undergraduate or Graduate Degrees at Continuously Authorized[8] Institutions)**

   i.) **New General Undergraduate and Graduate Degrees for which HLC approval is required**.
   An institution seeking authorization to offer a new degree level, either general undergraduate degrees such as the associate of arts, associate of science, bachelor of arts and bachelor of science or general graduate degrees such as master of arts, master of science, or PhD, beyond those listed on its current Certificate of Authorization may choose to obtain an amended Certificate of Authorization using the steps outlined below.

- **Initial Inquiry**. The institution completes an *Initial Inquiry* to begin the authorization process.

  ≫ The link to the *Initial Inquiry* is included in Appendix G.

  ≫ If the institution will be offering programs that lead to Ohio educator licensure or endorsement, the completed Inquiry must include that information.

  ≫ Once the completed *Inquiry* is received, an institutional mentor will be assigned to assist the institution through the authorization process.

  ≫ The institutional mentor will contact the institution to clarify the request, identify the fees and information needed to complete the review, and discuss the steps in the authorization process. The institutional mentor will summarize these discussions in a letter to the institution called a **Program Review Plan**.

- **Posting of Request**. Once the review fees are received, the institution and names of proposed degree programs are posted on the Ohio Board of Regents' website: (**https://www.ohiohighered.org/academic-program-approval/preliminary-requests**).

---

8  Continuously authorized institutions are non-profit institutions that have been continuously authorized by the Chancellor and continuously accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools (HLC) for more than 20 years.

EDU000998

- **Proposal Materials**. The institutional mentor accepts materials prepared for HLC in lieu of the standard Board of Regents proposal. The institution coordinates with the mentor to ensure that the office receives the materials received by HLC and the HLC site visit team at least two months prior to the visit.

- **Site Visit**. A representative of the Chancellor accompanies the HLC site visit team and observes the HLC accreditation team's site visit activities; if the proposed new degree contains a program that leads to educator licensure or endorsement, the institution must coordinate the degree approval with the approval of the licenses and endorsements according to the procedures outlined under item four of this section.

- **Documentation of HLC Approval**. The institution is responsible for submitting evidence, including HLC team reports, institutional responses and final determinations, demonstrating that the new degree has been approved by HLC; the Chancellor must be informed immediately if accreditation is denied so that the standard review process (Section 1.c.) can be initiated.

- **Public Comment Period**. Once HLC approval has been obtained, a background summary is posted on the Ohio Board of Regents' website (**https://www.ohiohighered.org/academic-program-approval/programs-pending**) for a 10-day public comment period.

- **Chancellor's Approval**. The request and public comments are forwarded to the Chancellor for final consideration and approval; the length and conditions of the approval are stipulated in the background summary.

- **Certificate of Authorization Issued**. An amended *Certificate of Authorization* is issued to the institution; if the institution is incorporated, the institution shall file a copy of the certificate of authorization with the secretary of state as required by section 1713.02 of the Revised Code.

- **Progress Reports**. If progress or follow-up reports are required as part of the HLC accreditation process, the institution is responsible for sending all such communication to the Chancellor's staff when it is sent to HLC and for immediately sending the Chancellor all communication received from HLC.

EDU000999

ii.)   **New Technical or Professional Undergraduate and Graduate Degrees for Which Specialized Accreditation is Available and HLC Approval is Not[9] Required**

An institution seeking authorization to expand specialized undergraduate technical or professional education programs (e.g., the associate of applied business in accounting, associate of applied science in respiratory therapy, bachelor of music, bachelor of science in nursing, bachelor of fine arts) or to expand graduate degrees in specialized fields of study (e.g., master of business administration, master of social work, master of fine arts, doctor of education or the doctor of business administration) beyond those listed on its current Certificate of Authorization may obtain an amended Certificate of Authorization using the steps outlined below.

- **Initial Inquiry**. The institution completes an *Initial Inquiry* to begin the authorization process.

  ≫  The link to the *Initial Inquiry* is included in Appendix G.

  ≫  If the institution will be offering programs that lead to Ohio educator licensure or endorsement, the completed *Inquiry* must include that information.

  ≫  Once the completed *Inquiry* is received, an institutional mentor will be assigned to assist the institution through the authorization process.

  ≫  The institutional mentor will contact the institution to clarify the request, identify the fees and information needed to complete the review, and discuss the steps in the authorization process. The institutional mentor will summarize these discussions in a letter to the institution called a **Program Review Plan**.

- **Posting of Request**. Once the review fees are received, the institution and names of proposed degree programs are posted on the Ohio Board of Regents' website: (**https://www.ohiohighered.org/academic-program-approval/preliminary-requests**).

- **Proposal Materials**. The institutional mentor accepts materials prepared for the professional accreditor in lieu of the standard Board of Regents' proposal. The institution coordinates with the mentor to ensure that the office receives all materials received by professional accreditor. If the proposed new degree contains a program that leads to educator licensure or endorsement, the institution must coordinate the degree approval with the approval of the licenses and endorsements according to the procedures outlined under item four of this section.

---

9   If approval for offering the program is required by HLC, the approval process for new general undergraduate and graduate degrees outlined will be followed.

*Chapter 5: Procedures for Requests Requiring the Chancellor's Approval*

- **Documentation of Accreditor's Approval**. The institution is responsible for submitting evidence, including team reports, institutional responses and final determinations, demonstrating that the new degree has been approved by the accreditor; the Chancellor must be informed immediately if accreditation is denied so that the standard review process (Section 1.c.) can be initiated.

- **Public Comment Period**. Once approval has been received from the accreditor, a background summary is posted on the Ohio Board of Regents' website (**https://www.ohiohighered.org/academic-program-approval/programs-pending**) for a 10-day public comment period.

- **Chancellor's Approval**. The request and public comments are forwarded to the Chancellor for final consideration and approval; the length and conditions of the approval are stipulated in the background summary.

- **Certificate of Authorization Issued**. An amended *Certificate of Authorization* is issued to the institution; if the institution is incorporated, the institution shall file a copy of the certificate of authorization with the secretary of state as required by section 1713.02 of the Revised Code.

- **Progress Reports**. If progress or follow-up reports are required as part of the accreditation process, the institution is responsible for sending all such communication to the Chancellor's staff when it is sent to the accreditor and for immediately sending the Chancellor all communication received from the accreditor.

iii.)  **New Technical or Professional Undergraduate and Graduate Degrees for which Professional Accreditation is Available Only After a Period of Program Operation**

If a specialized accreditor will not accredit a program until a period of operation has passed and if prior approval for offering the program is not[10] required by HLC, the institution may offer the program while specialized accreditation is pending using the steps outlined below.

- **Initial Inquiry**. The institution completes an *Initial Inquiry* to begin the authorization process.
  - ≫ The link to the *Initial Inquiry* is included in Appendix G.
  - ≫ If the institution will be offering programs that lead to Ohio educator licensure or endorsement, the completed *Inquiry* must include that information.

---

10 If prior approval for offering the program is required by HLC, the approval process for new general under graduate and graduate degrees outlined will be followed.

---

13          Guidelines & Procedures for **Academic Program Review**

EDU001001

≫ Once the completed *Inquiry* is received, an institutional mentor will be assigned to assist the institution through the authorization process.

≫ The institutional mentor will contact the institution to clarify the request, identify the fees and information needed to complete the review, and discuss the steps in the authorization process. The institutional mentor will summarize these discussions in a letter to the institution called a **Program Review Plan.**

- **Posting of Request**. Once the review fees are received, the institution and names of proposed degree programs are posted on the Ohio Board of Regents' website: (**https://www.ohiohighered.org/academic-program-approval/preliminary-requests**).

- **Proposal Materials**. The institutional mentor accepts materials prepared for the professional accreditor in lieu of the standard Board of Regents proposal. The institution coordinates with the mentor to ensure that the office receives all materials received by professional accreditor. If the proposed new degree contains a program that leads to educator licensure or endorsement, the institution must coordinate the degree approval with the approval of the licenses and endorsements according to the procedures outlined under item four of this section.

- **Documentation of Accreditor's Approval**. The institution is responsible for submitting evidence, including team reports, institutional responses and final determinations, demonstrating that the new degree has been approved by the accreditor; the Chancellor must be informed immediately if accreditation is denied so that the standard review process (Section 2.c.) can be initiated.

- **Public Comment Period**. Once approval has been received from the accreditor, a background summary is posted on the Ohio Board of Regents' website (**https://www.ohiohighered.org/academic-program-approval/programs-pending**) for a 10-day public comment period.

- **Chancellor's Approval**. The request and public comments are forwarded to the Chancellor for final consideration and approval; the length and conditions of approval are stipulated in the background summary.

- **Certificate of Authorization Issued**. An amended *Certificate of Authorization* is issued to the institution; if the institution is incorporated, the institution shall file a copy of the certificate of authorization with the secretary of state as required by section 1713.02 of the Revised Code.

EDU001002

- **Progress Reports**. If progress or follow-up reports are required as part of the accreditation process, the institution is responsible for sending all such communication to the Chancellor's staff when it is sent to the accreditor and for immediately sending the Chancellor all communication received from the accreditor.

**iv.)** **New Technical or Professional Undergraduate and Graduate Degrees for which Professional Accreditation is Not Available**

If the specialized degree does not have a specialized accreditor and if prior approval for offering the program is not[11] required by HLC, the institution may obtain an amended Certificate of Authorization using the steps outlined below.

- **Initial Inquiry**. The institution completes an *Initial Inquiry* to begin the authorization process.

  ≫ The link to the *Initial Inquiry* is included in Appendix G.

  ≫ If the institution will be offering programs that lead to Ohio educator licensure or endorsement, the completed *Inquiry* must include that information.

  ≫ Once the completed *Inquiry* is received, an institutional mentor will be assigned to assist the institution through the authorization process.

  ≫ The institutional mentor will contact the institution to clarify the request, identify the fees and information needed to complete the review, and discuss the steps in the authorization process. The institutional mentor will summarize these discussions in a letter to the institution called a **Program Review Plan.**

- **Posting of Request**. Once the review fees are received, the institution and names of proposed degree programs are posted on the Ohio Board of Regents' website: (**https://www.ohiohighered.org/academic-program-approval/preliminary-requests**).

- **Proposal Materials**. The institutional mentor accepts the following materials prepared in lieu of the standard Board of Regents proposal.

  ≫ The institution's president or chief academic officer notifies the Chancellor of the institution's intent to offer a new degree program for which professional accreditation is not available.

  ≫ The institution attests that a specialized accreditor does not exist for the degree.

  ≫ The institution attests that the new degree meets all standards outlined in the *Requirements of Academic Programs* section of this manual.

---

11  If prior approval for offering the program is required by HLC, the approval process for new general undergraduate and graduate degrees outlined will be followed.

EDU001003

≫ If the proposed new degree contains a program that leads to educator licensure or endorsement, the institution must coordinate the degree approval with the approval of the licenses and endorsements according to the procedures outlined under item four of this section.

• **Public Comment Period**. Once the Letter of Commitment has been approved, a background summary is posted on the Ohio Board of Regents' website (**https://www.ohiohighered.org/academic-program-approval/programs-pending**) for a 10-day public comment period.

• **Chancellor's Approval**. The request and public comments are forwarded to the Chancellor for final consideration and approval; the length and conditions of approval are stipulated in the background summary.

• **Certificate of Authorization Issued**. An amended *Certificate of Authorization* is issued to the institution; if the institution is incorporated, the institution shall file a copy of the certificate of authorization with the secretary of state as required by section 1713.02 of the Revised Code.

## 3. Requests for New Majors, Technical Majors, or Degree Programs within Approved Degrees

Majors and degree programs are defined as a course of study within a discipline, which contain 30 or more semester (or 45 quarter) hours.

a. **New Undergraduate Majors or Degree Programs at Ohio Public Colleges and Universities**

• **Initial Inquiry**. The institution completes an *Initial Inquiry* to begin the approval process.

≫ The link to the *Initial Inquiry* is included in Appendix G.

≫ If the new major contains a program that leads to educator licensure or endorsement, the completed *Inquiry* must include that information.

≫ Once the completed *Inquiry* is received, an institutional mentor will be assigned to assist the institution through the approval process.

≫ The institutional mentor will contact the institution to clarify the request, identify the information needed to complete the review, and discuss the steps in the approval process. The institutional mentor will summarize these discussions in a letter to the institution called a **Program Review Plan**.

≫ The institutional mentor also shares the information with the individuals charged with oversight of the Ohio Board of Regents Course and Program Sharing Network.

- **Posting of Request**. Once the **Program Review Plan** is sent to the institution, the institution and name of proposed degree is posted on the Ohio Board of Regents' website: (**https://www.ohiohighered.org/academic-program-approval/preliminary-requests**).

- **Proposal**. After the new degree has received all required internal approvals, the institution's president or chief academic officer submits a *Proposal* to the Chancellor at least four months prior to the planned implementation of the new degree. The *Proposal* provides information to demonstrate that the program meets the General Standards for Academic Programs.

  ≫ The institutional mentor will assist the institution through the proposal development process and review the submission for completeness prior to presentation for expert comment from peer institutions.

  ≫ If any of the programs offered lead to an Ohio educator license or endorsement, the *Proposal* must also include the materials required for review of the educator licensure or endorsement program.

  ≫ A *Proposal* must be submitted within one year of receiving a Program Review Plan.

- **Peer Review of Proposal**.

  ≫ Content experts from Ohio public colleges and universities may provide peer review for proposals. The peer review should focus on the qualifications, experience and sufficiency of faculty; the curriculum and its alignment with expectations for the discipline; the need for the degree; and the resources (e.g., classrooms, libraries, technology, laboratory, equipment) available to support the degree.

  ≫ Peer institutions have 30 days to submit comments.

- **Consultant Review of Educator Preparation Programs**. If the degree includes new educator licensure or endorsement programs, the licensure and endorsement programs may be reviewed by external consultants according to the process for submitting a new educator license or endorsement (see item four of this section).

- **Resolution of Concerns**. The institutional mentor works with the institution proposing the program to address questions or concerns raised during the peer comment period.

- **Public Comment Period**. If the program is recommended to the Chancellor for approval, a background summary is posted on the Ohio Board of Regents' website (**https://www.ohiohighered.org/academic-program-approval/programs-pending**) for a 10-day public comment period.

EDU001005

- **Chancellor's Approval**. The background piece and public comments are forwarded to the Chancellor for final approval; the conditions of the approval are stipulated in the background summary.

b. **New Graduate Majors or Degree Programs at Ohio Public Graduate Universities (and University of Dayton and Case Western Reserve University)**

The Regents' Advisory Committee on Graduate Studies (RACGS) oversees the peer review of new graduate program requests. The members of RACGS are the graduate deans (or designees) of each of Ohio's public research institutions and the University of Dayton and Case Western Reserve University.

The process for the approval of new graduate programs at Ohio public universities and at the University of Dayton and Case Western Reserve University are described in the *Guidelines and Procedures for the Review and Approval of Graduate Degree Programs*, which is available online at **https://www.ohiohighered.org/sites/ohio-highered.org/files/uploads/racgs/documents/RACGS_Guidelines_113012.pdf**.

Individuals at Ohio public universities and the University of Dayton and Case Western Reserve University interested in seeking approval for new graduate programs should begin by contacting the institution's representative to RACGS. A listing of current RACGS members is available online at: **https://www.ohiohighered.org/racgs/roster**.

c. **New Undergraduate or Graduate Majors or Degree Programs at Authorized[12] Institutions**

Institutions that have been authorized to offer general undergraduate degrees such as the associate of arts, associate of science, bachelor of arts or bachelor of science are ordinarily granted authorization for the liberal arts and sciences majors and degree programs commonly recognized by award of these degrees. Thus, a request for authorization of new majors or programs within these general degrees is normally not required.

Requests for an expansion of authorization is required, however, when an institution intends to offer new majors or degree programs in specialized technical or professional fields at the undergraduate level, or when the institution intends to offer any new major or degree program at the graduate level.

---

12 As noted in Ohio Administrative Code Rule 3333-1-08, a non-profit institution that has been continuously authorized by the Chancellor and continuously accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools (HLC) for more than 20 years may choose to follow the approval process described in section 3.e. below, *Option for Continuously Authorized Institutions*.

EDU001006

*Chapter 5: Procedures for Requests Requiring the Chancellor's Approval*

An authorized institution seeking to expand its scope of authorization to areas beyond those listed on its current Certificate of Authorization may obtain an amended Certificate of Authorization using the steps outlined below.

- **Initial Inquiry**. The institution completes an *Initial Inquiry* to begin the approval process.

  ≫ The link to the *Initial Inquiry* is included in Appendix G.

  ≫ If the new major contains a program that leads to educator licensure or endorsement, the completed *Inquiry* must include that information.

  ≫ Once the completed *Inquiry* is received, an institutional mentor will be assigned to assist the institution through the approval process.

  ≫ The institutional mentor will contact the institution to clarify the request, identify the information needed to complete the review, and discuss the steps in the approval process. The institutional mentor will summarize these discussions in a letter to the institution called a **Program Review Plan**.

- **Posting of Request**. Once the **Program Review Plan** is sent to the institution, the institution and name of proposed degree is posted on the Ohio Board of Regents' website: **https://www.ohiohighered.org/academic-program-approval/preliminary-requests**.

- **Proposal**. After the new degree has received all required internal approvals, the institution's president or chief academic officer submits a *Proposal* to the Chancellor at least four months prior to the planned implementation of the new degree. The *Proposal* provides information to demonstrate that the program meets the General Standards for Academic Programs.

  ≫ The institutional mentor will assist the institution through the proposal development process and review the submission for completeness prior to presentation for expert comment from peer institutions.

  ≫ If any of the programs offered lead to an Ohio educator license or endorsement, the *Proposal* must also include the materials required for review of the educator licensure or endorsement program.

  ≫ A *Proposal* must be submitted within one year of receiving a Program Review Plan.

- **Document Review and Preparation of Consultants' Report**.

  ≫ A team of consultants selected by the Chancellor's staff completes a "document review" of the *Proposal*.

  ≫ A team of consultants selected by the Chancellor's staff completes a "document review" to ensure that the proposed major or degree program meets the *General Standards for Academic Programs*. If the institution offers pro-grams that lead to Ohio educator licensure or endorsement, the license or

16            *Guidelines & Procedures for* **Academic Program Review**

EDU001007

endorsement preparation program will be reviewed by content experts according to the process for submitting a new educator license or endorsement preparation program (see item four of this section).

≫ The fees and expenses for the consultants are paid by the proposing institution. The Chancellor's staff will invoice the institution for these costs.

≫ The consultants determine suggestions and recommendations for the institution and prepare a *Consultants' Report*, which is sent to the institution within three months of the receipt of a complete proposal.

≫ The Chancellor's staff members reserve the right to schedule an abbreviated site visit if the consultants call into question the institution's resources to mount the new major or degree program.

• **Institutional Response**. The proposing institution prepares an *Institutional Response* to the recommendations in the *Consultants' Report*.

≫ Institutions have up to 90 days to prepare an *Institutional Response*, but the response must be received by the Chancellor's staff at least three months prior to the planned start date.

≫ The *Institutional Response* must demonstrate compliance with the consultants' recommendations, which are binding items; in the case of recommendations that can only be complied with over time, the institution must present a plan and a timeline for compliance as part of the Institutional Response.

≫ The Chancellors' staff, with input from the consultants as needed, reviews the *Institutional Response* to determine whether all recommendations have been satisfied.

• **Public Comment Period**. Once the recommendations have been satisfied, a background summary is posted on the Ohio Board of Regents' website (**https://www.ohiohighered.org/academic-program-approval/programs-pending**) for a 10-day public comment period.

• **Chancellor's Approval**. The request and public comments are forwarded to the Chancellor for final consideration and approval; the length and conditions of approval are stipulated in the background summary.

• **Certificate of Authorization Issued**. A new or a revised *Certificate of Authorization* is issued to the institution; if the institution is incorporated, the institution shall file a copy of the certificate of authorization with the secretary of state as required by section 1713.02 of the Revised Code.

EDU001008

*Chapter 5: Procedures for Requests Requiring the Chancellor's Approval*

d. **Progress Reports**

Initial authorization is typically granted for a three-year period with an annual progress report due each year. The Chancellor's staff will contact the institution to discuss the information needed, fees, and due date to submit the report.

e. **Option for New Undergraduate or Graduate Majors or Degree Programs at Continuously Authorized[13] Institutions)**

Institutions that have been authorized to offer general undergraduate degrees such as the associate of arts, associate of science, bachelor of arts or bachelor of science are ordinarily granted authorization for the liberal arts and sciences majors and degree programs commonly recognized by award of these degrees. Thus, a request for authorization of new majors or programs within these general degrees is normally not required.

Requests for an expansion of authorization is required, however, when an institution intends to offer new majors or degree programs in specialized technical or professional field at the undergraduate level or when the institution intends to offer any new major or degree program at the graduate level.

A continuously authorized institution seeking to expand its scope of authorization to areas beyond those listed on its current Certificate of Authorization may obtain an amended Certificate of Authorization using the steps outlined below.

i.) **New Technical or Professional Majors or Programs for which Specialized Accreditation is Available**

An institution seeking authorization to add technical or professional majors or programs at the undergraduate or graduate level beyond those listed on its current Certificate of Authorization may obtain an amended Certificate of Authorization using the steps outlined below.

- **Initial Inquiry**. The institution completes an Initial Inquiry to begin the authorization process.
  - ≫ The link to the *Initial Inquiry* is included in Appendix G.
  - ≫ If the new major contains a program that leads to educator licensure or endorsement, the completed *Inquiry* must include that information.
  - ≫ Once the completed *Inquiry* is received, an institutional mentor will be assigned to assist the institution through the approval process.

---

13 Continuously authorized institutions are non-profit institutions that have been continuously authorized by the Chancellor and continuously accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools (HLC) for more than 20 years.

---

**R3 - 46 of 92**

EDU001009

>> The institutional mentor will contact the institution to clarify the request, identify the information needed to complete the review, and discuss the steps in the approval process. The institutional mentor will summarize these discussions in a letter to the institution called a **Program Review Plan**.

- **Posting of Request**. Once the review fees are received, the institution and names of proposed degree programs are posted on the Ohio Board of Regents' website: (**https://www.ohiohighered.org/academic-program-approval/preliminary-requests**).

- **Proposal Materials**. The institutional mentor accepts materials prepared for the professional accreditor in lieu of the standard Board of Regents' proposal. The institution coordinates with the mentor to ensure that the office receives all materials received by professional accreditor. If the proposed new degree contains a program that leads to educator licensure or endorsement, the institution must coordinate the degree approval with the approval of the licenses and endorsements according to the procedures outlined under item four of this section.

  >> **Documentation of Accreditor's Approval**. The institution is responsible for submitting evidence, including team reports, institutional responses and final determinations, demonstrating that the new degree has been approved by the accreditor; the Chancellor must be informed immediately if accreditation is denied so that the standard review process (Section 3.c.) can be initiated.

  >> **Public Comment Period**. Once approval has been received from the accreditor, a background summary is posted on the Ohio Board of Regents' website (**https://www.ohiohighered.org/academic-program-approval/programs-pending**) for a 10-day public comment period.

  >> **Chancellor's Approval**. The request and public comments are forwarded to the Chancellor for final consideration and approval; the length and conditions of the approval are stipulated in the background summary.

  >> **Certificate of Authorization Issued**. An amended *Certificate of Authorization* is issued to the institution; if the institution is incorporated, the institution shall file a copy of the certificate of authorization with the secretary of state as required by section 1713.02 of the Revised Code.

- **Progress Reports**. If progress or follow-up reports are required as part of the accreditation process, the institution is responsible for sending all such communication to the Chancellor's staff when it is sent to the accreditor and for immediately sending the Chancellor all communication received from the accreditor.

**ii.) New Technical or Professional Majors or Degree Programs for which Professional Accreditation is Available Only After a Period of Program Operation**

If a specialized accreditor will not accredit a program until a period of operation has passed and if prior approval for offering the program is not[14] required by HLC, the institution may offer the program while specialized accreditation is pending using the steps outlined below.

- **Initial Inquiry**. The institution completes an *Initial Inquiry* to begin the authorization process.

  ≫ The link to the *Initial Inquiry* is included in Appendix G.

  ≫ If the institution will be offering programs that lead to Ohio educator licensure or endorsement, the completed *Inquiry* must include that information.

  ≫ Once the completed *Inquiry* is received, an institutional mentor will be assigned to assist the institution through the approval process.

  ≫ The institutional mentor will contact the institution to clarify the request, identify the information needed to complete the review, and discuss the steps in the approval process. The institutional mentor will summarize these discussions in a letter to the institution called a **Program Review Plan**.

- **Posting of Request**. Once the review fees are received, the institution and names of proposed degree programs are posted on the Ohio Board of Regents' website: **https://www.ohiohighered.org/academic-program-approval/preliminary-requests**.

- **Proposal Materials**. The institutional mentor accepts materials prepared for the professional accreditor in lieu of the standard Board of Regents' proposal. The institution coordinates with the mentor to ensure that the office receives all materials received by professional accreditor. If the proposed new degree contains a program that leads to educator licensure or endorsement, the institution must coordinate the degree approval with the approval of the licenses and endorsements according to the procedures outlined under item four of this section.

- **Documentation of Accreditor's Approval**. The institution is responsible for submitting evidence, including team reports, institutional responses and final determinations, demonstrating that the new degree has been approved by the accreditor; the Chancellor must be informed immediately if accreditation is denied so that the standard review process (Section 3.c.) can be initiated.

---

14 If prior approval for offering the program is required by HLC, the approval process for new general undergraduate and graduate degrees outlined will be followed.

R3 – 48 of 92

EDU001011

≫ **Public Comment Period**. Once approval has been received from the accreditor, a background summary is posted on the Ohio Board of Regents' website (**https://www.ohiohighered.org/academic-program-approval/programs-pending**) for a 10-day public comment period.

≫ **Chancellor's Approval**. The request and public comments are forwarded to the Chancellor for final consideration and approval; the length and conditions of the approval are stipulated in the background summary.

≫ **Certificate of Authorization Issued**. A new or a revised *Certificate of Authorization* is issued to the institution; if the institution is incorporated, the institution shall file a copy of the certificate of authorization with the secretary of state as required by section 1713.02 of the Revised Code.

≫ **Progress Reports**. If progress or follow-up reports are required as part of the accreditation process, the institution is responsible for sending all such communication to the Chancellor's staff when it is sent to the accreditor and for immediately sending the Chancellor all communication received from the accreditor.

### iii.) New Technical or Professional Majors or Degree Programs for which Professional Accreditation is Not Available

If the specialized degree does not have a specialized accreditor and if prior approval for offering the program is not[15] required by HLC, the institution may obtain an amended Certificate of Authorization using the steps outlined below.

• **Initial Inquiry**. The institution completes an Initial Inquiry to begin the authorization process.

≫ The link to the *Initial Inquiry* is included in Appendix G.

≫ If the institution will be offering programs that lead to Ohio educator licensure or endorsement, the completed Inquiry must include that information.

≫ Once the completed *Inquiry* is received, an institutional mentor will be assigned to assist the institution through the approval process.

≫ The institutional mentor will contact the institution to clarify the request, identify the information needed to complete the review, and discuss the steps in the approval process. The institutional mentor will summarize these discussions in a letter to the institution called a **Program Review Plan**.

---

15 If prior approval for offering the program is required by HLC, the approval process for new general undergraduate and graduate degrees outlined will be followed.

- **Posting of Request**. Once the review fees are received, the institution and names of proposed degree programs are posted on the Ohio Board of Regents' website: **https://www.ohiohighered.org/academic-program-approval/ preliminary-requests**.

- **Proposal Materials**. The institutional mentor accepts the following materials prepared in lieu of the standard Board of Regents proposal.

  ≫ The institution's president or chief academic officer notifies the Chancellor of the institution's intent to offer a new degree program for which professional accreditation is not available.

  ≫ The institution attests that a specialized accreditor does not exist for the degree.

  ≫ The institution attests that the new degree meets all standards outlined in the *Requirements of Academic Programs* section of this manual.

  ≫ If the proposed new degree contains a program that leads to educator licensure or endorsement, the institution must coordinate the degree approval with the approval of the licenses and endorsements according to the procedures outlined under item four of this section.

- **Public Comment Period**. Once the Letter of Commitment has been approved, a background summary is posted on the Ohio Board of Regents' website (**https:// www.ohiohighered.org/academic-program-approval/programs-pending**) for a 10-day public comment period.

- **Chancellor's Approval**. The request and public comments are forwarded to the Chancellor for final consideration and approval; the length and conditions of approval are stipulated in the background summary.

- **Certificate of Authorization Issued**. A new or a revised *Certificate of Authorization* is issued to the institution; if the institution is incorporated, the institution shall file a copy of the certificate of authorization with the secretary of state as required by section 1713.02 of the Revised Code.

**R3 - 50 of 92**

EDU001013

## 4. Requests for New Programs Leading to Educator Licenses or Endorsements When Awarded Independent of a Degree or Degree Program (All Institution Types)

All requests for new programs that lead to educator licenses or endorsements awarded independent of a degree or degree program must be reviewed. Reviews of requests for licenses and endorsements are conducted periodically based on a schedule determined by the Ohio Department of Education and the Ohio Board of Regents and do not normally require a site visit, but the Chancellor's staff reserves the right to schedule an abbreviated site visit if the consultants call into question the institution's resources to mount the license or endorsement. The review process is the same for Ohio public institutions, Ohio private institutions and out-of-state institutions.

- **Initial Inquiry**. The institution completes an *Initial Inquiry* to begin the authorization process.
  - ≫ The link to the *Initial Inquiry* is included in Appendix G.
  - ≫ Once the completed *Inquiry* is received, an institutional mentor will be assigned to assist the institution through the authorization process.
  - ≫ The institutional mentor will contact the institution to clarify the request, identify the fees and information needed to complete the review, and discuss the steps in the authorization process. The institutional mentor will summarize these discussions in a letter to the institution called a **Program Review Plan**.

- **Posting of Request**. Once the review fees are received (required for independent and out-of-state institutions), the institution and names of proposed programs are posted on the Ohio Board of Regents' website: **https://www.ohiohighered. org/academic-program-approval/preliminary-requests**.

- **Proposal**. The education unit head submits the applicable *Proposal* during one of the biannual submission periods; the *Proposal* provides information to demonstrate that the program meets the standards set forth by the Ohio Department of Education and the Chancellor of the Ohio Board of Regents.
  - ≫ All internal institutional approvals must be obtained before the *Proposal* is submitted.

- **Document Review and Preparation of Consultants' Report**.
  - ≫ Staff members, assisted by consultants selected by the Chancellor, review the *Proposal* to ensure that the proposed program meets the licensure or endorsement standards.
  - ≫ Staff members and consultants make recommendations to the Chancellor for program approval or denial.

EDU001014

- **Public Comment Period**. If approval is recommended, a background summary is posted on the Ohio Board of Regents' website (**https://www.ohiohighered.org/ academic-program-approval/programs-pending**) for a 10-day public comment period.

- **Chancellor's Approval**. The request and public comments are forwarded to the Chancellor for final consideration and approval; the length and conditions of approval are stipulated in the background summary.

## 5. Requests for On-Ground Field and Clinical Experiences by Out-Of-State Institutions

Out-of-state institutions offering online programs that contain components (e.g., internships, externships, practicum, clinical placements, field placements, student teaching) that are completed in the state of Ohio may submit a request to the Chancellor of the Ohio Board of Regents to offer such experiences within the state.

- **Initial Inquiry**. The institution completes an *Initial Inquiry* to begin the authorization process.
  - ≫ The link to the *Initial Inquiry* is included in Appendix G.
  - ≫ Once the completed *Inquiry* is received, an institutional mentor will be assigned to assist the institution through the authorization process.
  - ≫ The institutional mentor will contact the institution to clarify the request, identify the fees and information needed to complete the review, and discuss the steps in the authorization process. The institutional mentor will summarize these discussions in a letter to the institution called a **Program Review Plan**.

- **Submission of form**:
  - ≫ A separate form must be submitted for each program that contains an experience that Ohio residents must complete in Ohio.
  - ≫ If multiple programs of study are embedded within a single degree designation (e.g., multiple majors within a Bachelor of Science degree), the institution is required to submit a separate form and fee for each program of study within the degree that contains a component that must be completed in Ohio.

- **Staff review**:
  - ≫ The submission of a request is not considered complete until all materials and fees are received. Once complete, the staff reviews the request and provides a determination within 30 days of receiving a complete request.

- **Authorization**:
  - ≫ Authorization of the request is limited to the experience being completed on-ground in Ohio. If the institution intends to offer additional coursework or entire degree programs on-ground in Ohio, the institution must complete the standard program authorization process.

  - ≫ Authorization of the request is issued for a period of three years.

  - ≫ The institution may submit subsequent requests for authorization after initial authorization is granted. The institution should attain authorization for new experiences in existing or additional programs prior to an Ohio resident completing the on-ground experience.

  - ≫ Authorization of the request does not make the institution eligible to participate in Ohio state aid programs.

  - ≫ Authorization of the request does not guarantee that the experience will meet other state licensing board requirements for professional certification and licensure. The institution is encouraged to contact those agencies where appropriate to determine if additional approval is needed to offer the experience in Ohio.

- **Note to for-profit institutions**:
  - ≫ For-profit institutions requesting authorization for programming at or below the associate degree level are not required to attain authorization from the Chancellor for the aforementioned activities. However, institutions of this type are encouraged to contact the Ohio State Board of Career Colleges and Schools to determine if approval is needed from that agency to engage in such activities in Ohio.

## 6. Requests for Solicitation by For-Profit Institutions

For-profit institutions that intend to engage in advertising and/or recruitment activities in the state of Ohio for instruction at or above the baccalaureate level may submit a request to the Chancellor of the Ohio Board of Regents to solicit Ohio residents.

- **Initial Inquiry**. The institution completes an *Initial Inquiry* to begin the authorization process.
  - ≫ The link to the *Initial Inquiry* is included in Appendix G.

  - ≫ Once the completed *Inquiry* is received, an institutional mentor will be assigned to assist the institution through the authorization process.

  - ≫ The institutional mentor will contact the institution to clarify the request, identify the fees and information needed to complete the review, and discuss the steps in the authorization process. The institutional mentor will summarize these discussions in a letter to the institution called a **Program Review Plan**.

EDU001016

*Chapter 5: Procedures for Requests Requiring the Chancellor's Approval*

- **Submission of form**:
  - ≫ A separate form must be submitted for each program that the institution will solicit for in Ohio.
  - ≫ For-profit institutions that advertise and/or recruit within the state may also be required to be registered with the State Board of Career Colleges and Schools (SBCCS).
    - • Institutions are encouraged to contact SBCCS to determine if approval is needed from that agency to engage in such activities in Ohio.
    - • For-profit institutions that intend to solicit Ohio residents for programming at-or-below the associate level are not required to seek authorization from the Chancellor of the Ohio Board of Regents.

- **Staff review**:
  - ≫ The submission of a request is not considered complete until all materials and fees are received. Once complete, the staff reviews the request and provides a determination within thirty days of receiving a complete request.

- **Authorization**:
  - ≫ Authorization of the request is limited to solicitation activities for the program (s) submitted. Materials made available to Ohio residents must explicitly state that authorization is limited to such activities.
  - ≫ Authorization of the request is issued for a period of three years.
  - ≫ The institution may submit subsequent requests for authorization after initial authorization is granted.
  - ≫ Authorization of the request does not make the institution eligible to participate in Ohio state aid programs.
  - ≫ Authorization is not granted until the institution demonstrates that it has the approval of, or exemption from, the Ohio State Board of Career Colleges and Schools to engage in such activities.
  - ≫ Authorization of the request does not guarantee that the program to be advertised and/or recruited for will meet other state licensing board requirements for professional certification and licensure. The institution is encouraged to contact those agencies where appropriate to determine if additional approval is needed to advertise and/or recruit for the program in Ohio.

**R3 – 54 of 92**

EDU001017

# Chapter 6: Procedures for Requests Requiring Administrative Approval (Change Requests)

The following requests, known as "change requests," whether from Ohio public, Ohio private or out-of state institutions, are normally handled through administrative (i.e., staff) approval:

- A request to change the name or title of the academic program when there is not a substantive change to the requirements for the program.
- A request for a substantive change[16] to the curriculum of a degree, major, or educator licensure or endorsement preparation program.
- A request to open a new off-campus location where more than 50% of the requirements of an approved degree or major will be delivered.[17]
- A request to offer more than 50% of an approved degree or major at an existing off-campus location.
- A request to deliver more than 50% of the requirements for an approved degree or major in an online/blended format.

The Chancellor's staff members are able to handle most requests for changes to existing academic programs; however, staff members reserve the right to send the requests to an external consultant (and may even schedule an abbreviated site visit) if concerns arise during the review. The procedures followed are essentially the same for changes to undergraduate programs in Ohio public institutions and changes to undergraduate and graduate programs in private institutions. The procedures do vary slightly for graduate programs in public institutions and the University of Dayton and Case Western Reserve University, as those changes are vetted by the Regents Advisory Committee on Graduate Education (RAC-GS). The procedures will also differ in cases where the change is to a program that leads to an educator license or endorsement. In order to reduce duplicative review processes, the Chancellor's staff accepts materials prepared for regional and national accreditors and coordinates review processes as needed.

---

16 Substantive change is defined as a modification of 50% or more of the requirements for the academic program.

17 Per ORC 3333.04 Rrequests by public institutions to open new campus locationsacademic centers (i.e., regional campuses or new campus locations) are handled in consultation with the Chancellor.  Additional information and a public comment period may be required for Chancellor approval.

EDU001018

*Procedures for Requests Requiring Administrative Approval (Change Requests)*

1. **Requests to Change Undergraduate Degrees or Majors at Ohio Public Colleges and Universities**

   ≫ **Initial Inquiry**. The institution completes an *Initial Inquiry* to begin the approval process.

       a. The link to the *Initial Inquiry* is included in Appendix G.

       b. Once the completed *Inquiry* is received, an institutional mentor will be assigned to assist the institution through the approval process.

       c. The institutional mentor will contact the institution to clarify the request and identify the information needed to complete the review.

   ≫ **Submission of the Change Request**. The institution's president or chief academic officer submits the appropriate *Change Request* at least three months prior to the planned implementation the change.

       • As noted in the *Change Request*, materials prepared for a regional or national accreditor can be submitted in place of materials prepared separately for the Chancellor's staff.

       • If the program leads to an educator license or endorsement, a separate review may be needed.

   ≫ **Staff Review of Request and Resolution of Concerns**. The Chancellor's staff reviews the request for change to ensure that the proposed changes are in line with the *General Standards for Academic Programs* and work with the institution to resolve any concerns.

   ≫ **Letter of Acknowledgement**. A letter acknowledging the approval of the change is sent to the president or chief academic officer of the institution.

2. **Requests to Change Graduate Degrees or Majors at Ohio Public Universities (and the University of Dayton and Case Western Reserve University)**

   The Regents' Advisory Committee on Graduate Studies (RACGS) provides peer review of graduate program change requests. The members of RACGS are the graduate deans (or designees) of each of Ohio's public research institutions and the University of Dayton and Case Western Reserve University.

   The process for changes to approved graduate programs at Ohio public universities and at the University of Dayton and Case Western Reserve University is described in the *Guidelines and Procedures for the Review and Approval of Graduate Degree Programs*, which is available online at **https://www.ohiohighered.org/sites/ohiohighered.org/files/uploads/racgs/documents/RACGS_Guidelines_113012.pdf**.

Guidelines & Procedures for **Academic Program Review**

EDU001019

Individuals at Ohio public universities and the University of Dayton and Case Western Reserve University interested in seeking approval for changes to existing graduate programs should begin by contacting the institution's representative to RACGS. A listing of current RACGS members is included at **https://www.ohiohighered.org/racgs/roster**.

3. **Requests to Change Undergraduate or Graduate Degrees at Authorized Institutions**

   ≫ **Initial Inquiry**. The institution completes an *Initial Inquiry* to begin the approval process.

   a. The link to the *Initial Inquiry* is included in Appendix G.

   b. Once the completed *Inquiry* is received, an institutional mentor will be assigned to assist the institution through the approval process.

   c. The institutional mentor will contact the institution to clarify the request and identify the information needed to complete the review.

   ≫ **Submission of the Change Request**. The institution's president or chief academic officer submits the appropriate *Change Request* at least three months prior to the planned implementation the change.

   • As noted in the *Change Request*, materials prepared for a regional or national accreditor can be submitted in place of materials prepared separately for the Chancellor's staff.

   • If the program leads to an educator license or endorsement, a separate review may be needed.

   ≫ **Staff Review of Request and Resolution of Concerns**. The Chancellor's staff reviews the request for change to ensure that the proposed changes are in line with the *General Standards for Academic Programs* and work with the institution to resolve any concerns.

   ≫ **Letter of Acknowledgement**. A letter acknowledging the approval of the change is sent to the president or chief academic officer of the institution; approved changes are incorporated on the institution's *Certificate of Authorization*, as appropriate.

EDU001020

4. **Requests to Change Programs That Lead to Educator Licenses and Endorsements**

   The Ohio Revised Code requires the Chancellor of the Ohio Board of Regents to approve changes to programs that lead to educator licenses and endorsements. For the purposes of review, change is defined as a modification of 50% or more to the curriculum and student experiences within the licensure or endorsement preparation portion of the program.

   ≫ **Initial Inquiry**. The institution completes an *Initial Inquiry* to begin the approval process.

      a. The link to the *Initial Inquiry* is included in Appendix G.

      b. Once the completed *Inquiry* is received, an institutional mentor will be assigned to assist the institution through the approval process.

      c. The institutional mentor will contact the institution to clarify the request and identify the information needed to complete the review.

   ≫ **Submission of the Change Request**. The institution's president or chief academic officer submits the appropriate *Change Request* at least three months prior to the planned implementation the change.

      • As noted in the *Change Request*, materials prepared for a regional or national accreditor can be submitted in place of materials prepared separately for the Chancellor's staff.

   ≫ **Staff Review of Request and Resolution of Concerns**. The Chancellor's staff reviews the request for change to ensure that the proposed changes are in line with the *General Standards for Academic Programs* and the standards set by the Ohio Department of Education; staff members work with the institution to resolve any concerns.

   ≫ **Letter of Acknowledgement**. A letter acknowledging the approval of the change is sent to the president or chief academic officer of the institution; approved changes are incorporated on the Institution's *Certificate of Authorization*, as appropriate.

R3 - 58 of 92

EDU001021

# Chapter 7: Procedures for Maintaining Approval

1. **Periodic Review**

   The purpose of periodic review is to ensure that institutions operating in the state are following the *General Standards for Academic Programs*. The procedures differ depending upon whether the institution is an Ohio public institution or is an institution authorized to operate in the state of Ohio.

   In order to reduce duplicative review processes, the Chancellor's staff accepts materials prepared for regional and national accreditors and coordinates review processes as needed.

   a. **Periodic Review of Ohio Public Institutions**

      • **Notifying the Chancellor of the Institution's Upcoming HLC Review**. At least 12 months before the institution's reaffirmation with HLC, the president or chief academic officer will notify the Chancellor's staff of the upcoming reaffirmation review.

      • **Communicating the Results of the HLC Review to the Chancellor**. At the conclusion of the HLC review, the institution's president or chief academic officer provides documentation to the Chancellor's staff of the outcome of the review. If the HLC noted concerns or issues during the review, HLC documentation of those concerns must also be provided to the Chancellor's staff.

      • **Letter of Acknowledgement**. A letter acknowledging the Chancellor's receipt of the HLC outcome is sent to the president or chief academic officer of the institution.

   b. **Periodic Review of Authorized[18] Institutions**

      • **Planning for the Review**. At least 12 months before the institution's re-accreditation with its regional or national accreditor, the president or chief academic officer contacts a member of the Chancellor's staff to discuss the process that it will be using with its accreditor (for example: the specific HLC process; or the process used by the institution's national accreditor—e.g., ACICS, ACCSC, ATS). The coordination of the Chancellor's review with the re-accreditation review is planned and a letter confirming the plan is sent to the institution's president or chief academic officer.

---

18 As noted in Ohio Administrative Code Rule 3333-1-08, a non-profit institution that has been continuously authorized by the Chancellor and continuously accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools (HLC) for more than 20 years may choose to follow the approval process described in section 1.c. on page 48.

EDU001022

- **Submission of Materials for the Review**. The institution's president or chief academic officer submits the materials agreed upon during the planning phase; normally this material will include: a) materials that are submitted to the regional or national accreditor in preparation for the visit; and b) a brief supplement validating the accuracy of the Chancellor's records regarding the academic programming offered in the state.

- **Attendance at the Site Visit**. The Chancellor will designate a representative (either a member of the Chancellor's staff or a consultant) to attend the regional or national accreditation visit at the institution's expense.

- **Staff Evaluation**. The Chancellor's staff will use the materials submitted prior to the visit, observations during the visit, and the final report of the regional or national accreditation agency to ensure compliance with the *General Standards for Academic Programs*.

- **Public Comment Period**. Assuming there are no substantive issues identified in the review, a background summary is posted on the Ohio Board of Regents' website (**https://www.ohiohighered.org/academic-program-approval/programs-pending**) for a 10-day public comment period.

- **Chancellor's Approval**. The request and public comments are forwarded to the Chancellor for final consideration and approval; the length and conditions of approval is stipulated in the background summary.

- **Certificate of Authorization Issued**. A new certificate of authorization is issued to the institution; if the institution is incorporated, the institution shall file a copy of the certificate of authorization with the secretary of state as required by section 1713.02 of the Revised Code.

c. **Option for Periodic Review of Continuously Authorized[19] Institutions**

- **Notifying the Chancellor of the Institutions Upcoming HLC Reaffirmation**. At least 12 months before the institution's reaffirmation with HLC, the president or chief academic officer will notify the Chancellor's staff of the upcoming reaffirmation review process; the notification includes a statement attesting that the institution meets the *General Standards for Academic Programs.*

---

19 Continuously authorized institutions are non-profit institutions that have been continuously authorized by the Chancellor and continuously accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools (HLC) for more than 20 years.

**R3 - 60 of 92**

EDU001023

*Chapter 7: Procedures for Maintaining Approval*

- **Submission of Materials for the Review**. The institution's president or chief academic officer submits a form validating the accuracy of the Chancellor's records regarding the academic programming offered at the institution  to the Chancellor's staff.

- **Communicating the Results of the HLC Review to the Chancellor**. At the conclusion of the HLC review, the institution's president or chief academic officer provides documentation to the Chancellor's staff of the outcome of the review. If the HLC noted concerns or issues during the review, HLC documentation of those concerns must also be provided to the Chancellor's staff.

- **Public Comment Period**. Assuming there are no substantive issues identified in the review, a background summary is posted on the Ohio Board of Regents' website   (**https://www.ohiohighered.org/academic-program-approval/programs-pending**) for a 10-day public comment period.

- **Chancellor's Approval**. The request and public comments are forwarded to the Chancellor for final consideration and approval; the length and conditions of approval are stipulated in the background summary

- **Certificate of Authorization Issued**. A new certificate of authorization is issued to the institution; if the institution is incorporated, the institution shall file a copy of the certificate of authorization with the secretary of state as required by section 1713.02 of the Revised Code

d. **Periodic Review of Educator Preparation Programs, Licenses and Endorsements (All Institutions)**

- **Unit Review**. Institutions that offer educator preparation programs that lead to an education license or endorsement will undergo an onsite review on a schedule determined by the Ohio Board of Regents and the national accreditor (CAEP).

- **Educator Licensure and Endorsement Preparation Program Review**.
  - ≫ Periodic review of license and endorsement programs will occur on a schedule determined by the Chancellor and to coincide with national unit review.
  - ≫ For continuing program approval, institutions can choose the CAEP *"Review with Feedback"* option, or if the program holds full recognition from a specialized professional accreditor (SPA), the Limited State Review option.
  - ≫ In cases where the Limited State Review or CAEP *Review with Feedback* cannot be completed or result in negative outcomes, the institution's education program liaison may petition the Chancellor for a State Review; if the petition is accepted the review process described below is used

- State Review Process
  - ≫ The education unit's designee submits the appropriate *Proposal* materials; proposal templates is included in Appendix G, but institutions should discuss proposal format with the educator preparation program approval staff before proceeding to ensure that the appropriate forms are completed
  - ≫ Fees and expenses for the review, when required, are paid by the proposing institution when the *Proposal* is submitted
  - ≫ Consultants review the *Proposal* to ensure that the proposed program meets the education license or endorsement standards
  - ≫ The consultants prepare a report and recommends whether or not the program should be approved

- **Resolution of Concerns**. The Chancellor's staff members reviews the outcome of a) the Limited State Review; b) the CAEP *Review with Feedback*; or c) the State Review and work with the institution to resolve questions or concerns

- **Public Comment Period**. If the program is recommended to the Chancellor for approval, a background summary is posted on the Ohio Board of Regents' website (**https://www.ohiohighered.org/academic-program-approval/programs-pending**) for a 10-day public comment period.

- **Chancellor's Approval**. The request and public comments are forwarded to the Chancellor for final consideration and approval; the length and conditions of approval are stipulated in the background summary

2. **Requirements for Authorized Institutions Undergoing a Major Change**

   Private and out-of-state institutions must inform the Chancellor whenever major changes occur that might affect the institution's ability to deliver its academic programs. Major changes include, but are not necessarily limited to, a change of status (public, private not-for-profit, private for-profit), a change of ownership, a change in regional or national accreditation status or a change in resources. Institutions are responsible for notifying members of the Chancellor's staff when such changes occur so that the appropriate steps can be taken to ensure continuing authorization of the institution and its programs.

   The necessary steps may range from a formal letter to the Chancellor explaining the change (for changes that are expected to have minimal impact on the institution's ability to deliver its programs) to a re-authorization of the institution and its programs, including a proposal, site visit and provisional authorization period (for changes that are expected to impact substantially the institution's ability to deliver its programs).

**R3 – 62 of 92**

EDU001025

Members of the Chancellor's staff will work with each institution on a case-by-case basis to determine the steps needed to maintain authorization and coordinate authorization activities with the appropriate accreditors and state agencies.

3. **Reporting Negative National, Regional Or Specialized Accreditation Outcomes**

All institutions authorized or approved to operate in Ohio (Ohio public, Ohio private, or out-of-state) must inform the Chancellor's staff, in writing, any time a regional, national or specialized accreditor informs the institution of a finding that could place the institution's or the program's accreditation in jeopardy. Such findings include, but are not necessarily limited to, being placed on probation, being asked to "show cause", being asked to submit special reports or undergo special visits, or being given shortened accreditation periods because of a negative accreditation outcome. The Chief Academic Officer of the institution is responsible for notifying the Chancellor when such accreditation outcomes occur, so that the appropriate steps can be taken to ensure continuing authorization or approval of the institution's programs.

The necessary steps may range from a formal letter to the Chancellor explaining the accreditation outcome and the steps being taken to correct the problem (for outcomes that are expected to be easily addressed) to greater involvement by the Chancellor's staff members with the accreditor (for outcomes that are expected to substantially impact the institution's ability maintain accreditation for its programs). The Chancellor will assign staff to work with each institution to determine the steps needed to maintain approval and to coordinate activities with the appropriate accreditors and state agencies.

4. **Chancellor-Initiated Review of Authorization**

The Chancellor reserves the right to review an institution holding a certificate of authorization if the Chancellor has reasonable belief that the General Standards for Academic Programs are not being met or that a major change, such as those outlined in section 2 (above) has occurred.

The Chancellor's staff members work with institutions on a case-by-case basis to determine the steps needed to maintain authorization, or if necessary, the steps needed to initiate an initial authorization review and coordinate activities with the appropriate accreditors and state agencies.

EDU001026



EDU001027

# Appendix A: Definitions

**Approval**: The terminology applied to the approval of new degrees, new majors within degrees or substantive changes to existing educational programs within Ohio public colleges and universities. This terminology also applies to the approval of educator preparation licenses and endorsements at all institutions.

**Authorization**: The terminology applied to the approval of independent and out-of-state institutions to confer degrees or courses applicable to degrees in the state of Ohio or to substantively change existing education programs offered in Ohio.

**Credit hour**: A minimum of 750 minutes (semester credit hour) or 500 minutes (quarter credit hour) of formalized instruction that typically requires students to work at out-of-class assignments an average of twice the amount of time as the amount of formalized instruction[20]. Credit hours may be calculated differently for other types of instruction (e.g., laboratory experience, directed practice experience, practicum experience, cooperative work experience, field experience, observation experience, seminar, and studio experience) as long as the credit hour calculations align with commonly accepted practices in higher education and with the regulations of regional accreditors and the federal financial aid program.

**Credit instruction**: Academic instruction in the context of a course or activity leading to the award of credit by a regionally or nationally accredited institution of higher education. Such credit is generally acknowledged as applicable toward the attainment of a degree or certificate.

**Non-credit instruction**: A course or activity for which the learner does not receive academic credit that applies to a degree, certificate or diploma.

**Developmental/remedial education**: Courses and services emphasizing academic skill development in preparation for college-level course work. Developmental education program components can be used to enhance access for underprepared students through the provision of both course work and supplemental services, such as tutoring, course placement assessment, advising, study skills and personal development. Developmental/remedial education courses cannot be applied toward the minimum requirements for a certificate or degree program.

**Degree**: A recognition or award for completion of a prescribed course of study in an institution of higher education designated by the customary titles of associate, bachelor, master, specialist or doctor.

---

20 Formalized instruction is defined as instruction for which the instructor bears the primary responsibility for delivery, acknowledging that the delivery may take place using a variety of modes and methodologies.

EDU001028

*Appendix A: Definitions*

**Major**: That portion of a degree that is made up of at least 30 semester hours (45 quarter hours) of specialized study leading to both breadth and depth in a particular discipline. The term major may be used interchangeably with the terms program or degree program. Technical Major: That portion of an applied associate degree that includes at least 12 semester credit hours (18 quarter hours) of coursework and constitutes an area of specialization.

**Minor**: A program of study that is made up of at least 12 semester hours (18 quarter hours) in a particular discipline.

**Concentration**: An identified set of courses within a degree program indicating in-depth knowledge in a particular area of focus. Concentrations differ from majors in that the concentration must include a minimum of 50% of the curriculum within the major.

**General education**: The set of courses and experiences that provide students with a broad exposure to multiple disciplines within the arts and sciences with the aim of providing students with the knowledge and skills needed to succeed in the 21st century. In Ohio, the general education curriculum includes coursework in oral and written communication, mathematics and data analysis, arts and humanities, natural science and social science.

**Online Course**: A course where most (>80%) of the content is delivered online; typically the course will have no face-to-face meetings.

**Online Degree**: A degree in where most (>80%) of the degree can be completed online. Blended/Hybrid Courses: A course that blends online and on-ground delivery; substantial content is available online and there are a reduced number of face-to-face meetings.

**Blended/ Hybrid Degrees**: A degree that blends online and on-ground delivery; a substantial portion of the degree requirements are available online and there are a reduced number of face-to face meetings.

**Dual enrollment**: A form of enrollment that enables a high school student to earn transcripted high school and college credit upon successful completion of the course. Dual enrollment can be offered at the high school, at a college or university, or via distance learning.

**Concurrent enrollment**[21]: A form of enrollment that occurs when an adult student is enrolled in two post-secondary educational institutions at the same time, receiving education programs, services and/or benefits from each.

---

21 Nationally, the term "concurrent enrollment" is used to describe dual credit opportunities between high schools and higher education institutions; however in Ohio the term "dual enrollment" is used to describe partnerships between secondary and post-secondary education.

**R3 - 66 of 92**

EDU001029

*Appendix A: Definitions*

**Regional or branch campus**: a campus that is geographically apart from and independent of the main or home campus of the institution. It should have all or most of the following attributes: it is permanent in nature; it offers at least one, but typically multiple degree programs; it has its own faculty and administrative structure, often including its own budgetary and hiring authority; and it houses academic resources, support services and operational services for the campus. Ohio public institutions must receive the Chancellor's approval to open a new regional campus.

**Additional campus location**: a place, geographically separate or functionally distinct from any main or regional campus, where instruction takes place and students can complete 50 percent or more of the courses leading to a degree program or to a Title IV eligible certificate. An additional location typically does not have a full range of administrative and student services; such services are typically provided by a home or regional campus. Ohio public institutions must receive the Chancellor's approval to open a new campus location.

**Academic center**: a term used in ORC 3333.04 to denote an additional campus location.

**Community college**: term used to collectively identify any of the three types of two-year institutions defined in Ohio Revised Code (ORC)—community college (ORC 3354.), state community college (ORC 3358.), and technical college (ORC 3357.).

EDU001030

# Appendix B: Terminology and Requirements Related to Post-Secondary Degrees, Certificates and Educator Preparation Programs

**Degree**: Any recognition or award for completion of a prescribed course of study in an institution of higher education designated by the customary titles of associate, bachelor, master, specialist or doctor.

**Associate Degree**: An award that requires completion of 60 semester credit hours (or 90 quarter credit hours); associate degree programs should not exceed 65 semester credit hours unless it can be shown that the additional coursework is required to meet professional accreditation or licensing requirements. Programs requiring hours beyond the 65 hour maximum in order to meet accreditation or licensing requirements are expected to align similarly to like programs at other two-year public institutions and shall not exceed 73 semester credit hours.

- **Associate of Arts** and **Associate of Science** degrees are designed for students wishing to complete the first two years of a bachelor's degree, as well as those desiring two years of a liberal arts education.

- **Associate of Applied Business** and **Associate of Applied Science** degrees are awarded in recognition of successful completion of career technical education programs and prepare students for immediate employment upon graduation. The curricula for applied associate degree programs are described in terms of technical and non-technical studies. Non-technical studies include general education and courses that serve as a base for the technical field (sometimes referred to as "applied general education" or "basic" coursework). Non-technical studies, including general education and applied general education courses, should make up at least 30 semester hours (45 quarter hours) of the degree.

- **Associate of Technical Study** degrees are awarded for successful completion of a planned program of study designed to respond to the need for specialized technical education. The program must have an area of concentration which is equivalent to at least 30 semester credit hours (45 quarter credit hours) in technical studies and a clearly identifiable career objective. The area of concentration can either be formed by: Type A—a coherent combination of technical courses selectively drawn from two or more technical programs currently offered by the college to serve a career objective that would not be adequately addressed by one of the existing programs alone; or Type B—courses completed or training received by a student at other institutions of higher education, career centers, or other educational enterprises judged by the institution to be of college level and for which the institution awards degree credit.

- **Associate of Individualized Study** degrees are awarded for the satisfactory completion of an individually planned program designed to serve an educational objective that could not be served through another degree program of the awarding institution. The program, planned by the student and faculty advisor must contain an area of concentration consisting of a minimum of 20 semester credit hours (30 quarter credit hours),

R3 - 68 of 92

EDU001031

which is formed according to one of the following models: a) an interdisciplinary, but coherent combination of courses drawn from a minimum of two and a maximum of four instructional areas; b) up to forty semester credit hours (60 quarter credit hours) awarded by the institution for documentable educational experiences or courses completed at other institutions of higher education or educational enterprises judged by the institution to be of college level; or c) an unusual by academically coherent combination of technical and general studies courses.

**Bachelor's Degree**: An award that requires completion of 120 semester credit hours (or 180 quarter credit hours); bachelor's degree programs should not exceed 126 semester credit hours unless it can be shown that the additional coursework is required to meet professional accreditation or licensing requirements. Bachelor's degrees may be awarded for general areas of study, such as those recognized by the Bachelor of Arts and the Bachelor of Science degrees or in specialized professional and technical fields such as these recognized by the Bachelor of Fine Arts, the Bachelor of Science in Nursing, the Bachelor of Education, and so on. Although bachelor's degrees require completion of a specified number of credit hours, the length of the program can vary. For instance, bachelor's degrees may be conferred for a five-year cooperative (work-study plan) program, which provides for alternate class attendance and employment in business, industry or government. They may also be conferred in instances where the full complement of credits is obtained in three years.

**Master's Degree**: An award that requires the successful completion of at least 30 semester credit hours (or 45 quarter credit hours) of work beyond the bachelor's degree. Master's degrees such as the Master of Arts and the Master of Science are typically considered research graduate degrees, and involve preparation to carry out research and to discover new knowledge—whether the field is pure or applied. Master's degrees may also recognize preparation for professional practice. Examples of professional practice master's degrees include the Master of Business Administration (MBA), Master of Science in Nursing (MSN), Master of Public Health (MPH) and the Master of Social Work (MSW).

**Specialist Degree**: An award that generally requires the successful completion of at least 30 semester credit hours (or 45 quarter credit hours) of work beyond the master's degree. The specialist degree is typically considered a professional practice degree (e.g., the Education Specialist, or EdS) and may be pursued by individuals interested in furthering their education beyond a master's degree, but who are not interested in pursuing a research or professional practice doctorate.

**Doctoral Degree**: The highest award a student can earn for graduate study. Doctoral degrees generally require the successful completion of at least 90 semester credit hours (or 135 quarter credit hours) of work beyond the bachelor's degree or at least 60 semester credit hours (or 90 quarter credit hours) beyond the master's degree. Deviations from these credit hour guidelines require proper justification and state approval. The Doctor of Philosophy (PhD) is a research degree and involves preparation for the conduct of independent research and the discovery of new knowledge. Doctoral degrees may also recognize preparation for professional practice. Examples of professional practice doctoral degrees include the Doctor of Nursing Practice (DNP), Doctor of Education (EdD) and Doctor of Physical Therapy (DPT).

**Certificate**: A formal award certifying the satisfactory completion of an organized program of study at the postsecondary level. Certificates should be designed as building blocks toward future degrees and with the intent of articulating the program into the next degree.

General Certificates

≫ **Undergraduate/ Sub-Baccalaureate Certificate**: An award from an educational institution that requires completion of an organized program of study at the postsecondary level (below the baccalaureate degree). These certificates are classified by IPEDs as "less than one year," "at least one but less than two academic years" or "at least two but less than four academic years".

Technical Certificates

≫ **One Year Technical Certificate**: Certificates awarded by a post-secondary institution for the completion of an organized program of study in at least 30 semester credit hours or 900 clock hours, with the majority of the coursework completed in a prescribed technical area. While the certificates are designed to have value apart from a degree, these certificates should serve as building blocks to an associate degree. The technical certificate is designed for an occupation or specific employment opportunity. These certificates should prepare students for a valid occupational license or third-party industry certification, if available, related to the field of study.

≫ **Less than One Year Technical Certificate**: Certificates awarded by a post-secondary institution for the completion of an organized program of study in less than 30 semester credit hours or less than 900 clock hours that are designed for an occupation or specific employment opportunity. These certificates should prepare students for a valid occupational license or third-party industry certification, if available, related to the field of study.

**Post-Baccalaureate Certificate**: An award that requires completion of an organized program of study beyond the bachelor's degree; designed for individuals who have completed a bachelor's degree but have not met the requirements for a master's degree.

**Post-Master's Certificate**: An award that requires completion of an organized program of study beyond the master's degree; designed for individuals who have completed a master's degree but have not met the requirements for a doctoral degree.

**Educator Preparation License**: A document issued by the Ohio Department of Education to an individual who is deemed to be qualified to teach or practice in Ohio schools.

**Educator Preparation Endorsement**: A State Board of Education established addition of a teaching area to a license after completion of an approved program of preparation.

EDU001033

# Appendix C: General Education Guidelines

The guidelines for general education are divided into two sections—one for public institutions and one for private institutions. Although the general education credit hour expectations and breadth of experience are the same for public and private institutions, the general education requirements are more specific for public institutions because they must align their general education curriculum with the Ohio Transfer Module (OTM) and with Ohio's Articulation and Transfer Policy[22].

Throughout the document, the following definitions are used:

**General Education Courses**: Those courses in written and oral communication, quantitative principles, biological and physical sciences, social and behavior sciences and the arts and humanities that provide the foundation and common experience expected among individuals holding associate and baccalaureate degrees. These courses, along with courses within a major, provide opportunities for critical thinking, problem solving and analytic skills.

**Applied General Education (Basic Education) Courses**: Those courses within applied associate degrees that emphasize the application of general education to an occupational or technical area

- Courses such as technical communication, business mathematics, calculations for health professionals, study skills, applied computing, and practical psychology are examples that fall in this category. Applied general education coursework cannot be counted toward meeting the minimum requirements for general education courses in associate or baccalaureate degrees (i.e., 15 semester hours in applied associate degree programs and 36 semester hours in associate of arts, associate of science and bachelor's degrees).

**General Education Courses in the Arts**: Courses in this category do not include "performance" courses such as painting, sculpting or dance, but may include courses in the history of art, dance, film or theater.

**General Education Courses in Technology and Innovation**: Courses in this area are related to the analysis and understanding of how discovery and invention impact society.

**Note**: Developmental (remedial) courses cannot be counted toward meeting the minimum requirements general education courses in associate or baccalaureate degrees.

---

22 https://www.ohiohighered.org/transfer/policy

EDU001034

## General Education Guidelines: Ohio Public Institutions

### Applied Associate Degrees

Applied associate degrees (Associate of Applied Business, Associate of Applied Science, Associate of Technical Studies, and Associate of Individualized Studies), must include at least 30 semester hours of non-technical coursework, which includes both general education and applied general education (i.e., "basic") courses. The general education portion of the non-technical coursework must include at least 15 semester credit hours. A minimum of six semester hours must be found in the following two categories:

- At least one course (three semester credit hours) in the **English Composition and Oral Communication** area *(e.g., First Writing, Second Writing, Public Speaking)*
- At least one course (three semester credit hours) in the **Mathematics, Statistics and Logic** area *(e.g., Algebra, Trigonometry, Calculus, Statistics, Formal/Symbolic Logic)*

A minimum of six semester hours must come from the following three categories, and at least two of the three categories must be represented.

- At least one course (three semester credit hours) in the **Arts and Humanities** area *(e.g., Art History, Ethics, History, Literature, Philosophy, Religion, Ethnic or Gender Studies)*
- At least one course (three semester credit hours) in the **Social and Behavioral Sciences** area *(e.g., , Communication, History, Economics, Political Science, Psychology, Sociology)*
- At least one course (three semester credit hours) in the **Natural Sciences** area *(e.g., Anatomy, Biology, Chemistry, Environmental Science, Physics, Physiology)*

In order to assure maximum transferability, institutions are strongly encouraged to implement general education programs that include coursework in all five general education categories and to use a three semester hour *First Writing* course to fulfill the minimum requirement in the English composition and oral communication area.

Institutions are expected to use approved Ohio Transfer Module (OTM) courses and follow applicable Transfer Assurance Guides (TAGs) when developing general education requirements for their applied associate degrees. However, recognizing that the skills needed for some OTM courses in the mathematics and science areas exceed the skills needed for the successful completion of some applied degrees, OTM-approved courses are not required to fulfill the mathematics and science requirements.

EDU001035

**Associate of Arts (AA) and Associate of Science (AS) Degrees**

Consistent with the belief that the AA and AS degrees serve as the first two years of a bachelor's degree and to provide maximum transferability of courses from the associate level to the bachelor's level, the general education component of the A.A. and the AS degrees at Ohio's public institutions must fulfill the institution's Ohio Transfer Module (OTM).

**Ohio Transfer Module (OTM)[23]**

The Ohio Transfer Module contains 36-40 semester hours of coursework in general education. It is a subset or the complete set of general education requirements at each college or university. In order for general education courses to be a part of an institution's transfer module, all coursework is subject to a review by the statewide transfer module panels against the *Ohio Transfer Module Guidelines* and learning outcomes.

Each transfer module must include a minimum of 24 semester hours of approved OTM courses as outlined below:

- At least three semester credit hours in **English Composition and Oral Communication** (e.g., First Writing, Second Writing, Public Speaking)

- At least three semester credit hours in **Mathematics, Statistics and Logic** *(e.g., College Algebra, Pre-Calculus, Trigonometry, Calculus, Statistics, Formal/Symbolic Logic)*

- At least six semester credit hours in **Arts and Humanities** *(e.g., Art History, Ethics, American History, Literature, Philosophy, Religion, Ethnic or Gender Studies)*

- At least six semester credit hours in **Social and Behavioral Sciences** *(e.g., Anthropology, Economics, Geography, Political Science, Psychology, Sociology)*

- At least six semester credit hours in **Natural Sciences** *(e.g., Astronomy, Biology, Chemistry, Environmental Science, Geology, Physical Geography, Physics)*

The additional 12-16 semester credit hours needed to complete the OTM are distributed[24] among the same five categories but may be distributed differently in the Associate of Arts and the Associate of Science degrees. Typically an Associate of Arts degree would include more credit hours in the oral and written communication and arts and humanities areas, while an Associate of Science degree would include more credit hours in the mathematics and science areas.

---

23 The Ohio Transfer Module requirements are available on the Articulation and Transfer Policy website at http://regents.ohio.gov/transfer/policy/transfer_policy_d2aa.php

24 The distributive model outlined above is not meant to discourage institutions from experimenting with thematically clustered or multidisciplinary general education courses, particularly when those courses are approved as OTM or TAG courses.

**Baccalaureate Degrees**

For bachelor's degrees (e.g., Bachelor of Arts—BA, Bachelor of Fine Arts—BFA, Bachelor of Music—BM, Bachelor of Science—BS, or Bachelor of Applied Studies—BAS), the *minimum* general education requirements are the same as for the academic associate degrees. However, many baccalaureate programs require general education coursework beyond those minimum expectations, and students may be required to complete additional general education requirements beyond the minimum upon transfer.

## General Education Guidelines: Private and Out-of-State Institutions

**Applied Associate Degrees**

Applied associate degrees (Associate of Applied Business, Associate of Applied Science, and Associate of Technical Studies), must include at least 30 semester hours of non-technical coursework, which includes both general education and applied general education (i.e., "basic") courses. The general education portion of the non-technical coursework must include at least 15 semester credit hours. A minimum of six semester hours must be found in the following two categories:

- At least one course (three semester credit hours) in the **English Composition and Oral Communication** area *(e.g., English Composition, Public Speaking)*
- At least one course (three semester credit hours) in the **Mathematics, Statistics and Logic** area *(e.g., Algebra, Trigonometry, Calculus, Statistics, Formal/Symbolic Logic)*

A minimum of six semester hours must come from the following three categories, and at least two of the three categories must be represented.

- At least one course (three semester credit hours) in the **Arts, Humanities, Culture and Diversity** area *(e.g., Art History, Ethics, American History, Literature, Philosophy, Religion, Ethnic or Gender Studies)*
- At least one course (three semester credit hours) in the **Social and Behavioral Sciences** area *(e.g., Communication, Economics, Political Science, Psychology, Sociology)*
- At least one course (three semester credit hours) in the **Natural Sciences, Technology and Innovation** area *(e.g., Anatomy, Biology, Chemistry, Environmental Science, Physics, Physiology)*

EDU001037

### Associate of Arts (AA) and Associate of Science (AS) Degrees

A.A. and A.S. degrees must include a minimum of 36 semester hours of general education coursework. Each A.A. and A.S. degree must utilize 15 of the required 36 semester credit hours as follows:

- At least one course (three semester credit hours) in **Oral and Written Communication** *(English Composition, Public Speaking)*
- At least one course (three semester credit hours) in **Mathematics, Statistics and Logic** *(College Algebra, Pre-Calculus, Trigonometry, Calculus, Statistics, Formal/Symbolic Logic)*
- At least one course (three semester credit hours) in **Arts, Humanities, Culture and Diversity** *(e.g., History of Art, Dance, Film, Music, or Theater, Ethics, History, Literature, Philosophy, Religion, Ethnic or Gender Studies)*
- At least one course (three semester credit hours) in **Social and Behavioral Sciences** *(e.g., Communication, Economics, Political Science, Psychology, Sociology)*
- At least one course (three semester credit hours) in **Natural Sciences, Technology and Innovation** *(e.g., Anatomy, Biology, Chemistry, Environmental Science, Physics, Physiology)*

The additional 21 semester credit hours needed to complete the 36 semester credit hour requirement may be distributed[25] differently in the A.A. and A.S. degrees. Typically an A.A. degree would include more credit hours in the oral and written communication and arts and humanities areas, while an A.S. degree would include more credit hours in the mathematics and science areas.

### Baccalaureate Degrees

For bachelor's degrees (e.g., Bachelor of Arts—BA, Bachelor of Fine Arts—BFA, Bachelor of Music—BM, Bachelor of Science—BS, or Bachelor of Applied Studies—BAS), the *minimum* general education requirements are the same as for the academic associate degrees. However, many baccalaureate programs require general education coursework beyond those minimum expectations.

---

25 The distributive model outlined above is not meant to discourage institutions from experimenting with thematically clustered or multidisciplinary general education courses.

EDU001038

# Appendix D: Institutions Operating As "Bible Colleges" or "Bible Institutes" [26]

An institution that clearly identifies itself in its name with the phrase "bible college" or "bible institute" and has not received a certificate of authorization may confer diplomas and other written evidences of proficiency or achievement other than associate, baccalaureate, master's, and doctoral degrees or any other type of degree and may identify itself as a "bible college" if such institution:

a.  Prominently discloses on any transcripts, diplomas, or other written evidences of proficiency or achievement, and includes with any promotional material or other literature intended for the public, the statement: "this institution is not certified by the chancellor of the board of regents or the state of Ohio"

b.  Limits its course of instruction to religion, theology, or preparation for a religious vocation, or is operated by a church or religious organization and limits its instruction to preparation for a service to churches or other religious organizations

c.  Confers only diplomas and other written evidences of proficiency or achievement that bear titles clearly signifying the religious nature of the instruction offered by the institution

---

26 Institutions established prior to October 13, 1967 are not required to obtain a certificate of authorization to offer associate, bachelor's, master's and doctoral degrees provided that promotional material or other literature intended for the public includes the following statement: "this institution is not certified by the chancellor of the board of regents or the state of Ohio." Institutions that choose not to obtain a certificate of authorization are not eligible for any program administered by the Board of Regents (e.g., Ohio College Opportunity Grants, Choose Ohio First scholarships, War Orphans Scholarships) or by other agencies that require Ohio Board of Regents authorization for participation (e.g., Ohio Department of Education, State of Ohio Board of Nursing).

**R3 - 76 of 92**

EDU001039

# Appendix E: Required Actions for Institutional Closure

1. When an authorized institution proposes to discontinue its operation, the institution must provide the Chancellor with a *Notification of Commitment to Close* within 24 hours of the final decision[27]. The *Notification* must include:

   a. Official date of Board of Directors/Board of Trustees action;

   b. Anticipated end date for teaching activity;

   c. Anticipated end date for all operations; and

   d. Verification of notification of all applicable regional, national and specialized/professional accrediting agencies.

2. Following notification, the institution must submit a *Closure Plan* to the Chancellor no less than 90 days prior to the anticipated end date of teaching. The *Plan* must include:

   a. A listing of all degrees and degree programs in which students are currently enrolled

   b. A listing of all students in each of the degrees/degree programs

      i. The list shall include the student's name, address, phone number, email address, and estimated graduation date.

   c. A documented plan to ensure that educational obligations are met for all of the currently enrolled students (i.e., a "teach out" plan)

      i. "Teach out" plans may be completed by the closing institution or by other institutions, as circumstances dictate.

      ii. The Chancellor may approve other authorized or approved institutions to "teach out" students who are enrolled in an institution which ceases operation. An approved "teach out" institution shall:

      • Agree to offer the course of study or a course of study similar to that in which the student was enrolled at the closed institution;

      • Accept any and all academic credit earned by the student at the closed institution;

      • Provide the student the opportunity to complete his/her program at a cost and in a timeframe similar to that which the student would have paid and fulfilled at the closed institution;

      iii. If the closed or closing institution fails to provide an acceptable plan to the Chancellor, the Chancellor's staff may work toward effecting "teach out" arrangements with other authorized or approved institutions.

   d. Submission of any other information or materials requested by the Chancellor's staff

---

27 Institutions are encouraged to communicate with the Chancellor's staff prior to a final decision.

EDU001040

*Appendix E: Required Actions for Institutional Closure*

3.  The institution shall maintain sufficient and qualified faculty, staff and equipment to teach all subjects to all currently enrolled students, regardless of the size of the class, until an approved "teach out" plan has been implemented.

4.  The institution must make arrangements with an approved or authorized institution to secure the educational transcripts of its students and must provide the Chancellor with information on how students may access those records in the future.

5.  The institution must provide evidence that the Ohio State Grants and Scholarships office has been contacted for appropriate dispensation of grants/scholarships and other forms of financial aid.

6.  Institutions that close without proper notification to the Chancellor or that fail to comply with closure obligations may have their authorization retroactively revoked by the Chancellor.

**R3 - 78 of 92**

EDU001041

# Appendix F: SARA Guidelines

A. Responsibilities of the Chancellor of the Ohio Board of Regents

   a. Consistent with State Authorization Reciprocity Agreement (herein after "SARA") requirements, the Chancellor, or his or her designee, will perform the following duties:

      i. Serve as the primary point of contact for Ohio institutions participating in SARA for any issues that may arise between the institutions and other SARA member states;

      ii. Serve as the point of contact for all other SARA member states and their agencies for questions about SARA within Ohio;

      iii. Determine whether an Ohio institution is eligible for participation in SARA, and lead any investigations regarding whether an institution is in compliance with SARA rules and policies;

      iv. Serve as the contact point for complaints about any institution in the state that are operating under SARA;

      v. Work cooperatively with other SARA states, regional compacts and NC-SARA to enable the success of the initiative; and

      vi. Follow up on requests for information or investigations from the SARA member states or any SARA regional or national office, providing such data or reports as are required.

   b. The Chancellor will require each Ohio applicant institution to apply for state approval using the standard SARA institutional application, including the agreement to operate under the Council of Regional Accrediting Commissions guidelines.

   c. The Chancellor will review renewal applications for participation in SARA on an annual basis.

   d. The Chancellor will approve, in an administrative rule, an annual fee schedule that provides sufficient funds to cover the administrative costs for oversight of SARA.

   e. The Chancellor will verify institutional accreditation by an accrediting body recognized by the U.S. Department of Education.  Such accreditation is considered by the Chancellor to be sufficient initial evidence of academic quality for approving institutions for participation in SARA.

   f. The Chancellor will accept applications from accredited degree-granting institutions of all sectors.  Applications are approved based on the same criteria regardless of the sector.

   g. For non-public institutions, the Chancellor will accept an institutional federal financial responsibility rating of 1.5 or above as sufficient evidence of financial stability to qualify for participation in SARA.

   h. In the event an institution does not participate in federal Title IV financial aid, and therefore has no federal financial responsibility rating, the Chancellor will calculate

this rating, using the same or similar formula as is used by the federal government, before allowing an institution to participate in SARA:

    i.  In the event an institution has a financial responsibility rating of 1.0 to 1.4, the Chancellor will consider the institution for participation in SARA if the institution provides one of the following:

        1.  Evidence indicating that the institution is still eligible to receive Title IV funding, or

        2.  Evidence indicating that the institution's Senate Bill 6 ratio is above 1.75 for the past two years (see ohiohighered.org for more information on the Senate Bill 6 ratio calculations), or

        3.  A performance bond or irrevocable letter of credit in the amount equivalent to the unearned tuition of students served under SARA.

    ii.  The Chancellor will not consider an initial or renewal application for participation in SARA from an institution with a financial responsibility rating less than 1.0.

  i.  In the event of an unanticipated closure or natural disaster impacting a campus, the Chancellor will work with the institution to develop and approve a plan for the protection of student records.  All Ohio institutions participating in SARA must agree to provide a comprehensive plan for providing students with opportunities to complete their education program and for preservation of student records upon request from the Chancellor. For further information regarding required actions for institutional closure see Appendix E of this manual.

B.  Institutional Responsibilities

  a.  Ohio institutions seeking participation in SARA must hold proper authorization from Ohio to offer postsecondary education, hold accreditation from an accrediting association recognized by the U.S. Department of Education, and maintain accepted financial responsibility scores.

  b.  Any Ohio institution operating under SARA that offers courses or programs potentially leading to professional licensure must keep all students and potential students informed as to whether such offerings actually meet state licensing requirements in the states where the student resides.  Failure to provide proper notice in one of the two ways listed below invalidates the SARA eligibility of the course or program offered.

    i.  The institution will notify the applicant or student in writing that the institution has determined the course or program meets the requirements for professional licensure in the state where the applicant or student resides, or,

    ii.  The institution will notify the applicant or student in writing that the institution cannot confirm the course or program meets requirements for professional licensure in the student's state.  The institution must provide the student with current contact information for any applicable licensing boards and advise the student to determine whether the program meets requirements for licensure in

EDU001043

*Appendix F: SARA Guidelines*

the state where the student resides.  Such contact information may include, but is not limited to, the current, active website of the applicable licensing board.

iii.  An e-mail dedicated solely to this purpose and sent to the student's best known e-mail address meets this requirement. The institution should use other means to notify the student if needed.

c.  In order to maintain approval, an institution must agree to:

i.  Abide by the Interregional Guidelines for the Evaluation of Distance Education adopted by the Council of Regional Accrediting Commissions, as summarized below.

1.  Online learning is appropriate to the institution's mission and purposes.

2.  The institution's plans for developing, sustaining, and, if appropriate, expanding online learning offerings are integrated into its regular planning and evaluation processes.

3.  Online learning is incorporated into the institution's  system of governance and academic oversight.

4.  Curricula for the institution's online learning offerings are coherent, cohesive, and comparable in academic rigor to programs offered in traditional instructional formats.

5.  The institution evaluates the effectiveness of its online learning offerings, including the extent to which the online learning goals are achieved, and uses the results of its evaluations to enhance the attainment of the goals.

6.  Faculty responsible for delivering the online learning curricula and evaluating students' success in achieving the online learning goals are appropriately qualified and effectively supported.

7.  The institution provides effective student and academic services to support students enrolled in online learning offerings.

8.  The institution provides sufficient resources to support and, if appropriate, expand its online learning offerings.

9.  The institution assures the integrity of its online offerings.

ii.  Be responsible for the actions of any third-party providers used by the institutions to engage in operations under SARA.

iii.  Notify the Chancellor of any negative changes to its accreditation status or financial stability.

iv.  Provide data necessary to monitor SARA activities, as determined by the Chancellor and NC-SARA.

v.  Submit annual participation fees as appropriate to SARA and the Chancellor.

vi.  Make the institution and the Chancellor's complaint resolution policies readily available to applicants and students for coursework under SARA provisions. Readily available in this context means published as part of the institution's catalog or student handbook and/or published on the institution's website.

vii. Work with the Chancellor to resolve any complaints arising from its students in SARA states and to abide by decisions of the Chancellor.  Complaints must follow the institution's customary resolution procedure prior to being referred to the Chancellor under SARA procedures.  Under SARA, the Chancellor will not accept complaints more than two years after the incident, complaints regarding grade appeals, or appeals related to student conduct violations.  Complaints concerning criminal misconduct should be filed directly with local law enforcement authorities.  Complaints relating to violations of federal law should be filed directly with the federal agency having jurisdiction over the matter in question.

viii.     Agree, in cases where the institution cannot fully deliver the instruction for which a student has contracted, to provide a reasonable alternative, as determined by the Chancellor, for delivering the instruction or reasonable financial compensation, as determined by the Chancellor for the education the student did not receive.

d.  In the event of an unanticipated closure or natural disaster impacting a campus, each institution has an obligation to work with the Chancellor to develop and receive approval of a plan for the protection of student records.

C.  Complaint Process

a.  If the Chancellor receives a complaint about an Ohio institution under the Chancellor's jurisdiction, the individual who makes the complaint will be contacted by the Chancellor's staff to determine if such person has exhausted the grievance process at the institution.

b.  If the person making the complaint has not utilized the institutional remedies available, the individual will be directed to contact the institution to seek resolution. If the institutional grievance process has been completed, the Chancellor will provide appropriate forms to file a formal complaint against the institution. These forms will also be made available on the Chancellor's website.

c.  The formal complaint must be submitted in writing using the form provided by the Chancellor. The form will be available on the Chancellor's website www.ohiohighered.org. The complaint may be mailed or submitted electronically via e-mail and must include supporting materials as well as documentation verifying institutional remedies have been exhausted. The Chancellor's staff will acknowledge receipt of the formal complaint in writing (e-mail acknowledgment is acceptable).

d.  SARA-related complaints that fall within the jurisdiction of the Chancellor will be investigated and resolved as appropriate.  SARA applies solely to those complaints resulting from distance education courses offered by Ohio institutions that have been approved for participation in SARA by the Chancellor to students in other SARA states.  It does not apply to Ohio residents taking distance education courses inside Ohio. Complaints concerning criminal misconduct will be referred to local law enforcement authorities.  Complaints related to violations of federal law will be referred to the federal agency having jurisdiction over the matter in question.

R3 – 82 of 92

EDU001045

e.  Institutions will provide a response to the complaint within ten working days of official notification by the Chancellor.

f.  The Chancellor will keep a log of all complaints, record the date received, the name of the individual making the complaint, the institution against which the complaint is made, a brief description of the complaint and the date and nature of its disposition.

g.  The Chancellor will promptly report complaints and concerns to the institutions about which the complaint is lodged, the home state SARA portal agency responsible for any such institution and, if appropriate, the relevant accrediting bodies.

    i.  The Chancellor will ensure all complaints, supporting documentation and logs are securely stored.  The Chancellor will report all complaints to NC-SARA on a quarterly basis.

# Appendix G: Program Approval Forms and Staff Contact Information

## General Program Approval Requests

- Initial authorization and reauthorization
- New undergraduate programs at Ohio public colleges and universities
- New undergraduate and graduate programs at previously authorized institutions
- Requests related to SARA (State Authorization Reciprocity Agreements)
- Requests to make changes to existing programs (Change Requests)
- Solicitation of Ohio students by out-of-state for-profit institutions
- On-ground experiences for students enrolled in out-of-state institutions

**Information**: **https://www.ohiohighered.org/academic-program-approval**

**Contact Information**:
Email: **mexline@regents.state.oh.us**
Phone: 614-728-3095

## Educator Licensure and Endorsement Preparation Programs

- Requests for new and continuing programs
- Requests to make changes to approved programs (change requests)

**Information**: **https://www.ohiohighered.org/offering-education-programs**

**Contact**:
Email: **educator_prep@regents.state.oh.us**
Phone: 614-728-3095

## Graduate Programs at Ohio Public Universities (RACGS)
### (and Case Western Reserve University and University of Dayton)

- Requests for new programs
- Requests to make changes to approved programs (change requests)

**Information**: **https://ohiohighered.org/racgs**

**Contact Information**:
Email: **crogge@regents.state.oh.us**
Phone: 614-466-0886

R3 - 84 of 92

EDU001047

# Appendix H: Links to Related Documents and Sites

## Ohio Revised Code

- **Chapter 1713**: Educational corporations and certificates of authorization - **http://codes.ohio.gov/orc/1713**
- **Chapter 3333**: Ohio Board of Regents - **http://codes.ohio.gov/orc/3333**
  - » **Section 3333.16**: Universal course equivalency classification system for state institutions of higher education - **http://codes.ohio.gov/orc/3333.16**
  - » **Section 3333.162**: Criteria, policies and procedures for transfer of courses - **http://codes.ohio.gov/orc/3333.16**
  - » **Section 3333.163**: Standards for college credit based on advanced placement scores - **http://codes.ohio.gov/orc/3333.163**
- **Section 3354.01**: Community college definitions - **http://codes.ohio.gov/orc/3354.01**
- **Section 3357.01**: Technical college definitions - **http://codes.ohio.gov/orc/3357.01**
- **Section 3358.01**: State community college definitions - **http://codes.ohio.gov/orc/3358.01**

## Ohio Administrative Code

- **Section 3333-1**: General Provisions - **http://codes.ohio.gov/oac/3333-1**

## Chancellor's Directives

- Signed Directives Archive: **https://www.ohiohighered.org/board-of-regents/chancellor/proposed-actions/directives**
- Definition of Semester Credit Hour and Length of Semester Term: **http://regents.ohio.gov/actions/documents/2010/Dir2010-016.pdf**

*Appendix H: Links to Related Documents and Sites*

## Other Documents and Sites

- Regents' Advisory Committee on Graduate Study (RACGS) Guidelines: **https://www.ohiohighered.org/racgs**

- Inter-University Council (IUC): **http://www.iuc-ohio.org**

- Ohio Association of Community Colleges (OACC): **http://www.ohiocommunitycolleges.org**

- Association of Independent Colleges and Universities of Ohio (AICUO) **http://www.aicuo.edu/AboutAICUO.html**

- Ohio Association of Career Colleges and Schools (OACCS) **http://www.ohiocareercolleges.org**

- State Board of Career Colleges and Schools (SBCCS): **http://scr.ohio.gov**

- Council for the Accreditation of Educator Preparation (CAEP): **http://caepnet.org**

- Ohio Department of Education (ODE) - Information for Teachers: **http://education.ohio.gov/Teachers**

**R3 - 86 of 92**

EDU001049

# **Appendix I**: Program Approval Records Retention Policy

In adherence to, and in compliance with Ohio Revised Code 149.34 for records management and in accordance with the regulations set forth by the Ohio Department of Administrative Services, the offices of the Ohio Board of Regents shall comply in retaining paper files, electronic mail correspondence and electronically scanned documents. A full listing of Ohio Board of Regents record retention schedules can be found using the Records Management System (RIMS) on the Department of Administrative Services website, **www.das.ohio.gov**.

**R3 - 87 of 92**

EDU001050

R3 – 88 of 92



Ohio Board of Regents  |  25 South Front Street  |  Columbus, OH 43215-4183  |  614.466.6000

EDU001051

# RESPONDENT'S EXHIBIT 3 ATTACHMENT B

**R3 - 89 of 92**

EDU001052

**From:** "Mexline@highered.ohio.gov" <Mexline@highered.ohio.gov>

**Subject: RE: Request for clarity from Ashland University Provost**

**Date:** February 10, 2022 at 3:54:24 PM EST

**To:** Amiel Jarstfer <ajarstfe@ashland.edu>

Dear Dr. Jarstfer,

Thank you for reaching out. I hope that you are well.

The closest definition that we have for a compressed term is what we call "accelerated delivery." Accelerated delivery: an accelerated program delivery model includes courses that do not meet during the institution's regular academic term as well as courses that meet during the regular academic term but are offered in a substantially different manner than a fixed number of meeting times per week for all the weeks of the term.

We have a process to approve new programs using an accelerated model and a process to approve changes to an existing program that would like to move to an accelerated model. I am happy to share those forms with you if needed.

I hope this helps. Please feel free to reach out with any questions. Have a nice day!

Sincerely,

Matt

Matt Exline

Ohio Department of Higher Education

614-728-3095

**PLEASE NOTE: This message and any response to it may constitute a public record, and therefore may be available upon request in accordance with Ohio public records law. (ORC 149.43)**

**From:** Amiel Jarstfer <ajarstfe@ashland.edu>
**Sent:** Tuesday, February 8, 2022 5:59 PM
**To:** Exline, Matthew <Mexline@highered.ohio.gov>
**Subject:** Request for clarity from Ashland University Provost

Dear Matt,

We are working through questions surrounding a 12-week course format within a 15-week semester and it has raised the question of whether ODHE has a specific definition of "compressed term" as referenced in some state higher education communications. Could you please point me in the right direction on defining this officially?

Sincerely,

Amiel Jarstfer, PhD

Provost and Professor

Ashland University

419-289-5051

ajarstfe@ashland.edu

**R3 - 91 of 92**

EDU001054

**CAUTION:** This is an external email and may not be safe. If the email looks suspicious, please do not click links or open attachments and forward the email to csc@ohio.gov or click the Phish Alert Button if available.

**R3 - 92 of 92**

EDU001055

# RESPONDENT'S EXHIBIT 4

# DECLARATION OF STEPHEN HOWELL WITH ATTACHMENT A

EDU001056

**U.S. DEPARTMENT OF EDUCATION**
**FEDERAL STUDENT AID**
**SCHOOL PARTICIPATION DIVISION – CHICAGO/DENVER**

*In re: Ashland University Program*
*Review Report dated January 3, 2022*
*OPE ID: 00301200*
*PRCN: 2021-4-05-30426*

**DECLARATION OF STEPHEN HOWELL, IN SUPPORT OF ASHLAND UNIVERSITY'S RESPONSE TO PROGRAM REVIEW DATED JANUARY 3. 2022**

I, Stephen Howell, declare as follows:

1.     I make this declaration based on personal knowledge. If called to testify, I would and could testify competently as set forth below.

2.     I submit this declaration in support of Ashland University's ("Ashland") response to the Program Review Report ("PRR") issued by U.S. Department of Education's Office of Federal Student Aid ("Department") dated January 3, 2022.

3.     I currently serve as the Director of Financial Aid at Ashland. I have served in this role since 1985.

4.     I earned a Bachelor of Arts in Business Administration in from Taylor University in 1980 and a Master of Arts in Student Personnel Administration from Ball State University in 1985.

Page **1** of **2**

R4 - 1 of 9

EDU001057

5.      Prior to serving in my current role at Ashland, I was a Financial Aid Administrator at Taylor University from May 1980 to August 1985.

6.      My responsibilities as Director of Financial Aid are: to counsel and inform current and prospective undergraduate/graduate students, parents, guardians regarding financial aid programs and their eligibility; prepare and review (for accuracy) financial aid applications for undergraduate/graduate students and determines financial aid awards; manage and administer the federal and private student loan programs; manage and administer the student employment programs; in collaboration with the Executive Director, maintain compliance with the U.S. Department of Education Title IV aid and other similar state programs; manage and administer the default management program; hire, supervise, train and evaluate staff and makes personnel recommendations to the Executive Director; chair and co-chair meetings and presentations with the financial aid staff and other department staff to educate students, parents, and the campus community on financial aid policies, regulations and compliance matters; in consultation with the Executive Director, establish and maintain policies and manuals related to the administration of financial aid government programs and compliance there with; actively initiates and participates with the Executive Director in the continuous improvement of the Financial Aid Office operations and processes; collaborates with the Director of Undergraduate Admissions and other like positions to provide financial aid information to assist in the recruitment of students; collaborate with the Business Office to resolve financial aid/billing problems; collaborates with the Executive Director to ensure the University is in compliance with NCAA regulations as it relates to student financial aid; collaborates with other University departments including but not limited to Athletics, the Business Office, Admissions, Registrar, and Information Technology Departments; stay current on all industry standards and state and

EDU001058

federal rules and regulations through self-directed professional readings and attending professional development training; and serve on various University committees and task forces as required.

7. In my current role as Director of Financial Aid at Ashland, I have completed the following trainings, including but not limited to: annual compliance Family Educational Rights and Privacy Act (FERPA) and Title IX training; Federal Student Aid Annual conference(s); Ohio Association of Student Financial Aid Administrators conference(s); and National Association of Student Financial Aid Administrators ("NASFAA")conference(s); NASFAA: "COVID-19 and Federal Student aid: What we know"; Ashland Online Drug-Free Workplace compliance training; and Ashland IT Cyber and Data Security training.

8. Kelly Liocano was hired as Senior Associate Director of Financial Aid in September 2018 and until October 2020, Kelly Liocano reported to me as it related to the Experimental Sites Initiative (ESI) Second Chance Pell ("SCP") program. Kelly Liocano managed the Financial Aid matters related to the SCP program from her date of hire until her resignation and last day with Ashland in November 2021.

9. Kelly Liocano became Executive Director of Financial Aid in October 2020 and until November 2021, I performed my duties as Director of Financial Aid under her direction and supervision as Executive Director.

10. Consistent with Federal Student Aid guidance, SCP students do not have a separate academic program and are enrolled in the same academic programs which all other Ashland students award calculations are based upon.[1]

---

[1] Attachment A - FSA Handbook

Page 3 of 2

EDU001059

11. My office conducted a full file review of all SCP students Pell Grant packaging from 2019-2020 and 2020-2021 award years using Formula 2 and 3.[2] In addition, my office revised its Pell Grant packaging policies and procedures.[3]

12. My office conducted a full file review of all SCP students during award years 2019-2020 and 2020-2021 award subject to a Return of Title IV ("R2T4") funding.[4] Consistent with the file reviews for each award year, my office also calculated the difference in R2T4 using Formulas 2 and 3, respectively.[5] In addition, my office revised policies and procedures governing R2T4 calculations.[6]

13. As a general proposition, my office always tries to help students maximize their federal student aid, and it always tries to fully utilize the funds which are allocated to Ashland so that its student body on the whole will receive the greatest possible educational opportunity from the SCP program. Ashland does not have a formal policy, as cited in the Finding 4 of the PRR, to award Pell Grant funds to SCP students in the award year that is most beneficial to the individual student.

14. Ashland always contributes institutional aid to supplement Pell Grant awards so that all SCP students' financial obligations are fully covered every year, to supplement the remaining balance on any SCP student account once Pell awards have been applied.

15. Regarding Finding 6, my office has revised its Pell Grant Packaging Policy and Procedure.[7] To ensure that funds are only disbursed after Ashland has corroborated

---

[2] Attachment B - Formula 2 SCP Pell Awards 2019-2020, Attachment C - Formula 2 SCP Pell Awards 2020-2021, Attachment D - Formula 3 SCP Pell Awards 2019-2020, and Attachment E - Formula 3 SCP Pell Awards 2020-2021.

[3] Attachment O – Revised Pell Grant Packaging Policy and Procedures.

[4] Attachment F - File Review 2019-2020 Formula 2, Attachment G - File Review 2019-2020 Formula 3, Attachment H - File Review 2020-2021 Formula 2, and Attachment I - File Review 2020-2021 Formula 3.

[5] Attachment J- R2T4 2019-2020 Formula 2, Attachment K - R2T4 2019-2020 Formula 3, Attachment L - R2T4 2020-2021 Formula 2, and Attachment M - R2T4 2020-2021 Formula 3.

[6] Attachment N - R2T4 Policies and Procedures

EDU001060

attendance in all courses of enrollment, my office completed training during the week of January 31, 2022, and SCP site directors completed training on February 2-3, 2022.

16.     Moreover, regarding Finding 6, my office conducted a full file review and substantiated the PRR findings as to the students identified in Finding 6 as Students 1 and 10, respectively.

17.     My office conducted a file review and concurred with the PRR's Finding 7 as to the student identified therein as "Student 13" and determined this Pell Grant overpayment in the summer 2020 term was due to human error.   My office will await instruction as to the return of funds to Department.

18.     As to the student identified as "Student 23" in Finding 7, my office acknowledges an error occurred and was corrected prior to the initiation of the program review. As noted in the PRR, my office detected this overpayment through our own internal controls and returned funds to the Department on June 10, 2021.[8]  The Department confirmed to the review team that these funds were returned.[9]

19.     As to the inadvertent errors cited in Finding 7, to prevent future human errors from impacting Pell Grant packaging, my office has coordinated with the Vice President of Correctional Education and Innovation, Dr. Todd Marshall, whose office addressed this issue and the requisite remedial measures thereto.

20.     In response to Finding 9, I have reviewed the federal regulations and will provide updates to the Eligibility and Certification Approval Report ("ECAR") as required and reaffirm my commitment regarding updating the changes to Ashland's electronic application.

---

[7] *See* n.3, Attachment O - <u>Revised Pell Grant Packaging Policy and Procedure</u>
[8] PRR, Page 15.
[9] *Id.*

Page **5** of **2**

**R4 - 5 of 9**

EDU001061

I, Stephen Howell, declare under penalty of perjury that the foregoing is true and correct. Executed on this ___2___ day of March, 2022, in _Ashland_ , ___OH_____ .

_Stephen Howell_
Stephen Howell
Director of Financial Aid, Ashland University

Page **6** of **2**

**R4 - 6 of 9**

EDU001062

# RESPONDENT'S EXHIBIT 4 ATTACHMENT A

**R4 - 7 of 9**

EDU001063

# Academic Years, Academic Calendars, Payment Periods, & Disbursements



CHAPTER **1**

*This chapter discusses the academic year, academic calendar, payment period, and disbursement requirements for awarding aid across the Federal Student Aid (FSA) programs. Additional information about requirements that are specific to particular FSA programs is provided in other chapters of this volume.*

---

## CHAPTER 1 HIGHLIGHTS

**Academic Year requirements**
**Academic calendars & terms**
**Payment periods**
**Grant programs**
- Standard and nonstandard terms
- Clock-hour and non-term credit-hour

**Direct Loan program**
- Standard terms and substantially equal nonstandard terms
- Clock-hour, non-term credit-hour, and nonstandard terms not substantially equal in length

**"Successfully completes"**
**"Substantially equal" terms**
**Disbursement issues**
**Payment period completion requirements**
**Timing of disbursements**
**Related topics**
Payment periods when student re-enters a program after withdrawing—see *Volume 5, Chapter 2.*
Direct Loan annual loan limit progression—see *Volume 3, Chapter 5.*

---

## ACADEMIC YEAR REQUIREMENTS

Every eligible program must have a defined academic year. The academic year is one component used in determining a student's eligibility for Title IV aid. A school may have different academic years for different academic programs. For example, a school may choose to define the academic year for a term-based program differently from a non-term program. In some cases, the definition *must* be different, such as in the case of a clock-hour program and a credit-hour program. For FSA purposes, the academic year is defined in weeks of instructional time and for undergraduate programs in credit or clock-hours. The program's academic year does not have to coincide with the school's academic calendar.

A school may treat two versions of the same academic program (day and night, for example) as separate programs and define different academic years for each version. If your school establishes separate versions of a program, with different academic years, but allows individual students to take courses from both versions, your school must be able to demonstrate in which program the student is actually enrolled. Generally, to be considered enrolled in a particular program or version of a program, a student must be taking the majority of his or her coursework in that program. Although a school

### Regulatory citations
Academic year: 34 CFR 668.3
Payment period: 34 CFR 668.4
Weeks of instructional time: 34 CFR 668.3(b).

**R4 - 8 of 9**

EDU001064

may have different academic years for different programs, it must use the same academic year definition for **all** FSA awards for students enrolled in a particular program, and for all other FSA program purposes.

### Weeks of instructional time in an academic year

- For a program offered in **credit hours**, the academic year must include at least 30 weeks of instructional time.

- For a program offered in **clock hours**, the academic year must include at least 26 weeks of instructional time.

The minimum standards for weeks of instructional time described above apply to both undergraduate and graduate or professional programs.

**Note:** See *Volume 2* for information about academic year requirements for direct assessment programs, which do not measure academic progress using credit or clock hours.

The number of weeks of instructional time is based on the period that generally begins on the first day of classes in the academic year and ends on the last day of classes or the last day of examinations, whichever is later.

**Reductions in academic year length**
34 CFR 668.3(c)
HEA Sec. 481(a)(2)(B)

Schools that provide 2- or 4-year associate or baccalaureate degree programs may apply to the Department if they want to request approval to establish a full academic year of less than 30 weeks of instructional time. The Department is permitted to grant a reduction for good cause to no less than 26 weeks of instructional time. These requests are handled on a case-by-case basis. To request approval, contact the School Participation Division that oversees your school (see *Volume 2*).

For all FSA programs, a week of instructional time is any period of seven consecutive days in which at least one day of regularly scheduled instruction, examination, or (after the last day of classes) at least one scheduled day of study for examinations occurs. Instructional time does not include periods of orientation, counseling, homework, vacation, or other activity not related to class preparation or examination. Therefore, the weeks of instructional time may be less than the number of calendar weeks that elapse between the first day of classes and the last day of classes or examinations. Note that the Department has not set a regulatory standard for the number of hours of instructional time that make up one day of instruction. This has been left to the reasonable interpretation of schools and their accrediting agencies.

Although most programs are at least one academic year in length, some eligible programs are shorter than an academic year. See *Volume 2, Chapter 2* for more detail on the requirements for such programs.

EDU001065

# RESPONDENT'S EXHIBIT 5

# DECLARATION OF MARY DELOE

EDU001066

**U.S. DEPARTMENT OF EDUCATION**
**FEDERAL STUDENT AID**
**SCHOOL PARTICIPATION DIVISION – CHICAGO/DENVER**

*In re: Ashland University Program*
*Review Report dated January 3, 2022*
*OPE ID: 00301200*
*PRCN: 2021-4-05-30426*

**DECLARATION OF MARY DELOE**

I, Mary Deloe, declare as follows:

1.     I make this declaration based on personal knowledge. If called to testify, I would and could testify competently as set forth below.

2.     I currently serve as the Director of Academic Services at Ashland. I have served in this role since July 1, 2019.

3.     As Director of Academic Services, I report to and serve at the direction of the Vice President of Correctional Education and Innovation at Ashland, Dr. Todd Marshall.

4.     I earned a Bachelor degree in Public and Corporate Communications from Butler University and my Master of Business Administration from LeTourneau University.

5.     My responsibilities as Director of Academic Services include support for the vision and direction for the University as articulated by the Dean of College of Online and Adult Studies and consistent with the University's mission, working collaboratively in a participative environment. I provide academic leadership, faculty support, planning, coordination and guidance

Page **1** of **3**

**R5 - 1 of 3**

EDU001067

to the University's online curriculum and work to support an environment conducive to effective online teaching and scholarly achievement.

6.      As Director of Academic Services at Ashland, I have completed the many trainings, internally and externally, included but not limited to: Ashland Teaching & Learning in the Online Environment Best Practices Module, Ashland Teaching & Learning in the Online Environment Online Learning Expectations Module, Ashland Teaching & Leaning in the Online Environment Certification, Drug-Free Workplace, Title IX Training, Quality Matters Introduction to Quality Matters, Quality Matters Designing Your Online Course, Quality Matters Improving Your Online Course, and CITI Program Family Educational Rights and Privacy Act ("FERPA").

7.      My responsibilities in the Experimental Sites Initiative ("ESI") and Second Chance Pell ("SCP") program included enrollment management, section optimization, Correctional Education faculty training and improvement, coordinating assessment for academic departments, facilitating weekly communication to address non-curricular issues with Correctional Education teaching faculty, administration of the Subject Matter Expert program, working with department chairs for staffing, and course development needs, and contract administration.

8.      The course delivery for SCP students is asynchronous, distance education, with twelve (12) weeks of scheduled class instruction.

9.      Prior to the start of class instruction ("Pre-Week 1"), instructors engage with the SCP students about the course syllabus, available resource materials, technology issues necessary to facilitate the delivery of course content, and any other academic matters necessary to initiate the course including a technology module. Instructors are also encouraged to begin exchanges with each student individually by prompting them to review the syllabus, course materials, and

Page **2** of **3**

**R5 - 2 of 3**

EDU001068

resources, and then respond to the instructor with information relating to their impression of the topic areas to be covered, readings, modules, and what their learning outcomes or objectives are.

10.     Submission of grades are due the week after the twelfth week of class instruction on that Thursday. However, some SCP students may continue to submit assignments and some instructors may continue to interact with SCP students to evaluate any unfinished assignments and other matters which may be necessary for the student to complete the course and establish steps to do so during the week grades are due.

11.     However, some students are still assigned an "incomplete" grade when the instructor submits their grades. To facilitate their course completion, students may submit assignments necessary to complete the course and effectuate any steps an instructor may identify the week grades are due until the incomplete grade is ultimately resolved.

12.     Due to the nature of the program, incarcerated students often face interruptions which cause delays. Some of those interruptions have included but are not limited to: lockdowns related to events within the facility ranging from behavioral to medical incidences, tablet technical issues, kiosks malfunctions, hurricanes, WIFI disruptions, COVID-19 outbreaks, and floods.

I, Mary Deloe, declare under penalty of perjury that the foregoing is true and correct. Executed on this ___26___ day of February, 2022, in ___Sylvania   Ohio___

_____
Mary Deloe
Director of Academic Services, Ashland University

Page **3** of **3**

**R5 - 3 of 3**

EDU001069

# RESPONDENT'S EXHIBIT 6

# DECLARATION OF JAMES HAYES

EDU001070

**U.S. DEPARTMENT OF EDUCATION**
**FEDERAL STUDENT AID**
**SCHOOL PARTICIPATION DIVISION – CHICAGO/DENVER**

| | |
|---|---|
| *In re: Ashland University Program Review Report dated January 3, 2022 OPE ID: 00301200          PRCN: 2021-4-05-30426* | **DECLARATION     OF     JAMES HAYES, Ph.D.** |

I, James Hayes, declare as follows:

1.      I make this declaration based on personal knowledge. If called to testify, I would and could testify competently as set forth below.

2.      I currently serve as the Director of Educational Technology and User Services at Ashland University. I have served in this role since December 2019.

3.      I received my degree in Bachelor of Arts of Communication Youngstown (2009) Masters Communication from Cleveland State in 2012, and a Ph.D. in Instructional Technology from Kent State in 2020.

4.      Prior to serving in my current role at Ashland, I was the Instructional Designer at Mt. Carmel College of Nursing from 2018-2019.

5.      My responsibilities are in my role as Director of Educational Technology and User Services at Ashland are to work collaboratively with faculty, staff, and technology partners to design, develop, and deploy technology across the University's educational system; supervise and mentor IT Educational Technology and User Services staff and students; manage

Page **1** of **4**

R6 - 1 of 4

EDU001071

the research, implementation, integration, and administration of Educational Technologies including LMS & applications, video hosting and conferencing, accessibility as well as academic integrity tools; direct and supervise Tier 1, Tier 2 and Tier 3 Help Desk, technical and client support services acting as a focal point for Information Technology customer service both in person and on the phone; maintain and expands knowledge of technology and eLearning trends, innovations, research, and best practices; develop instructor and student tutorials, as needed to facilitate Educational Technology adoption; collaborate with faculty to increase their capacities for effective technology-based teaching and learning; participate in the development and administration of applicable University policies, strategic plans, goals and programmatic activities pertaining to classroom, online, and hybrid technology; work with vendors to get installs, firmware updates, and ongoing issues resolved; managing inventory, purchasing, and budgeting for computing devices and software including monitoring and updates; participate in IT security planning and remediation efforts including disaster recovery and contingency planning.

6. As Director of Educational Technology and User Services at Ashland, I have completed the following trainings including but not limited to:

- Blackboard Administrator Training

- Zoom Administrator Training

- Kaltura Administrator Training

- Spring Faculty College 2020, 2021, and 2022

- Fall Faculty College 2020 and 2021

7. My responsibilities with the Experimental Sites Initiative ("ESI") Second Chance Pell ("SCP") program involve:

Page **2** of **4**

R6 - 2 of 4

EDU001072

• Activate and Deactivate students in our Corrections Learning Management Systems

• Generate and Interpret LMS Activity reporting in our Corrections Learning Management Systems

• Oversee educational device inventory and logistics

• Manage a team of educational technologists, learning systems administrators, and technology project managers dedicated to the corrections program

• Assist with strategic planning for the corrections program with regard to technology transitions and upgrades

8.     SCP students receive access to their devices two (2) weeks before the start of the twelve (12) weeks of course instruction.

9.     SCP students receive access to course materials for their enrolled classes on their devices one week before course instruction begins ("Pre-Week 1").

10.     SCP Students or their Site Director on their behalf, submit a request for an "Incomplete" grade prior to the submission of grades.

11.     My office receives a list from the Registrar's Office of those students whose request for an "Incomplete" grade have been approved.

12.     SCP students assigned an "Incomplete" will retain access to course materials, instructors, resource materials, and other resources necessary to complete the course objectives, and Ashland expects those students to use those resources to complete their coursework.

13.     SCP students who have not requested an Incomplete, retain their device so long as they are continuing their academic studies at Ashland. Course materials are removed from these devices one week following final grades being submitted by instructors.

Page **3** of **4**

**R6 - 3 of 4**

EDU001073

I, James Hayes, declare under penalty of perjury that the foregoing is true and correct.

Executed on this 2nd day of March, 2022, in Ashland, OH.

James Hayes,
Director of Educational Technology
and User Services, Ashland University

Page **4** of **4**

**R6 - 4 of 4**

EDU001074

# RESPONDENT'S EXHIBIT 7

# ASHLAND UNIVERSITY'S RESPONSE TO THE PROGRAM REVIEW REPORT

EDU001075



March 2, 2022

Mr. Mark Kreutzer
School Participation Division – Chicago/Denver
Federal Student Aid
230 South Dearborn, Room 3922
Chicago, IL  60604

|  |  |
|---|---|
| RE: | Ashland University Program Review Report Response |
| OPE ID: | 00301200 |
| PRCN: | 2021-4-05-30426 |

Dear Mr. Kreutzer:

Please find attached the response of Ashland University ("Ashland") to the January 3 Program Review Report.  We have requested that our counsel, Steptoe & Johnson PLLC, respond on our behalf.  As noted in our response, it appears that there were a number of facts which were not brought to the attention of the review team.  Further, our response is based in substantial measure on a detailed regulatory analysis.  We requested the assistance of counsel in both compiling the evidence which provides the factual background and developing the regulatory analysis necessary to support Ashland's response.

Since we believe our response contains new information for you and your colleagues, please know that members of our staff, our counsel, and I are willing to meet with you, your colleagues, and your counsel to discuss that new information at a time and place of your choosing.  With the longest running correctional education program in the U.S., our missional commitment to this population of students runs deep. Both Federal Student Aid and Ashland share a mutual goal of making federal financial aid available to students in a manner that is consistent with both the letter and the spirit of the laws governing the use Title IV funds.  We look forward to working with you to achieve that goal.

Sincerely yours,

Carlos Campo, Ph.D.
President

Attachment
  Ashland Response

**Office of the President**
401 College Avenue | Ashland, Ohio 44805 | 419.289.5050 | fax 419.289.5099 | www.ashland.edu

R7 - 1 of 27

EDU001076



700 N. Hurstbourne Parkway

Suite 115

Louisville, KY 40222

(502) 423-2000    (502) 423-2001 Fax

www.steptoe-johnson.com

Writer's Contact Information

Jim.newberry@steptoe-johnson.com
(502)423-2052

March 11, 2022

VIA COD

Mr. Mark Kreutzer
School Participation Division – Chicago/Denver
Federal Student Aid
230 South Dearborn, Room 3922
Chicago, IL  60604

RE:        Ashland University Program Review Report Response
OPE ID:   00301200
PRCN:    2021-4-05-30426

Dear Mr. Kreutzer:

Our firm represents Ashland University ("Ashland") in connection with its response ("Response") to the Program Review Report dated January 3, 2022 ("PRR"). On behalf of Ashland, we are pleased to submit the following Response. Ashland appreciates the opportunity to respond to the PRR, and we look forward to talking with you and your Federal Student Aid ("FSA") colleagues in the coming weeks. We trust we will be able to work with FSA to achieve a resolution of the issues identified in the PRR that will serve the purposes and mission of FSA, Ashland, and the students which we both seek to serve. We respectfully submit that some of the PRR findings were based on incomplete and/or incorrect information, and Ashland looks forward to working with FSA to correct the record in this matter.

As you will see below, our Response provides some general information about Ashland and the students it serves through its financial aid program, with a specific emphasis on the students which Ashland serves through the "Pell for Students Who Are Incarcerated" experiment ("Second Chance Pell" or "SCP") under the Experimental Site Initiative ("ESI"). We then move to a discussion of each of the ten PRR findings.

For the reasons set forth below, no refunds are merited as to Findings 1 and 2, and only limited refunds are merited as to Findings 6 and 7. Ashland acknowledges that, in some instances, its interpretations of the applicable regulations are at odds with the review team's interpretations. We trust that these good faith disagreements will be resolved in Ashland's favor through the administrative and judicial review processes. However, at the end of those processes, Ashland is dedicated to operating a fully compliant financial aid program, regardless of whether Ashland's or the review team's positions are ultimately sustained. In the meantime, there are other instances where Ashland acknowledges its need to refine certain policies and practices. Some of those policies and practices have already been changed, and others are being implemented so that Ashland can continue its longstanding practice of administering its financial aid programs in a manner that is entirely consistent with both the spirit and the letter of the laws applicable to federal student aid.

West Virginia  •  Ohio  •  Kentucky  •  Pennsylvania  •  Texas  •  Colorado    TERRALEX

**R7 - 2 of 27**

EDU001077

Mr. Mark Kreutzer
March 11, 2022
Page 2

At the end of this process, Ashland will remain irrevocably committed to helping its students receive the optimum awards of Federal Pell Grants and other forms of federal student aid to which they are entitled so that they can achieve their educational goals. We are confident that FSA and the United States Department of Education ("Department") share those goals, and we look forward to continuing to work with you and your colleagues to achieve our mutual goals.

### Background Information on Ashland

Ashland was founded in 1878 as Ashland College, but as a result of its growth over the years and the diversification of its academic programs, its name was changed to Ashland University in 1989.[1] Ashland is fully-accredited by the Higher Learning Commission, as well as by an assortment of programmatic accreditors, including the Accreditation Council for Business Schools and Programs which accredits Ashland's academic business programs.[2] Ashland is licensed as an institution of higher education by the Ohio Department of Higher Education ("ODHE").[3] Ashland has approximately 7,000 students pursuing undergraduate degrees in over 70 academic programs.[4] In those academic programs there are approximately 2,200 SCP students pursuing degrees in five (5) areas of study.[5]

The quality of Ashland's academic programs is reflected in the multitude of awards and recognitions those programs have received over the years. In just the last year, those awards include:

- *The Wall Street Journal* ranked Ashland's Master of Business Administration program as second in Ohio, based on average debt-income ratio for 2015 and 2016 graduates.[6]
- Six of Ashland's College of Business and Economics programs have been ranked among the nation's best by Intelligent.com.[7]
- Ashland University's online Bachelor's in Criminal Justice program has been ranked as the 25th best online degree program in the nation and the second best in Ohio based on return on investment.[8]

Ashland's mission, vision, and core values reflect the bases for many of its achievements in the past, as well as the activities which are the subject of the PRR. Ashland's mission statement reads:

---

[1] Exhibit 1 - Carlos Campo Declaration ¶5.

[2] *Id.*

[3] Exhibit 1 – Campo ¶5, Attachment A - ODHE Certificate of Authorization.

[4] Academic programs are available online. *See* https://www.ashland.edu/administration/office-provost/academic-affairs/majors-programs. (last viewed 02/27/2021). The number of enrolled students as of Fall 2020, *See* https://www.usnews.com/best-colleges/ashland-university-3012#:~:text=Ashland%20University%20has%20a%20total,of%20students%20live%20off%20campus (last viewed 02/27/2022).

[5] Exhibit 2 – Todd Marshall Declaration ¶16.

[6] https://news.ashland.edu/article/ashland%E2%80%99s-mba-program-no-2-ohio-according-wall-street-journal-study (last viewed 2/5/22).

[7] https://news.ashland.edu/article/intelligentcom-rates-six-au%E2%80%99s-business-programs-among-nation%E2%80%99s-best (last viewed 2/5/22).

[8] https://www.onlineu.com/degrees/criminal-justice (last viewed 2/5/22).

EDU001078

Mr. Mark Kreutzer
March 11, 2022
Page 3

> Ashland University, guided by our Christian heritage, is a comprehensive, private university that provides a transformative learning experience, shaping graduates who work, serve and lead with integrity in their local, national, and global communities.[9]

Ashland's vision for its future reflects its desire to be a leading institution of higher education:

> Ashland University aspires to be a nationally-recognized private university, where traditions of excellence are fostered and students discern their life calling and thrive.[10]

Ashland's core values impact all of the institution's activities:

ACCENT ON THE INDIVIDUAL
Pledges the best individual and collective efforts to challenge and encourage each member of the university within a supportive community.

SPIRITUALITY AND FAITH
Affirms Christian values as a core element of the University's institutional identity, emphasizing faith in God, moral integrity and respect for the diversity of values and faith of each person in a community of learning.

CHARACTER DEVELOPMENT
Promotes integrity, self-discipline, responsibility, compassion, leadership, service and good citizenship.

ACADEMIC FREEDOM
Supports free, open and critical inquiry for both students and faculty necessary for intellectual and professional development.

EXCELLENCE IN TEACHING
Emphasizes teaching supported by research and scholarship as the University's central responsibility.[11]

Ashland's mission, vision, and core values made its entry into corrections education a logical step. Ashland is the home of the nation's longest continually running corrections education program, having begun its corrections education program in 1964.[12] Ashland currently serves more than 3,000 incarcerated students in 13 states and the District of Columbia.[13] Just since 2016, over 1,500 corrections education students have received degrees from Ashland.[14]

By providing incarcerated students a nationally-recognized and transformative educational experience, Ashland furthers its core values. Specifically, Ashland challenges and encourages its SCP

---

[9] https://www.ashland.edu/about-ashland  (last visited 02/05/2022).
[10] Id.
[11] Id.
[12] Exhibit 1 – Campo ¶6.
[13] Exhibit 3 – Amiel Jarstfer Declaration ¶15. This total includes the approximately 2,200 SCP students. See n. 5.
[14] Exhibit 3 – Jarstfer ¶15.

Mr. Mark Kreutzer
March 11, 2022
Page 4

students in a unique learning environment, promotes transformation to a student population whose life experiences have been incredibly difficult, and promotes good citizenship among its SCP students.

Ashland's results speak for themselves. SCP students are enrolled with and measured against the traditional Ashland students enrolled in the same academic program. To date, there have been four (4) SCP students who have graduated as valedictorians in their class, outperforming their traditional classmates.[15] In addition, 1,008 SCP students have graduated from their program with a grade point average (GPA) 3.00 or higher.[16] Several SCP graduates have gone on to earn graduate degrees. [17] Ashland graduates have expressed the following regarding Ashland's impact:

- "I'm really grateful for the opportunity the program gave me," "The best part was that I wasn't treated like an ex-con but as a student like everyone else."
  - Chris L. - Graduate - Ohio[18]
- "Education is the secret to freedom for guys like myself"
  "of course it makes you feel good about yourself" "getting on the Deans list, it kind of does a lot for your confidence"
  "It's opened an entirely new field of possibilities for me"
  "its an amazing feeling, there is nothing like it"
  - Ashland Students on Dean's List at Arizona Department of Corrections (video).[19]
- "I earned my degree while I was still incarcerated, and that made all the difference in the world when I was released. It gave me a sense of purpose and led to a whole new life." "I'm a different person today thanks to the Ashland program. I have financial security. I'm contributing to society. And most of all I have self-respect."
  - Benito C. - Graduate - Louisiana[20]

The impact of Ashland SCP efforts is perhaps best summarized of Ashland's impact in a recent article entitled "More Than Warehouses: Ashland University's Correctional Education Program Prepares Prisoners for Life":

So who pays for these programs? Pell Grants are a primary funding source. This federal government program is the same one that provides funding for more traditional students. Unlike a lot of government programs, where the return on investment (ROI) is questionable, tracking the ROI on educational programs for prisoners is relatively easy, and the results are significant. A 2014 Department of Justice/RAND Corporation study found that incarcerated individuals who participate in educational programs while incarcerated are 43 percent less likely to return to prison within three years of their release than their peers who did not participate in such programs.[21] According to the DOJ/Rand study, that means that for every dollar invested, four to five dollars in incarceration costs are saved.

---

[15] Exhibit 3 – Jarstfer ¶17.

[16] *Id.*

[17] Exhibit 3 - Jarstfer ¶15.

[18] https://www.dispatch.com/story/news/local/communities/grove-city/2021/09/08/college-degrees-provide-lifeline-grove-city-resident-chris-lyons-overcome-addiction-prison-stints/5657265001/ (last visited 02/25/2022).

[19] https://www.linkedin.com/feed/update/urn:li:activity:6861432993559515136/ (last visited 02/25/2022).

[20] https://www.ashland.edu/cc/alumni-former-students (last visited 02/25/2022).

[21] In this article, the Department of Justice is abbreviated "DOJ" without clarification. *See* n. 23.

EDU001080

Mr. Mark Kreutzer
March 11, 2022
Page 5

"Reducing recidivism is a critical challenge affecting the entire country, and, as educators, we understand that giving incarcerated individuals access to higher education is a pivotal tool that will help them be successful after their release," said Todd Marshall, Ph.D., Associate Provost at Ashland University.

Ashland University is operating in 11 facilities in its home state of Ohio. However, its biggest partner is Louisiana, where it is in 16 facilities. A key reason for the strong presence in Louisiana is the early advocacy of that state's Department of Public Safety and Corrections Education Director, Kim Barnette. She said, "During my tenure as Education Director, I have seen the education offerings to Louisiana's offender population grow at a slow, steady pace, but it wasn't until 2015[22], when we introduced Ashland University's program, that I saw the greatest positive interest in college interest and activity. I consider the introduction of Ashland to Louisiana's state and local prisons one of my greatest achievements."[23]

## Response to PRR Findings

### 1. Response to Finding 1: Pell Grants Were Properly Packaged

As noted in the PRR, 34 CFR §690.63(a) establishes three different formulas which must be used to calculate Pell awards for each SCP student. Although the review team concluded that Ashland University ("Ashland") was required by 34 CFR §690.93(a)(2) to apply one of the two formulas set forth in 34 CFR §690.63(c) ("Formula 2" and "Formula 3"), Formula 1 has been properly applied by Ashland based upon the requirements set forth in 34 CFR §690.63(b) ("Formula 1").

As a threshold issue, both 34 CFR §690.63(a)(1) and (2) require Ashland to undertake a two-step analysis. Under either paragraph (1) or (2), Ashland must determine (a) whether the student is enrolled in an eligible program and (b) whether there are (i) at least 30 weeks of instructional time or (ii) less than thirty weeks of instructional time in the eligible program in which the student is enrolled. Specifically, that regulation states:

> § 690.63 Calculation of a Federal Pell Grant for a payment period.
> (a)
> (1) Programs using standard terms with at least 30 weeks of instructional time. A student's Federal Pell Grant for a payment period is calculated under paragraphs (b) or (d) of this section if -
>     (i) The student is enrolled in an eligible program that -
>         (A) Measures progress in credit hours;
>         (B) Is offered in semesters, trimesters, or quarters; and

---

[22] Ashland's program was introduced in Louisiana in 2016, not 2015, as either erroneously printed or misquoted in the article cited below (*See* n. 23).

[23] https://ministrywatch.com/more-than-warehouses-ashland-universitys-correctional-educational-program-prepares-prisoners-for-life/ (last visited 02/10/2022).

EDU001081

Mr. Mark Kreutzer
March 11, 2022
Page 6

(C) Requires the student to enroll for at least 12 credit hours in each term in the award year to qualify as a full-time student; and

(ii) **The program uses an academic calendar that provides at least 30 weeks of instructional time in -**

(A) **Two semesters** or trimesters in the fall through the following spring, or three quarters in the fall, winter, and spring, none of which overlaps any other term (including a summer term) in the program; or

(B) Any two semesters or trimesters, or any three quarters where -

(1) The institution starts its terms for different cohorts of students on a periodic basis (e.g., monthly);

(2) The program is offered exclusively in semesters, trimesters, or quarters; and

(3) Students are not allowed to be enrolled simultaneously in overlapping terms and must stay with the cohort in which they start unless they withdraw from a term (or skip a term) and re-enroll in a subsequent term.

**(2) Programs using standard terms with less than 30 weeks of instructional time.** A student's Federal Pell Grant for a payment period is calculated under paragraph (c) or (d) of this section if -

(i) The student is enrolled in an eligible program that -

(A) Measures progress in credit hours;

(B) Is offered in semesters, trimesters, or quarters;

(C) Requires the student to enroll in at least 12 credit hours in each term in the award year to qualify as a full-time student; and

(D) Is not offered with overlapping terms; and

(ii) The institution offering the program -

(A) Provides the program using an academic calendar that includes two semesters or trimesters in the fall through the following spring, or three quarters in the fall, winter, and spring; and

(B) Does not provide at least 30 weeks of instructional time in the terms specified in paragraph (a)(2)(ii)(A) of this section.

(Emphases added.)  The review team did not engage in the analysis required by 34 CFR §690.63.  As indicated below, the required analysis reflects that each of the SCP students in question was enrolled in one of five eligible programs, all of which, by definition, provided for 30 or more weeks of instructional time.[24]

## 1.1 The Eligible Program Requirement

---

[24] Should the Department disagree and find that Ashland's SCP students are not enrolled in a 15-week academic program, Ashland would also point out that it recognizes the importance of the number of weeks of instruction in Pell award calculations, as the number of weeks directly impact Cost of Attendance (COA).  To that point, Ashland SCP students are distinct in that regard because they have no COA which is impacted by duration of the program.  Included in ordinary COA for traditional students are costs such as room and board, transportation, personal expenses, etc., which increase with the length of the student's program, while costs related to tuition, books, supplies, etc. remain the same and are not impacted by any duration. SCP students have no durational COA, by virtue of being incarcerated. Their only COA is tuition, fees, books, supplies, etc., which does not change based on the number of weeks the Department finds.

Mr. Mark Kreutzer
March 11, 2022
Page 7

Since both 34 CFR §690.63(a)(1)(i) and (a)(2)(i) require a student to be enrolled in "an eligible program," an initial determination must be made regarding the program in the which the student was enrolled and whether that program was an "eligible program" as defined by the regulations. Five academic programs were subject to the program review.[25] Each SCP student evaluated by the review team was enrolled in one specific Ashland academic program, just as are all other Ashland students.[26] For example, Ashland has only one Bachelor of Arts degree in Interdisciplinary Studies, and all Ashland students majoring in Interdisciplinary Studies, including SCP students, enroll in that same degree program.[27]

That said, Ashland acknowledges that its eligible academic programs are delivered in multiple modalities. They are delivered in person on Ashland's campus, online to students throughout the country, and online to the SCP students who are incarcerated. However, despite the alternative delivery methods, the content is the same, the student learning objectives are the same, the amount of class time is the same, the resulting transcript entries are the same, and the degrees earned by students are the same, regardless of the manner in which the content was delivered.[28] Thus, from an academic perspective, there is only one program, a concept with which the review team apparently agreed.

On page 6 of the PRR, the review team correctly stated: "The review team concluded that the Ashland students considered 'Pell for Students Who Are Incarcerated' experiment ("Second Chance Pell") under the Experimental Site Initiative (ESI) **have the same academic program content as other Ashland students** but have a different structure to complete **the** academic program." (Emphases added.) This conclusion by the review team is fundamental to Ashland's analysis. The relevant program for each student's Pell award calculation as confirmed by the review team was **the** program in which each student was enrolled, regardless of the "structure" of that program. This is consistent with Ashland's credit hour policy, as the SCP course delivery meets the "same requirements as courses of the same departmental prefix, number, credit hours, and title taught in a traditional semester structure."[29] SCP students receive the same number of credit hours and instruction time in their accelerated format as traditional students do over 15 weeks, equaling "1,500 minutes of out-of-classroom work by the student, or 150 to 180 minutes of independent or directed work per week for 15 weeks" per the credit hour policy.[30]

Moreover, each of the five (5) degree programs at issue are eligible programs under applicable regulations. The regulatory definition of "eligible program" found in 34 CFR § 668.8, which states in relevant part:

§ 668.8 Eligible program.
(a) General. An eligible program is an educational program that -
(1) Is provided by a participating institution; and
(2) Satisfies the other relevant requirements contained in this section.

---

[25] Exhibit 3 - Jarstfer ¶12. The five academic degree programs subject to the review were: Bachelor of Arts programs in Applied Communications, Interdisciplinary Studies, and Business Administration, and Associate of Arts programs in General Studies and Business Cognate. SCP students may also enroll in Multidisciplinary Studies, but no SCP students are currently enrolled in that program. Nonetheless, all of the analysis applicable to the other five programs is equally applicable to the Multidisciplinary Studies program.

[26] Exhibit 3 - Jarstfer ¶16.

[27] Id.

[28] Exhibit 3 - Jarstfer ¶19.

[29] Exhibit 2 - Marshall ₱10.

[30] Id.

**R7 - 8 of 27**

Mr. Mark Kreutzer
March 11, 2022
Page 8

**(b) Definitions.**  For purposes of this section -

(1) The Secretary considers the "equivalent of an associate degree" to be -

(i) An associate degree; or

(ii) The successful completion of at least a two-year program that is acceptable for full credit toward a bachelor's degree and qualifies a student for admission into the third year of a bachelor's degree program;

(2) A week is a consecutive seven-day period; and

(3)

(i) The Secretary considers that an institution provides one week of instructional time in an academic program during any week the institution provides at least one day of regularly scheduled instruction or examinations, or, after the last scheduled day of classes for a term or a payment period, at least one day of study for final examinations.

(ii) Instructional time does not include any vacation periods, homework, or periods of orientation or counseling.

**(c) Institution of higher education.**  An eligible program provided by an institution of higher education must -

(1) Lead to an associate, bachelor's, professional, or graduate degree;

(2) Be at least a two-academic-year program that is acceptable for full credit toward a bachelor's degree; or

(3) Be at least a one-academic-year training program that leads to a certificate, or other nondegree recognized credential, and prepares students for gainful employment in a recognized occupation.

**(d) Proprietary institution of higher education and postsecondary vocational institution.**

\* \* \*

**(e) Qualitative factors.**

\* \* \*

**(f) Calculation of completion rate.**

\* \* \*

**(g) Calculation of placement rate.**

\* \* \*

**(h) Eligibility for Federal Pell Grant, ACG, National SMART Grant, TEACH Grant, and FSEOG Programs.**  In addition to satisfying other relevant provisions of the section -

(1) An educational program qualifies as an eligible program for purposes of the Federal Pell Grant Program only if the educational program is an undergraduate program or a postbaccalaureate teacher certificate or licensing program as described in 34 CFR 690.6(c);

\* \* \*

**(i) Flight training.**

\* \* \*

**(j) English as a second language (ESL).**

\* \* \*

**(k) Undergraduate educational program in credit hours.**  <u>If an institution offers an undergraduate educational program in credit hours, the institution must use the formula contained in paragraph (l) of this section to determine whether that program satisfies the requirements contained in paragraph (c)(3) or (d) of this</u>

EDU001084

Mr. Mark Kreutzer
March 11, 2022
Page 9

section, and the number of credit hours in that educational program for purposes of the title IV, HEA programs, unless -

(1) The program is at least two academic years in length and provides an associate degree, a bachelor's degree, a professional degree, or an equivalent degree as determined by the Secretary; or

(2) Each course within the program is acceptable for full credit toward completion of an eligible program offered by the institution that provides an associate degree, bachelor's degree, professional degree, or equivalent degree as determined by the Secretary, provided that -

(i) The eligible program requires at least two academic years of study; and

(ii) The institution can demonstrate that least one student graduated from the program during the current award year or the two preceding award years.

(l) Formula. For purposes of determining whether a program described in paragraph (h) of this section satisfies the requirements contained in paragraph (c)(3) or (d) of this section, and the number of credit hours in that educational program for the purposes of the title IV, HEA programs -

(1) A semester or trimester hour must include at least 30 clock hours of instruction; and

(2) A quarter hour must include at least 20 clock hours of instruction.

(m) An otherwise eligible program that is offered in whole or in part through telecommunications is eligible for title IV, HEA program purposes if the program is offered by an institution, other than a foreign institution, that has been evaluated and is accredited for its effective delivery of distance education programs by an accrediting agency or association that -

(1) Is recognized by the Secretary under subpart 2 of part H of the HEA; and

(2) Has accreditation of distance education within the scope of its recognition.

(n) For Title IV, HEA program purposes, eligible program includes a direct assessment program approved by the Secretary under § 668.10 and a comprehensive transition and postsecondary program approved by the Secretary under § 668.232.

(Emphases added.)  All five of those programs are at least two academic years in length and lead to either a bachelor's or associate degree.[31]  Further, all five programs are offered through online courses and have been evaluated by the Higher Learning Commission through the normal accreditation process.[32]  Thus, pursuant to the standards of 34 CFR §668.8, all five of the Ashland academic programs available to SCP students are "eligible programs."

## 1.2 The 30-Weeks of Instructional Time Requirement

Having determined that all of Ashland's SCP students are enrolled in one of five eligible programs, the next issue is whether those programs provide 30 or more weeks of instructional time during the academic year.  For two separate reasons described in detail below, all five of the programs in which Ashland's SCP students are enrolled provide 30 or more weeks of instructional time during the academic year.  First, all of Ashland's academic programs are approved by the Ohio Department of Higher Education ("ODHE") as having academic years of 30 or more weeks.  Since Ashland has not elected to

---

[31] Exhibit 3 - Jarstfer ¶12.
[32] Exhibit 3 - Jarstfer ¶12.

EDU001085

Mr. Mark Kreutzer
March 11, 2022
Page 10

have separate versions of its academic programs for SCP students under the provisions of the Federal Student Aid Handbook ("FSA Handbook"), Ashland must use the same academic year for all students in the same program.  That requirement mandates the application of Formula 1 to all Ashland students enrolled in the five academic programs.  Second, each of the five academic programs has 30 weeks of instructional time as defined by 34 CFR §668.3(b)(2).  Under either of these analyses, Ashland must apply Formula 1 in the calculation of the SCP students' Pell awards.

### 1.2.1  Formula 1 Must Apply to Ashland's Academic Programs Since Those Programs (A) Meet ODHE's Thirty Week Academic Year Requirement and (B) Do Not Have the Optional Separate Versions of the Program Permitted by the Department's Guidance.

All of Ashland's programs must be and are approved by ODHE.[33]  To be approved by ODHE, any institution's academic program must undergo significant scrutiny as set forth in Guidelines and Procedures for Academic Program Review ("GPAPR").[34]

The GPAPR requires all Ohio colleges and universities to follow certain institutional and program standards specified in the guidelines.[35]  Specifically the GPAPR requires Ohio institutions of higher education to have academic policies consistent with ODHE's definition of "academic year."[36]  That definition states:

> Academic Year Length
> The academic year shall be at least 30 weeks in length counting periods of time (terms) that begin on the first day of classes and end on the last day of classes or examinations. **The 30 week requirement shall be measured exclusive of compressed terms (e.g., summer term).**[37]

(Emphasis added.)  Thus, for any Ashland academic program to be approved by ODHE, it must have a 30-week academic year consistent with the standards set forth above.  That said, one part of each of the five academic programs in question is taught in a manner that accelerates the course delivery to the incarcerated SCP students through, to use the language of the GPAPR, "compressed terms."[38]  As a result, all five of the Ashland academic programs subject to the PRR satisfy the requirements of 34 CFR §690.63(a)(1) as programs with at least 30 weeks of instructional time, even though a part of each program is taught in a compressed term as contemplated by the GPAPR.

---

[33] https://www.ohiohighered.org/academic-program-approval (last visited 03/08/2022).
[34] https://www.ohiohighered.org/sites/ohiohighered.org/files/uploads/program-approval/Academic-Program-Review-Guidelines_070516.pdf (last visited 03/08/2022).
[35] Exhibit 3 - Jarstfer ¶11, Attachment A - GPAPR, pp. 4-14.
[36] Id., at p. 5.
[37] Directive 2010-016 dated March 18, 2010, accessible at http://regents.ohio.gov/actions/documents/2010/Dir2010-016.pdf (last visited 02/14/2022).
[38] Exhibit 3 – Jarstfer ¶14, Attachment B - Email from Matt Exline to Dr. Amiel Jarstfer dated February 10, 2022. An ODHE staff member likened the phrase "compressed term" to ODHE's concept of "accelerated delivery." The ODHE staff member has advised Ashland that ODHE considers an accelerated program delivery model to include "courses that do not meet during the institution's regular academic term as well as courses that meet during the regular academic term but are offered in a substantially different manner than a fixed number of meeting times per week for all the weeks of the term." This definition furthers the notion that a compressed term or an accelerated delivery model is not a separate program.  It is merely a means by which one or more courses in one of Ashland's eligible academic programs is delivered.

EDU001086

Mr. Mark Kreutzer
March 11, 2022
Page 11

As noted above, the PRR actually sets forth the key finding that supports the appropriate application of Formula 1 to the SPC students. The review team correctly indicated that: "The review team concluded that the Ashland students considered "Pell for Students Who Are Incarcerated" experiment ("Second Chance Pell") under the Experimental Site Initiative (ESI) **have the same academic program content as other Ashland students** but have **a different structure** to complete **the academic program**."[39] (Emphases added.) However, just three sentences later, the review team erroneously concluded: "As the Second Chance Pell students at Ashland are enrolled in academic programs with fall through spring terms that provide less than 30 weeks of instructional time, the institution was required to employ either Pell formula 2 or 3 for award packaging."[40] As demonstrated in this discussion, the review team failed to recognize that each Ashland SCP student is enrolled in the same eligible academic program in which all other Ashland students are enrolled, which is a 32-week program. Despite the fact that the SCP students' curriculum is delivered through a different structure, as the review team noted, or compressed terms, as described by ODHE, there is no separate program for SCP students at Ashland, and SCP students receive the same content over the same amount of class time as other students enrolled in the same program. All Ashland students are each enrolled in one of five eligible academic programs, all of which were a part of Ashland's academic catalog when ODHE reauthorized Ashland in 2019.[41]

Having established that Ashland's academic programs meet the 30-week requirement of ODHE, both regulations and the Department's guidance require Ashland to apply Formula 1 to the SCP students' awards. First, 34 CFR §668.3 defines an academic year by *the program of study*. Second, the FSA Handbook states explicitly that "Every eligible program must have a defined academic year. . . . A school *may* treat two versions of the same academic program (day and night, for example) as separate programs and define different academic years for each version."[42] Ashland, however, has not elected to do that.[43] Instead, as detailed above, SCP students are enrolled in the same program as traditional Ashland students.[44] Further, by the terms of the FSA Handbook, Ashland is *not* required to create a separate program or treat the SCP program as a separate "version." While the FSA Handbook's guidance *allows* Ashland to define different academic years for each version, Ashland never treated the SCP "version" of the SCP academic programs as separate programs, nor did Ashland define a different academic year for the SCP "version" of Ashland's five academic programs.[45] Simply put, each SCP student is enrolled in the same academic program with the same academic year as every other Ashland student – an academic program with an academic year of more than 30 weeks.

Finally, guidance from the Department *requires* that Ashland, for financial aid purposes, use the same academic year definition for all students in the same academic program for award purposes. "Although a school may have different academic years for different programs, it must use the same academic year definition for all FSA awards for students enrolled in a particular program, and for all other FSA program purposes."[46] Ashland complied with that requirement. In other words, the Department gave Ashland the discretion to make a decision, and Ashland exercised that discretion by taking no action to define the SCP

---

[39] PRR, p. 6.
[40] PRR, p. 6.
[41] Exhibit 3 - Jarstfer ¶12.
[42] Exhibit 4 - Stephen Howell Declaration ¶10, Attachment A - FSA Handbook, p. 3-5 (emphasis added).
[43] Exhibit 4 - Howell ¶10.
[44] *See*, n. 25.
[45] Exhibit 4 - Howell ¶10.
[46] *See*, n. 42.

EDU001087

Mr. Mark Kreutzer
March 11, 2022
Page 12

version as a separate program.  Now that Ashland has exercised that option, the Department requires that Ashland use the same academic year definition for all students in the five academic programs in question. When Ashland followed that directive from the Department, it was obligated to use Formula 1.

In summary, all SCP students are enrolled in longstanding Ashland academic programs, just as are all non-SCP students.  Those academic programs are all eligible programs, and all of those programs meet the 30-week standard of 34 CFR §690.63(a)(1).  In accordance with the FSA Handbook, Ashland must apply the same academic year definition to its 30-week or longer academic years associated with those academic programs to all enrolled students uniformly.  Thus, under the applicable regulations and guidance, the Formula 1 calculation must be applied in determining the Pell awards of all SCP students.

### 1.2.2.  Ashland's Academic Programs Involving SCP Students Meet the Fifteen Week Requirement for Each Semester Described in 34 CFR §668.3(b)(2).

Furthermore, the terms offered by Ashland to SCP students have thirty weeks of instructional time based on the definition of "week of instructional time" set forth in 34 CFR 668.3(b)(2).  That regulation states:

> (2) A week of instructional time is any week in which -
>
> * * *
>
> (ii)
> (A) In a program offered using asynchronous coursework through distance education or correspondence courses, the institution makes available the instructional materials, other resources, and instructor support necessary for academic engagement and completion of course objectives; and
> (B) In a program using asynchronous coursework through distance education, the institution expects enrolled students to perform educational activities demonstrating academic engagement during the week.

There is no dispute that the Ashland academic programs offered to SCP students through asynchronous distance education courses consisting of twelve weeks of class instruction.[47]  There are, however, at least three additional weeks of "academic engagement."

"Academic engagement" is defined in 34 CFR §600.2 as:

> *Academic engagement*: Active participation by a student in an instructional activity related to the student's course of study that -
> (1) Is defined by the institution in accordance with any applicable requirements of its State or accrediting agency;
> (2) Includes, but is not limited to -
>    (i) Attending a synchronous class, lecture, recitation, or field or laboratory activity, physically or online, where there is an opportunity for interaction between the instructor and students;
>    (ii) Submitting an academic assignment;

---

[47] Exhibit 5 - Mary Deloe Declaration ¶8.

R7 - 13 of 27

Mr. Mark Kreutzer
March 11, 2022
Page 13

      (iii) Taking an assessment or an exam;

      (iv) Participating in an interactive tutorial, webinar, or other interactive computer-assisted instruction;

      (v) Participating in a study group, group project, or an online discussion that is assigned by the institution; or

      **(vi) Interacting with an instructor about academic matters;** and

(3) Does not include, for example -

      (i) Living in institutional housing;

      (ii) Participating in the institution's meal plan;

      (iii) Logging into an online class or tutorial without any further participation; or

      (iv) Participating in academic counseling or advisement.

(Emphasis added.)

The first additional week of academic engagement occurs during the week prior to the week when classes begin. During that week ("Week 1"), instructors interact with the SCP students about the course syllabus, available resource materials, technology issues necessary to facilitate the delivery of course content, and any other academic matters necessary to initiate the course.[48]

The second additional week of academic engagement ("Week 14") occurs after the twelve weeks of classes ("Weeks 2 through 13") end. During Week 14, the instructors interact with the SCP students regarding any unfinished assignments and any other matters necessary for the SCP students to complete the course.[49] Students also submit assignments in Week 14.[50]

However, despite their efforts, some students receive an "Incomplete" grade for the course for an assortment of reasons, including: lockdowns at their facility, medical incidences, technological malfunctions, limitations in services at the facility, and even natural disasters.[51] During Week 14, those students discuss with their instructors the steps which the students will take to complete the course.[52] Once those steps are identified, the instructor and the students with Incomplete grades continue to interact for at least one day during the following week ("Week 15") and beyond to facilitate the SCP students' completion of the course.[53] During Week 15 and beyond, students submit assignments necessary to complete the course.[54] Therefore, there is at least one additional week of academic engagement for SCP students because of the interaction between the student and instructor, the submission of assignments, remedial instruction relevant to course learning objectives, or other academic matters. Throughout Week 15 (and beyond if necessary), SCP students with incomplete grades have access to instructors, resource materials, and other resources necessary to complete the course objectives, and Ashland expects those students to use those resources to complete their coursework.[55]

---

[48] Exhibit 5 - Deloe ¶9; Exhibit 6 - James Hayes Declaration ¶9. Please note, Week 1, as used here, is also referred to as "Pre-Week 1" by Ms. Deloe and Dr. Hayes.

[49] Exhibit 5 - Deloe ¶10-11; Exhibit 6 - Hayes ¶10-12.

[50] Exhibit 5 - Deloe ¶10-11; Exhibit 6 - Hayes ¶10-12.

[51] Exhibit 5 - Deloe ¶11-12.

[52] Exhibit 5 - Deloe ¶10-11.

[53] *Id.*

[54] Exhibit 6 - Hayes ¶10-12; Exhibit 2 - Marshall ¶12-13.

[55] Exhibit 6 - Hayes ¶10-12; Exhibit 5 - Deloe ¶11.

Mr. Mark Kreutzer
March 11, 2022
Page 14

The importance of Week 15 to the SCP students cannot be understated.[56]  For semesters within the scope of the PRR (Summer 2019 – Spring 2021), the total number of SCP course sections with incompletes ranged from 30.73% (Fall 2019) to 74.31% (Fall 2020).[57]  That is roughly 31-75% of SCP sections still submitting assignments, interacting with their instructor about academic matters, and otherwise having active academic engagement with access to course materials and other Ashland resources to complete their courses.[58]

Thus, all five of Ashland's academic programs qualify as programs with at least 30 weeks of instructional time.  Even during the compressed term involving SCP students, the five programs permit academic engagement between instructors and students for at least 30 weeks under the definitions of "academic engagement" in 34 CFR §600.2 and the definition of "week of instructional time" in 34 CFR §668.3(b)(2).

### 1.3  Conclusion as to Finding 1

The Pell awards for SCP students were appropriately calculated using Formula 1.  All SCP students are enrolled in one eligible academic program which has been approved by ODHE based on an academic year of at least 30 weeks of instruction.  Further, Ashland utilizes distance education modalities for the SCP students, and the distance education courses extend for at least 15 weeks of academic engagement each semester.  Thus, 34 CFR § 690.63(a)(1) and (b) require Ashland to utilize Formula 1.  Moreover, Ashland has not availed itself of its option to designate the SCP instruction as separate programs, and as a result, it is obligated to compute SCP students' awards on the same basis as all other students in those programs.

Nevertheless, as specified by the "Required Action" section on page 7 of the PRR, Ashland submits two full file reviews of all SCP students from the 2019-2020 and 2020-2021 award years.  Exhibit 6, Attachments B and C reflect the corrected Pell amount using Formula 2 for award years 2019-2020 and 2020-2021, respectively[59]  Exhibit 6, Attachments D and E reflect the corrected Pell amount using Formula 3, respectively, for award years 2019-2020 and 2020-2021.[60]  For the reasons set forth herein, however, no correction is appropriate given that Formula 1 was properly applied.[61]

---

[56] Week 15 also meets the objectives of the SCP Program as stated by the Department: (1) "Examine how providing Pell Grants to incarcerated students influences their participation in educational opportunities and academic outcomes" and (2) "Examine any challenges or obstacles to an institution's administration of Title IV HEA programs to incarcerated students" Week 15 is a direct response to challenges and obstacles faced in administering the SCP program, and Ashland nevertheless creates consistent educational opportunities and academic outcomes for its SCP students. *See* https://experimentalsites.ed.gov/exp/pdf/SecondChancePell061720Slides.pdf (last visited 02/22/2022).

[57] Exhibit 2 – Todd Marshall ¶17, Attachment A - Incomplete SCP Sections 2019-2021.

[58] Exhibit 6- Hayes ¶10-12; Exhibit 5 - Deloe ¶11.

[59] Exhibit 4 – Howell ¶ 11, Attachment B - Formula 2 SCP Pell Awards 2019-2020, and Attachment C - Formula 2 SCP Pell Awards 2020-2021.

[60] Exhibit 4 – Howell ¶ 11, Attachment D - Formula 3 SCP Pell Awards 2019-2020, and Attachment E - Formula 3 SCP Pell Awards 2020-2021.

[61] While Ashland is providing calculations under Formulas 2 and 3, Formula 2 could only apply if the Department determined that Ashland's SCP students were enrolled in 14-week programs instead of 15 or more-week programs.  Formula 3 simply cannot be properly applied given the established number of weeks of academic engagement with SCP students.  Ashland continues to assert that its analysis of the applicable regulations supports its conclusion that Formula 1 should apply to award years 2019-2020, 2020-2021, and 2021-2022.  Nonetheless, in the interest of avoiding any further dispute with the Department

EDU001090

Mr. Mark Kreutzer
March 11, 2022
Page 15

### 2. Response to Finding 2: Return of Title IV (R2T4) Calculation

The R2T4 calculation issues raised in Finding 2 are based on the review team's substantive conclusions of Findings 1 and 6. Ashland incorporates by reference its responses to Findings 1 and 6 as a part of its response to Finding 2.

#### 2.1 R2T4 Calculation for Student 1

As noted in its Response to Finding 6, Ashland accepts the review team's Finding 6 regarding Student 1. In short, Ashland agrees that Student 1's award should have been based on Student 1 being eligible for a three-quarter time Pell amount rather than a full time Pell amount. Thus, Ashland accepts the Finding 2 insofar as the amount of Student 1's over award and the resulting R2T4 calculation is concerned.

#### 2.2 R2T4 Calculation for Students 1, 2, 8, 10, 19, 20, 22, 27, and 30

As noted in its Response to Finding 1, Ashland does not accept the review team's Finding 1. Specifically, Ashland submits that the correct formula was employed at the time of packaging. As a result, there is no impact on the R2T4 calculation for the nine students listed in the heading of this section.

Nonetheless, in an effort to be responsive to the PRR's required actions on pages 8 and 9, Ashland has conducted the file review specified in the "Required Action" section of Finding 2.[62] Ashland has also prepared calculations consistent with the file reviews.[63] In addition, Ashland has revised its policies and procedures governing R2T4 calculations.[64] This revised policy and procedure (Exhibit 6 - Attachment N) was prepared as if the Department will reject Ashland's Response to Finding 1. If the Department or the judicial system ultimately determines that Ashland's Response to Finding 1 is correct, the revised policy will not be implemented, and no training will be necessary. However, if the Department or judicial system ultimately determines that Ashland's Response to Finding 1 is incorrect, then the revised policy will be implemented, and Ashland's staff will be trained to perform in a manner consistent with revised policy.

### 3. Response to Finding 3: National Student Loan Data System Enrollment Reporting

Ashland recognizes the importance of accurate reporting to the National Student Loan Data System ("NSLDS"). The review team concluded that there were reporting inaccuracies for all students in the sample set.[65] Ashland submits that it reported the effective dates according to the start date of the

---

on this legal point, we have modified our course delivery format. Any question related to the number of weeks of academic engagement for SCP students will be moot in the future, as Ashland is transitioning the accelerated course delivery schedule for SCP students to mirror the course delivery format of the same programs provided to non-SCP students.

[62] Exhibit 4 – Howell ¶12, Attachment F - File Review 2019-2020 Formula 2, Attachment G - File Review 2019-2020 Formula 3, Attachment H - File Review 2020-2021 Formula 2, and Attachment I - File Review 2020-2021 Formula 3.

[63] Exhibit 4 – Howell ¶12, Attachment J- R2T4 2019-2020 Formula 2, Attachment K - R2T4 2019-2020 Formula 3, Attachment L - R2T4 2020-2021 Formula 2, and Attachment M - R2T4 2020-2021 Formula 3.

[64] Exhibit 4 – Howell ¶12, Attachment N – Revised R2T4 Calculations Policies and Procedures.

[65] PRR, pp. 9-10.

EDU001091

Mr. Mark Kreutzer
March 11, 2022
Page 16

students' academic programs.[66] However, consistent with the required action in the PRR, Ashland conducted a review of all NSLDS enrollment reports for the 2019-2020 and 2020-2021 terms.[67]

As noted in Ashland's Response to Finding 1, all SCP students are enrolled in the same programs as other Ashland students.[68] The relevant program for each student's effective date is consistent with the start date of the program in which each student was enrolled, regardless of the "structure" of that program. As a result, the effective dates which were reported initially by Ashland were reported properly.[69] A "corrected" effective date as suggested in the PRR is not consistent with the start of "academic engagement" for SCP students.[70] Moreover, the "corrected" effective date, as suggested, is in opposition to Department guidance on institutional discretion for establishing effective enrollment dates.[71] With the limited exception of withdrawal and graduation effective dates, "the Department defers to a school's policy regarding the establishment of effective dates."[72]

Ashland established effective enrollment dates for SCP students consistent with their "program start date."[73] That program start date is the same start date as the program in which all Ashland students are enrolled, a program which the review team acknowledged was, in substance, the same program as the program in which the SCP students were enrolled.[74] As such, those dates identified by the review team as "correct" dates, are incorrect.

Nevertheless, Ashland has included in its full file review the corrected dates consistent with the Department's guidance and will await further instruction from the Department.[75] Further, Ashland has revised its policy and procedure relating to NSLDS reporting.[76] In addition, Ashland's Registrar's Office conducted training related to Finding 3 during the week of February 10, 2022.[77]

## 4. Response to Finding 4

Ashland takes Finding 4 extremely seriously. Its contents go to the very essence of Ashland's mission as an institution of higher education dedicated to promoting integrity and good citizenship among its students and integrating moral integrity in its institutional identity.[78] Ashland appreciates the Department's assurances that no liabilities will be assessed against Ashland for the review team's

---

[66] Exhibit 3 – Jarstfer ¶21.

[67] Exhibit 3 – Jarstfer ¶20, Attachment C - NSLDS File Review 2019-2020 and 2020-2021.

[68] Response to Finding 1, p.p. 5-15.

[69] See Enclosure 3 of the PRR, effective dates originally reported.

[70] Exhibit 5 - Deloe ¶9; Exhibit 6 - Hayes ¶9.

[71] See Federal Student Aid, National Student Loan Data System, Enrollment Reporting Guide, November 2020 Guide (pages 21-25) https://fsapartners.ed.gov/sites/default/files/attachments/2019-12/NewNSLDSEnrollmentReportingGuide_0.pdf (last viewed on 02/23/2022) and September 2021 Guide(pages 20-26). See also https://fsapartners.ed.gov/sites/default/files/2021-10/EnrollmentReportingGuide2021FINAL.pdf (last visited 02/23/2022).

[72] Id.

[73] Exhibit 3 – Jarstfer ¶21.

[74] PRR, page 6; Exhibit 3 – Jarstfer ¶16-19.

[75] See n. 67.

[76] Exhibit 3 – Jarstfer ¶22, Attachment D - Revised NSLDS Reporting Policies and Procedures.

[77] Exhibit 3 – Jarstfer ¶22.

[78] See Ashland's Mission Statement and Core Values as set forth on pp. 2-3 above.

EDU001092

Mr. Mark Kreutzer
March 11, 2022
Page 17

allegations in Finding 4. As a result of those assurances and the facts established in this response, Ashland requests any FPRD would exclude such allegations or references thereto, as the Findings are conclusory and premature, as they were made before Ashland was provided a full and fair opportunity to respond to the allegations.[79] As demonstrated by the information provided below, Ashland's actions related to the disbursement of Pell funds in the summer of 2021 were taken in good faith in an effort to maximize the student benefit of federal financial aid – which was exactly what Ashland was required to do to meet its obligations to its students and to the federal government as a fiduciary of federal funds.

As a preliminary matter, there are two fundamental points which completely undercut the review team's conclusions in Finding 4 and which should be stressed prior to a discussion of the summer 2021 events.

First, the PRR states: "Ashland staff explained to the review team that rather than identifying the summer term as a header or a trailer for its Second Chance Pell student population, the institution's policy is to award Pell funds from the award year that is most beneficial to the student."[80] Ashland does not have a formal policy to that effect.[81] As a general proposition, Ashland always tries to help students maximize their federal student aid, and it always tries to fully utilize the funds which are allocated to Ashland so that its student body on the whole will receive the greatest possible educational opportunity from the Pell program.[82] As a result, Ashland did endeavor in the summer of 2021 to maximize the authorized and appropriate use of award year 2020-2021 ("AY20") funds and to minimize the use of award year 2021-2022 ("AY21") funds so as to retain the maximum amount of funds available to its students in AY21. However, Ashland has no policy that supports the idea of varying the status of the summer term in order to maximize student awards. Thus, the review team's allegation that Ashland purposely violated a policy that does not exist should be totally disregarded by the Department. Since that purported violation was the essence of Finding 4, Finding 4 should be set aside by the Department.

Second, Ashland always contributes institutional aid to supplement federal aid awards so that all SCP students' financial obligations are fully covered every year.[83] As a result, there is no need to have the policy described in the PRR since all SCP students receive the full tuition benefit, regardless of whether it is comprised of Pell grants or institutional aid. Thus, the policy described above would be of no consequence at Ashland, even if it existed. At the same time, if the policy existed, no SCP students would have had their awards diminished, regardless of whether the awards were computed on the basis of AY20 or AY21 funding. Moreover, the decision to move awards back to AY20 was not to the detriment of the five students identified by the review team because Ashland always supplements SCP student balances with its own institutional funds. It only cost Ashland more to reverse the awards in AY20, while providing more opportunities for students in AY21.

---

[79] The PRR is written in terms which suggest that the Department has already reached its conclusions as to Ashland's activities. The PRR states on p. 11, "The Department considers this practice a violation of Ashland's responsibility as a fiduciary of Title IV funds." To the extent the Department has reached conclusions prior to its receipt of Ashland's response, such action would be premature and would constitute an arbitrary and capricious agency action. *See* 5 U.S.C. §§ 500, 706(2)(A)(E).
[80] PRR, p. 11.
[81] Exhibit 4 - Howell ¶13.
[82] *Id.*
[83] Exhibit 4 - Howell ¶14.

EDU001093

Mr. Mark Kreutzer
March 11, 2022
Page 18

For both of these reasons, the review team's conclusions as to the intent of Ashland to purposely violate its non-existent policy or to fail in its responsibility as a fiduciary of Title IV funds are fundamentally flawed, without factual basis, and should be set aside by the Department.

Nevertheless, Ashland has conducted a review of the facts revealed by its internal records and a clear picture of the summer 2021 events has emerged. That picture reflects a delayed funding request by Ashland for an increase in its AY20 allocation of funds followed by an extended period of time for the Department's response to Ashland's request, but there is absolutely no indication of any effort to purposefully violate Ashland's policies or Ashland's responsibilities as a fiduciary of Title IV funds. Further, as detailed below, Ashland's email traffic and internal accounting records demonstrate that the review team's recitation of the facts on page 11 of the PRR is inaccurate.

Ashland's ability to fully respond to Finding 4 is complicated by the November 21, 2021, resignation of its former Executive Director of Financial Aid ("EDFA"), Kelly Liocano. Ms. Liocano was the point-of-contact for the review team during the course of their review, and she was the only Ashland staff member involved in all aspects of the decisions which are the subject of Finding 4.[84] Since that time, her interaction with Ashland's staff has been limited.[85] However, during the critical periods addressed in Finding 4, Ms. Liocano engaged in extensive email exchanges with both her Ashland colleagues and with ESI Team members. Without exception, those emails reflect nothing but a diligent effort to use Pell funds in compliance with applicable requirements. Those emails fully refute the review team's conclusions in Finding 4.

Based on communications which Ms. Liocano had with Ashland staff members from April through August of 2021, and Ashland's review of its internal records, it is clear that there was absolutely no nefarious intent on the part of any Ashland staff member to violate any Ashland policy, nor any intent to violate Ashland's responsibility as a fiduciary of Title IV funds. To the contrary, a detailed review of the facts reveals that a series of good faith steps were taken to address a rapidly growing SCP student population, a delayed request for expanded AY20 funding to address the increased number of enrolled students, and a delayed response by the Department to Ashland's request, as illustrated by the following timeline:

- October 6, 2020 – Ms. Liocano requested that the ESI Team increase Ashland's $14,000,000 Pell allocation by $4,751,500 to a total of $18,751,500 for AY20.[86]
- October 8, 2020 – The ESI Team denied Ms. Liocano's requested increase and asked that Ashland renew its request in January 2021.[87]
- May 21, 2021 – Ms. Liocano sent a detailed summary of plans for packaging SCP students' awards for the 2021 summer term to Ashland's CFO making several points, all of which reflected her good faith efforts to appropriately allocate AY20 and AY21 funds.[88]
- May 22, 2021 – Ashland completes packaging of students and posts bills to their student ledger accounts, including SCP students. This process generated a list of all students with Pell Grant

[84] Exhibit 7 - Marc Pasteris Declaration ¶9.

[85] Id.

[86] Exhibit 7 - Pasteris ¶10, Attachment A - Email from Kelly Liocano to ESI Team dated October 6, 2020.

[87] Exhibit 7 - Pasteris ¶11, Attachment B - Email from ESI Team to Kelly Liocano dated October 8, 2020.

[88] Exhibit 7 - Pasteris ¶13, Attachment C - Email from Ms. Liocano to Marc Pasteris, et al. dated May 21, 2021.

EDU001094

Mr. Mark Kreutzer
March 11, 2022
Page 19

awards, including SCP students, which was transmitted through the Common Origination and Disbursement Process ("COD") as a part of Ashland's request for reimbursement.[89]

- May 25, 2021 – Ashland's AY20 authorization in G5 is increased for all student awards to account for the May 22 request for reimbursement to COD, *but Ashland made no draw on G5 in excess of the $14 million ESI allocation.*[90]
- May 26, 2021 – A draft letter is prepared in which Ashland would request $2,355,500 in additional AY20 funding to meet the needs of Ashland's growing population of SCP students. Ashland did not draw upon these funds in excess of its award pending in G5.[91]
- June 9, 2021 – The ESI Team inquires about Ashland having appeared to have disbursed awards totaling $16,396,851.94, an amount in excess of Ashland's $14,000,000 allocation for AY20.[92]
- June 9, 2021 – Ms. Liocano raised the ESI Team's inquiry and need to expedite the funding request contemplated in the May 26 draft letter.[93] Ms. Liocano also reports that although funds had been transmitted to students and the request for reimbursement had been sent as a result, there had been no draw against the G5 account in excess of Ashland's $14 million allocation for AY20.[94]
- June 14, 2021 – Ashland President Carlos Campo sent a letter dated June 9, 2021 to the ESI Team in which he (a) responded to allegation of overspending by Ashland and (b) requested $2,855,000 in additional funding to meet student needs in AY20.[95]
  - Dr. Campo explained that while the funds had been marked as "disbursed" in the ESI Team's system, Ashland had not actually drawn those funds from G5.
  - Dr. Campo also explained that final disbursements would be made from AY20 when the final AY20 funding was determined, with remaining obligations to students being funded from Ashland's AY21 allocation.
- June 22, 2021 – Ms. Liocano emails the ESI Team to inquire about the status of Ashland's request for expanded AY20 funding.[96]
- June 28, 2021 – Ms. Liocano advises CFO Marc Pasteris and Corrections Education Program Vice President Todd Marshall that $3 million in Pell funds had been packaged for AY20, but that Ashland could not draw that amount from G5 since Ashland's AY20 allocation had not been increased.[97] At the same time, she sought advice from senior administrators as to how to deal with the fact that the anticipated increase in Ashland's AY20 had not been approved.[98]
- July 7, 2021 – More than three weeks after President Campo's request for additional funding, the ESI Team emails Ms. Liocano acknowledging the receipt of the request for additional funding but requesting an explanation for excessive disbursements in AY20 prior to ESI acting on the request for additional funding.[99]
- July 14, 2021 – Ms. Liocano responds to ESI Team with a detailed explanation for the alleged overspending which states:

---

[89] PRR, p. 11; Exhibit 8 - Janet Edwards Declaration ¶9; Exhibit 9 - Alexander Jordan Declaration ¶9.

[90] Exhibit 8 - Edwards ¶8.

[91] Exhibit 7 - Pasteris ¶14, Attachment D - Draft letter dated May 26, 2021.

[92] Exhibit 7 - Pasteris ¶15, Attachment E - Email from ESI Team to Kelly Liocano and Stephen Howell dated June 9, 2021.

[93] Exhibit 7 - Pasteris ¶16, Attachment F - Email from Kelly Liocano to Marc Pasteris and Todd Marshall dated June 9, 2021.

[94] Id.

[95] Exhibit 1 - Campo ¶8, Attachment B - Letter from Carlos Campo to ESI Team dated June 9, 2021.

[96] Exhibit 7 - Pasteris ¶17, Attachment G - Email from Kelly Liocano to ESI Team dated June 22, 2021.

[97] Exhibit 7 - Pasteris ¶18.

[98] Id.

[99] Exhibit 7 - Pasteris ¶19, Attachment H - Email from ESI Team to Kelly Liocano dated July 7, 2021.

EDU001095

Mr. Mark Kreutzer
March 11, 2022
Page 20

Thank you for your email and additional consideration. Our initial request included an explanation to your initial questions. I am happy to provide further information for clarification. Although these funds are marked disbursed, Ashland University has only drawn funding from G5 within our allocated amount. In explanation, summer term is currently underway and can be classified as a header or trailer with the majority of students initially packaged as a trailer to the [20]20- [20]21 award year. Our students attend classes year-round Fall, Spring, Summer. Due to an unexpected number of late applications and enrollments to our program immediately preceding the start of the summer semester, the automated packaging and disbursal process happened for these students.

Students are automatically packaged and the records automatically originate through a daily export file process following the guidelines of cash management under FSA causing disbursement. As a result, records disbursed prior to the semester due [to] the timing of enrollments and automatic processing. Again, we have not drawn any funds over our allocation from G5. We were preparing a request for additional funds for [20]20-[20]21 once the additional enrollment was recognized.

Summer is often challenging as a crossover payment period. If no additional funds are awarded for [20]20-[20]21 summer, disbursements for eligible students will be repackaged and allocated to the [20]21-[20]22 award year for the students that best benefit from a summer award as a header in the [20]21-[20]22 award year instead of as a trailer in the [20]20-[20]21 award year under the allowable crossover period regulations.

Please let me know if I can answer additional questions or if you feel a phone - [call] would best help our communications regarding this matter.[100]

- July 21, 2021 – Based on a lack of response from the ESI Team, Ms. Liocano concludes that increased AY20 funding is unlikely, acknowledges that the ESI Dashboard reflects that Ashland, as of that date, had apparently (but not actually) overspent its AY20 allocation by $1,273,812, and initiates steps to move $1.3 million in previous AY20 awards to AY21 so as to eliminate the apparent (but not actual) overspent amount in AY20.[101]  As a result of the reallocation of AY20 awards to AY21, Ashland's Business Office proceeds to draw $2 million from AY21 allocation from G5.[102]
- July 22, 2021 – Ashland reverses May 21, 2021 disbursement of AY20 funds and replaces those AY20 funds with a disbursement of AY21 funds.[103]
- July 27, 2021 – More than six weeks after President Campo's June 14 request for an additional AY20 allocation, the ESI Team grants Ashland's request for $2,855,000 in AY20 funding.[104]

---

[100] Exhibit 7 - Pasteris ¶20, Attachment I - Email from Kelly Liocano to ESI Team dated July 14, 2021.
[101] Exhibit 7 - Pasteris ¶21, Attachment J - Email from Kelly Liocano to Todd Marshall, et al. dated July 21,2021.
[102] Exhibit 7 - Pasteris ¶22; Exhibit 8 – Edwards ¶12.
[103] Exhibit 9 - Jordan ¶10; Please note, PRR, p. 11 erroneously references this date as July 23, 2021. See PRR, p. 11.
[104] Exhibit 7 - Pasteris ¶23, Attachment K - Email from ESI Team to Kelly Liocano dated July 27, 2021.

**R7 - 21 of 27**

Mr. Mark Kreutzer
March 11, 2022
Page 21

- July 28, 2021 – Ashland reverses July 22 award of AY21 funds and makes awards to those SCP students from AY20 funds.[105]
- July 30, 2021 – ESI Team notifies Ashland that its AY21 allocation was being reduced by $2,855,000 due to AY20 overspending.[106] (The review team indicated on page 11 of the PRR that this notification was sent on July 1 and 21. We have no evidence of Ashland receiving any such notification until July 30.)

This detailed assessment of contemporaneous email traffic and internal accounting records evidences a series of good faith efforts to apply Pell funds appropriately. It also refutes the review team's allegation that Ashland was attempting to retain Pell disbursements that exceeded current and potential future allocations, which appears to be based, in at least some measure, on the review team's mistaken chronology. As indicated in the internal accounting records at Ashland, requests for reimbursement for the five students in question were made on May 22, 2021. From Ashland's perspective, those requests were temporary requests which were intended to facilitate the internal bookkeeping necessary to enable the students in question to begin their summer term studies on June 1.[107] The requests were processed through COD as part of an automated process for all Ashland students, without any intent on Ashland's part to draw funds from G5 unless and until there were adequate allocations available to be drawn.[108]

When the ESI saw the May 22 requests, it apparently interpreted those requests as an immediate draw by Ashland in excess of Ashland's authorized allocation. After ESI raised that issue with Ashland on June 9, Ashland's President promptly responded with both an explanation for what had occurred and a request for a supplemental allocation.[109] On July 7, ESI responded to President Campo's June 14 request for additional funding by seeking additional information about the reasons why the May 22 request was made.[110]

On July 14, Ms. Liocano responded to ESI as noted above. Significantly, she explained that no funds had been drawn from the G5 account in excess of those which had previously been authorized.[111] Further, having concluded that no additional funding would be forthcoming from the ESI Team for AY20, she moved the five student awards from AY20 to AY21 on July 23 so as to facilitate a draw on the G5 account from AY21 funds – a move designed to bring Ashland into compliance with the limitations imposed on the AY20 funds. Ultimately, Ashland's June 9 funding request for AY20 was approved on July 27.[112] On July 28, a portion of the SCP students were repackaged using the newly available AY20 funds.[113]

In short, there is no factual basis for the review team's Finding 4. While hindsight enables one to identify both steps which could have been taken differently and opportunities for better and more timely

---

[105] Exhibit 9 - Jordan ¶11; Please note, Ashland's accounting records indicate that this transaction occurred on August 12 and was recognized by the G5 External Award Activity History Detail Report on August 13. *See* PRR, p. 11.
[106] Exhibit 7 - Pasteris ¶25, Attachment L - Email from ESI Team to Kelly Liocano dated July 30, 2021; PRR, p. 11.
[107] Exhibit 7 - Pasteris ¶27.
[108] Exhibit 8 – Edwards ¶7; Exhibit 7 - Pasteris ¶28.
[109] *See*, n. 95.
[110] *See*, n. 99.
[111] *See*, n. 100.
[112] *See*, n. 104.
[113] *See*, n. 105.

EDU001097

Mr. Mark Kreutzer
March 11, 2022
Page 22

communication by Ashland's financial aid staff with the ESI Team, there is simply no evidence to support the review team's incorrect and entirely premature conclusion that Ashland engaged in any practice that violates Ashland's responsibility as a fiduciary of Title IV funds.[114] **As noted above, Ashland never drew any amounts from G5 in excess of its authorized allocation.** To the contrary, the evidence reflects extensive efforts by Ashland staff to ensure that Ashland expended Title IV funds in a manner consistent with its authorized spending limits. Nonetheless, Ashland's President has avowed on behalf of Ashland that he: (a) has closely reviewed this finding, (b) has taken applicable corrective actions, and (c) fully understands the seriousness of this finding, including the risk that future recurrences of this nature could result in fines or other sanctions, including the suspension or termination of all Title IV programs.[115] Among the corrective actions taken by Ashland is the adoption of a policy which will preclude Ashland's Financial Aid Office from awarding and allowing the transmission of grants to the accounts of SCP students in excess of the ESI SCP approved allocation to be sent to COD. Finally, Ashland again requests that in light of the information provided in response to Finding 4, that reference to this Finding and the allegations contained therein would be excluded from the FPRD.

### 5. Response to Finding 5: Admission Policy Not Followed

Consistent with Ashland's Program Participation Agreement ("PPA") with the Secretary and Ashland's 2016 Amended PPA ("Amended PPA"), Ashland accepts the review team's finding that Ashland's admissions policies and procedures did not include a mechanism to specifically prioritize those applicants who are likely to be released from incarceration within five years.

As this prioritization is required by 34 C.F.R. §§ 668.14(a)(1), (b)(1) and Ashland's PPA and Amended PPA, Ashland has amended those policies and procedures consistent with the review team's findings and Ashland's PPA Amendment.[116] Specifically, Ashland has revised its enrollment procedure to give priority to students who are within 5 years of release from prison. Nevertheless, Ashland notes that during the period of the review, all students who were within 5 years of release were enrolled. Thus, despite the absence of a specific written policy, Ashland was fully compliant with its obligation to see that those students scheduled for release within 5 years were prioritized for inclusion in SCP educational opportunities.

### 6. Response to Finding 6: Attendance/Enrollment Status Not Verified

The review team identified two instances of noncompliance with a student's attendance as it relates to the Pell amount paid.[117] Ashland has revised its Pell Grant packaging policy and procedures, to ensure that funds are only disbursed after Ashland has corroborated attendance in all courses of enrollment.[118]

---

[114] The Department states on page 4 of the PRR that "This report reflects initial findings. These findings are not final. The Department will issue its final findings in a subsequent Final Program Review Determination (FPRD) letter." Ashland trusts that to be the case, despite the Department's conclusory language at the bottom of page 11 of the PRR.

[115] Exhibit 1 - Campo ¶¶7, 9.

[116] Exhibit 2 – Todd Marshall ¶21, Attachment D – Revised Admissions Policy and Procedures.

[117] PRR, pp. 13-14.

[118] Exhibit 4 – Howell ¶15, Attachment O – Revised Pell Grant Packaging Policy and Procedures.

**R7 - 23 of 27**

EDU001098

Mr. Mark Kreutzer
March 11, 2022
Page 23

As to the review team's findings for Student 1, Ashland's review substantiated the review team's finding that Ashland lacked documentation to establish Student 1 had attended MGT 307 in the fall 2020 term.[119]  Ashland will await instructions in the Final Program Review Determination ("FPRD") to return funds to the department, consistent with an amended three-quarter-time attendance for Student 1's Pell Grant for the fall 2020 term.  As to the review team's findings for Student 10, Ashland's review substantiated that Ashland lacked documentation to establish Student 10 had attended COM 120 or HIST 212 in the fall 2019 term.[120]  Ashland will await instructions in the FPRD to return funds to the Department, consistent with an amended less-than-half-time attendance for Student 10's Pell Grant for the fall 2019 term.

## 7.  Response to Finding 7:  Federal Pell Grant Overpayment

As noted in Finding 7, a student's Pell grant for any academic year is based upon compliance with the disbursement schedules published by the Secretary for each award year, pursuant to 34 CFR 690.62.  In the Department's first instance of noncompliance, Ashland concurs with the finding which noted a Pell Grant overpayment to Student 13 for the summer 2020 term.  Student 13 was enrolled in a class that was not required for graduation, and Student 13 should have received a three-quarter-time Pell Grant.[121]  Ashland accepts and agrees with the review team's finding and will await instruction in the FPRD on the return of funds ($774) to the Department.[122]

With regard to Student 23, Ashland acknowledges that an error occurred and was corrected prior to the initiation of the program review.[123]  Although Student 23 should have received a half-time Pell Grant, on May 22, 2021, a three-quarter-time Pell Grant was disbursed.[124]  However, as noted in the PRR, Ashland detected this overpayment through its own internal controls and returned funds on June 10, 2021.[125]  The Department confirmed to the review team that these funds were returned.[126]  Thus, Ashland maintains a finding of noncompliance in the FPRD would be inappropriate.

Finally, Ashland has reviewed the incidences of human error which led to the issues raised in Finding 7.[127]  During the week of January 31, 2022, Ashland conducted a review with its academic advisors related to Finding 7 to ensure there is no future noncompliance related to Pell Grant packaging.[128]

## 8.  Response to Finding 8:  Ineligible Student

Finding 8 asserts that Ashland failed to retain a copy of Student 24's high school diploma or a general educational development test certificate ("GED") as required by Ashland's provisional admission

---

[119] Exhibit 4 – Howell ¶15-16.
[120] *Id.*
[121] Exhibit 4 – Howell ¶17.
[122] *Id.*
[123] Exhibit 4 – Howell ¶ 18-19.
[124] *Id.*
[125] PRR, Page 15.
[126] *Id.*
[127] Exhibit 4 – Howell ¶19.
[128] *Id.*

Mr. Mark Kreutzer
March 11, 2022
Page 24

policy. Ashland maintains that it complied with 34 C.F.R. § 668.32(e), which requires a student have a high school diploma or its recognized equivalent to be eligible to receive Title IV program assistance. Ashland agrees that it failed to maintain a readily available copy of Student 24's GED. While the GED was received for Student 24, it was not received prior to the disbursement of Title IV funds. However, Student 24 had earned the GED prior to the disbursement, with an award date of April 10, 2008.[129]

Having earned the GED prior to the disbursement of Title IV funding, Student 24 was eligible to receive the funding pursuant to 34 C.F.R. § 668.32(e). Thus, a final determination of noncompliance in Finding 8 and requirement to return of Title IV funding for Student 24 for violation of 34 CFR 668.32(e) is inappropriate. Moreover, while Ashland awaited receipt of the GED, Student 24's eligibility to receive Title IV funding was confirmed via Clearinghouse as Student 24 was a transfer student who was enrolled and certified by other institutions of higher education.[130]

That said, Ashland does submit to the Department and the review team's suggestions in Finding 8 and as a result, Ashland has revised its SCP student admissions procedures, recommits itself to strict adherence to its provisional admissions policies and record retention, to ensure future noncompliance does not occur.[131]

### 9.  Response to Finding 9:  Failure to Update Application

During program review, Ashland remedied the finding of untimely reporting a new Third-Party Servicer. Consistent with 34 C.F.R. § 601.21, Ashland updated its electronic application, which the Department confirmed during the program review, to reflect a new Third-Party Servicer (CampusLogic). Ashland has heeded the Department's reminder regarding Ashland's obligations to timely adhere to reporting requirements. Ashland reaffirms its commitment to careful review of guidance from the Department as to future reporting requirements.[132]

### 10.  Response to Finding 10:  FSEOG Selection Policy Inadequate

Ashland recognizes the importance of accurate Title IV packaging policies and has remedied the misprint identified by the review team.[133] The Department confirmed that the misprint in Ashland's policy has been cured.[134]

### Conclusion

---

[129] Exhibit 2 – Todd Marshall ¶20, Attachment C – GED of Student 24.
[130] Exhibit 2 – Todd Marshall ¶19, Attachment B – Student 24 National Student Clearinghouse Report.
[131] *See* n. 116.
[132] Exhibit 4 - Howell ¶20.
[133] PRR, p. 17.
[134] *Id.*

Mr. Mark Kreutzer
March 11, 2022
Page 25

       Ashland is fully committed to operating its financial aid program in a manner that is consistent with both its institutional values and applicable law.[135]  Through the FSA's program review, Ashland has more clearly recognized its need to continuously improve and to actively assure compliance with applicable FSA regulations and guidance.  As reflected above, Ashland takes all of the PRR's findings seriously.

       We do not believe any Ashland staff member acted with the intent to violate any FSA regulation or guidance.  However, Ashland understands how actions by its staff may have created the appearance of an intent to violate FSA standards.  Ashland does not want any of its future actions to even appear to be questionable, and to that end, Ashland has begun the process of adopting an institution-wide Compliance and Ethics Policy which is designed to strengthen not only Ashland's financial aid compliance, but also its compliance with applicable law and standards throughout its operations.[136]

       We look forward to working with the review team and other members of the Department's staff to resolve the issues identified in the PRR's findings.  Despite our disagreement with some aspects of the PRR, Ashland appreciates the review team's efforts to achieve compliance with applicable statutes, regulations, and the Department's guidance documents.  If we can provide additional documentation, answer questions, or visit in person to facilitate the review team's work and the preparation of the Department's Final Program Review Determination letter, we will be pleased to do so. Furthermore, to the extent we can work with you to promptly resolve these matters, serve the Department's mission, and avoid prolonged administrative and judicial processes, we will welcome that opportunity.

       Thank you for your consideration of our Response.

                 Respectfully submitted,

                 Jim Newberry
                 Kalynn Walls
                 STEPTOE & JOHNSON PLLC
                 700 Hurstbourne Parkway, Suite 115
                 Louisville, KY  40222
                 (502) 423-2000
                 jim.newberry@steptoe-johnson.com
                 kalynn.walls@steptoe-johnson.com

                 Susan Llewellyn Deniker
                 STEPTOE & JOHNSON PLLC
                 400 White Oaks Boulevard
                 Bridgeport, WV  26330
                 (304) 933-8154
                 susan.deniker@steptoe-johnson.com

                 By: _____
                 Counsel for Ashland University

---

[135] Exhibit 1 - Campo ¶10.
[136] Exhibit 1 - Campo ¶11.

Mr. Mark Kreutzer
March 11, 2022
Page 26

Cc:     Dr. Carlos Campo, President
        Ashland University

**R7 - 27 of 27**

EDU001102

# RESPONDENT'S EXHIBIT 8

# 2019 FEDERAL STUDENT AID HANDBOOK PAGE 3-7

EDU001103

**Academic Year regulatory citations**

Award Year: 34 CFR 600.2

Academic Year: 34 CFR 668.3

Payment Period:  34 CFR 668.4

Weeks of instructional time: 34 CFR 668.3(b)

Weeks of instructional time are used in the Pell Grant and Direct Loan calculations (*Chapters 3 and 5* of this volume).

**Reductions in academic year length**

34 CFR 668.3(c)

HEA Sec. 481(a)(2)(B)

**Weeks of instructional time in distance education and competency-based programs**

DCL GEN-14-23

Q&A #8 in the DCL applies to both distance education and CBE programs.

### Credit or clock-hours in an academic year

The law and regulations set the following minimum standards for coursework earned by a full-time student in an academic year in an *undergraduate* educational program (including direct assessment programs):

- 24 semester or trimester credit-hours or 36 quarter credit-hours for a program measured in credit-hours; or

- 900 clock-hours for a program measured in clock-hours.

There is no minimum hours component to the definition of an academic year for *graduate and professional* programs.

For purposes of Direct Loans, a loan period certified for an academic year in a graduate or professional program would include the weeks of instructional time in the academic year and the hours a full-time student is expected to complete in those weeks. See *Chapter 5* for more details on loan limits.

### Awards are affected when a program does not meet one of the academic year standards

The FSA academic year that a school defines for a program has to meet the regulatory minimums for both clock or credit-hours AND weeks of instructional time. In some instances, the academic year may not coincide with the academic calendar of the school. These cases may affect Pell Grants and loan disbursements, and, in Direct Loans, annual loan limits and annual loan limit progression.

For example, awards would be affected if a program is an academic year in length in credit or clock-hours but not in weeks of instructional time. Also, for a program longer than an academic year in length, awards would be affected if the completion of the credit or clock-hours in the program's academic year does not coincide with completing the weeks of instructional time in the academic year.

**R8 - 1 of 1**

EDU001104

# RESPONDENT'S EXHIBIT 9

# "DEAR COLLEAGUE LETTER" DATED DECEMBER 18, 2014, GEN-14-23

EDU001105



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF POSTSECONDARY EDUCATION

THE ASSISTANT SECRETARY

## DEC 1 8 2014

GEN-14-23

Subject:     Competency-Based Education Programs - Questions and Answers

Summary:     The attachment to this letter provides, in a Question and Answer (Q&A) format, guidance to institutions regarding the eligibility of competency-based education programs, which include direct assessment programs, under existing statutory and regulatory requirements for the Title IV, Higher Education Act of 1965, as amended (HEA) student assistance programs.

Dear Colleague:

On March 19, 2013, the U.S. Department of Education published a Dear Colleague Letter (DCL GEN 13-10) titled "Applying for Title IV Eligibility for Direct Assessment (Competency-Based) Programs." That letter described the statutory and regulatory authority for Title IV eligibility of competency-based education programs where student progress is measured by direct assessment.

The letter also explained the process by which an institution may apply for approval to award Title IV, HEA student assistance to students enrolled in a direct assessment program. An institution that wishes to apply for approval to provide Title IV, HEA program assistance to students enrolled in a direct assessment program should follow the instructions included in DCL GEN 13-10, and should continue to send supporting materials to CaseTeams@ed.gov.

Since the March 19, 2013, letter was published, we have received numerous questions regarding the requirements for providing Title IV, HEA student assistance to students enrolled in competency-based education programs more generally. The Q&As in the attachment to this letter address these questions, including –

- The distinction between credit hour competency-based education and direct assessment;
- Requirements for establishing credit hour equivalencies in direct assessment programs;
- Requirements for regular and substantive interaction between students and faculty;
- Prohibitions on paying Title IV aid for credit earned through prior learning assessments;
- Satisfactory academic progress;
- Return of Title IV Funds provisions; and
- Accrediting agencies' roles in reviewing competency-based education programs.

The attachment to this letter will primarily address competency-based education programs that are offered using credit hours or using direct assessment with credit hour equivalencies.

1990 K ST. N.W., WASHINGTON, DC 20006

www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

**R9 - 1 of 13**

EDU001106

Page 2

To provide information about the Title IV eligibility of competency-based education programs, we have also established a dedicated e-mail address to which institutions may submit questions about Title IV requirements for such programs: CBE@ed.gov.

On July 31, 2014, we published a Federal Register notice inviting institutions to apply to participate in one or more of four experiments under the Department's Experimental Sites Initiative, among which are three that are related to competency-based education and direct assessment programs. Those experiments would provide, to those institutions that are selected to participate, some flexibilities to the current requirements. However, the information in this letter and its attachment provide guidance on how institutions can provide Title IV, HEA program assistance to students enrolled in competency-based and direct assessment programs under the existing statutory and regulatory requirements.

Institutions wishing to apply to participate in one or more of the experiments described in the July 31, 2014, Federal Register notice, or ask questions about one of the experiments, should contact the Experimental Sites Initiative team at: experimentalsites@ed.gov.

Please note that while some questions may be appropriate for more than one e-mail address, an institution should attempt to direct each of its inquiries to the most appropriate resource. An institution should not attempt to send the same inquiry to multiple e-mail addresses.

We thank institutions for their interest in competency-based education and for their continued cooperation in the administration of the Title IV student assistance programs.

Sincerely,

Lynn B. Mahaffie
Acting Assistant Secretary
for Postsecondary Education

Attachment:

GEN-14-23 Credit Hour Competency-Based Education Programs - Questions and Answers

R9 - 2 of 13

EDU001107

### Credit Hour Competency-Based Education Programs

**Q1**  **What makes competency-based education (CBE) programs different from traditional academic programs?**

**A1**  Competency-based education (CBE) is an innovative approach in higher education that organizes academic content or delivery according to competencies – what a student knows and can do – rather than following a more traditional scheme, such as by course.

**Q2**  **Are there differences between credit hour CBE programs and direct assessment programs?**

**A2**  A program that is organized by competency, but measures student progress using clock or credit hours, is a CBE program, but not a direct assessment program. In such a program, Title IV aid must be administered under normal statutory and regulatory provisions for clock or credit hour programs.  Note that an institution offering a CBE program using credit hours must ensure that each credit hour requires sufficient educational activity to fulfill the Federal definition of a credit hour, as described in Q&A #3.

A direct assessment program is another form of CBE program.  Student progress in a direct assessment program is measured solely by assessing whether the student can demonstrate that he or she has a command of a specific subject, content area, or skill, or can demonstrate a specific quality associated with the subject matter of the program.  Therefore, unlike a CBE program measured in credit hours, a direct assessment program does not specify the level of educational activity in which a student is expected to engage in order to complete the program.  However, the program must provide students with sufficient educational resources, including substantive interaction with instructors, for students to develop each competency required for completion.  Additionally, before an institution may provide Title IV aid to students in a direct assessment program, that program must be approved under the regulatory provisions at 34 CFR 668.10.

Note that if an institution measures student progress in a program using direct assessment, but also provides credit or clock hour equivalents on a student's transcript in order to facilitate the transfer of credit to other institutions, that program would still be considered a direct assessment program subject to the requirements in 34 CFR 668.10.  In such a case, institutional policies, publications and consumer information would need to be clear in specifying that

EDU001108

Page 2

the program is a direct assessment program rather than a clock or credit hour program.

**Q3  What are the requirements for establishing credit hours for a CBE program that is not offered using direct assessment?**

**A3**  The definition of a credit hour in the regulations at 34 CFR 600.2 includes a provision that allows an institution, along with its accrediting agency, to establish credit hours in a CBE program that are based on an amount of expected educational activity that reasonably approximates not less than one hour of classroom instruction and two hours of out of class work each week.

For example, consider a degree program that measures student progress in credit hours. In a traditional version of that program a credit hour could consist of one hour-long class session per week with an assumption of at least two hours of out of class preparation (e.g., homework). A credit hour CBE version of the program might not require structured class sessions, but it would still require sufficient academic activity – for instance, reading and writing assignments, with feedback from an instructor – to reasonably approximate three hours of expected academic engagement per week for each credit hour. The CBE version of the program could allow this work to be completed more flexibly and at the student's desired pace, as long as the student was otherwise making satisfactory academic progress.

An institution's policies for establishing credit hours for a CBE program must also meet all requirements and standards set by the institution's accrediting agency. See Q&As #14 and #15 for more about accrediting agencies' responsibilities for reviewing CBE programs.

**Q4  What are the requirements for establishing credit hour equivalencies for the competencies in a direct assessment program?**

**A4**  For CBE programs that are direct assessment programs, the regulations at 34 CFR 668.10(a)(3) require an institution to provide a factual basis, satisfactory to the Secretary, for its claim that the program or portion of the program is equivalent to a specific number of credit or clock hours, but this factual basis could take a variety of forms. The purpose of these equivalencies is, for the Title IV student aid programs, to ensure that, in the judgment of the institution and its accrediting agency, the amount of learning in the direct assessment program is

EDU001109

Page 3

equivalent to the amount of instruction, student work, and demonstrated knowledge expected in an equivalent traditional program.

One approach to establishing credit hour equivalencies for a direct assessment program is to identify the intended learning outcomes of a traditional course or courses that correspond to the competencies that have been defined for the direct assessment program.  The following example demonstrates an institution's mapping of the program's competencies to traditional courses or to components of traditional courses.

| Traditional Course | Credit Hours | Competency | Credit Equivalent |
|---|---|---|---|
| Marketing 101 | 3 | Apply theories, models, and practices of marketing | 1 |
| | | Analyze how a company uses marketing resources | 2 |
| Accounting 101 | 4 | Apply theories, models, and practices of accounting in the analysis of financial statements | 1.5 |
| | | Describe regulatory and ethical issues in accounting | 0.5 |
| | | Integrate accounting theories, models, and practices across an organization | 2 |
| English 101 | 3 | Write appropriately researched persuasive arguments | 6 |
| Communications 101 | 3 | | |
| Statistics 101 | 3 | Perform complex statistical calculations | 3 |
| Management 101 | 4 | Identify the recent major trends in leadership theory | 2 |
| | | Analyze and critique leadership case studies | 2 |
| **Total** | **20** | **Total** | **20** |

Note that this example, while intended to illustrate this approach, does not include the level of detail that the institution would need to provide to establish a factual basis for its claim of clock or credit hour equivalency.

The mapping described above is not the only possible method for establishing equivalencies.  Another approach would be to establish the credential level of the direct assessment program, the number of credit hours typically needed to attain that credential in an equivalent traditional program, and the proportion of the direct assessment program represented by each competency.  With this approach, each competency could be assigned a proportional share of the total number of expected credit hours for the program for Title IV purposes.  As with the approach described above, the institution would need to provide sufficient detail to validate its claims of clock or credit hour equivalency.

EDU001110

Page 4

**Q5**    **Are CBE programs, including direct assessment programs, less than a year in duration eligible for Title IV, HEA program funds?**

**A5**    Yes, as with any eligible program, direct assessment programs may be as short as 10 weeks of instructional time in duration if other applicable requirements are met. The regulatory requirements for program length are provided in the regulations at 34 CFR 668.8. Because, as discussed above in Q&A #2, direct assessment programs do not measure student progress using credit hours, the competencies in the program must be the equivalent, in terms of content, to a program of at least the minimum number of credit hours required for Title IV eligibility, and the institution must document that mastery of program content typically requires at least 10 weeks of academic engagement.

**Q6**    **Is there a specific calendar format – standard term, nonstandard term, or nonterm – that CBE programs must use?**

**A6**    All CBE programs, including direct assessment programs, could be offered as nonterm programs. A CBE program may also be offered as a standard or nonstandard term program; however, to be offered as a standard or as a nonstandard term program, a CBE program must require students to start and finish competencies within established term dates.

Note that if an institution chooses to offer a direct assessment program as a standard term program, the duration of the term should correspond with the appropriate credit equivalency. For example, if the standard term is 14 to 17 weeks in length the institution must use semester hour equivalencies. If the standard term is 10 to 12 weeks in length, the institution must use quarter hour equivalencies.

Some institutions use "subscription periods" where students pay a flat fee for a defined calendar time period in which a student may enroll in as many competencies as they choose during that period. Subscription periods may coincide with the institution's regular academic terms; they may also themselves constitute academic terms for Title IV purposes. If a subscription period is treated as a standard term or a nonstandard term, the subscription period is considered a payment period, and Title IV awards must be based on an individual student's enrollment status in that payment period.

Subscription periods may also be used in nonterm CBE programs. However, in nonterm CBE programs, a payment period is defined as the period in which a

EDU001111

Page 5

student successfully completes half of the number of clock or credit hours or their equivalents (in a direct assessment program) and half of the weeks in the academic year.  Therefore, in a nonterm CBE program, students' payment periods may or may not coincide with an institution's subscription periods.

**Q7    Are indirect costs – e.g. room and board – included in a CBE student's cost of attendance?**

**A7**    A student's cost of attendance (COA) is defined in section 472 of the HEA and, for a student enrolled on at least a half-time basis, must include allowances for room and board, transportation, and miscellaneous personal expenses, unless the student is incarcerated or enrolled in a correspondence program.

With the exceptions stated above, an institution must include allowances for all the costs above in a student's cost of attendance when determining that student's eligibility for Title IV unless the institution can document, on a case-by-case basis, that an individual student has no such expenses, and the institution exercises professional judgment to omit these expenses from the student's COA.

**Q8    Does each student have to engage in educational activity every week in a CBE program?**

**A8**    While it is expected that students will generally be academically engaged throughout an educational program, there is no requirement that the institution be able to document academic engagement for each student for every week of instructional time.

However, institutions must ensure that the instructional materials and faculty support necessary for academic engagement are available to students every week that the institution counts toward its definition of a payment period or an academic year.  Note that, to the extent that instructional services supporting educational activity are not offered at any time during a seven-day period, that week would not count toward the institution's definition of a payment period or an academic year, nor would it count toward the minimum program length requirements in 34 CFR 668.8.

For all CBE programs, including direct assessment programs, educational activity includes (but is not limited to):

EDU001112

Page 6

- Participating in regularly scheduled learning sessions (where there is an opportunity for direct interaction between the student and the faculty member);
- Submitting an academic assignment;
- Taking an exam, an interactive tutorial, or computer-assisted instruction;
- Attending a study group that is assigned by the institution;
- Participating in an online discussion about academic matters;
- Consultations with a faculty mentor to discuss academic course content; and
- Participation in faculty-guided independent study (as defined in 34 CFR 668.10(a)(3)(iii).

For direct assessment programs only, educational activity also includes development of an academic action plan developed in consultation with a qualified faculty member that addresses competencies identified by the institution.

Note that not all of the educational activities described above fulfill the requirements for regular and substantive interaction between students and instructors, as described in Q&A #9 below.

**Q9     Is regular and substantive interaction between students and faculty required for CBE programs, including direct assessment programs?**

**A9**     All Title IV eligible programs, except correspondence programs, must be designed to ensure that there is regular and substantive interaction between students and instructors.  Such interaction must occur as a required part of the program.  Therefore, any CBE program, including a direct assessment program, that does not include regular and substantive interaction between students and instructors would be considered to be a correspondence program with the significant limitations and restrictions on Title IV eligibility that apply to such programs.

**Q10   What are the required conditions for regular and substantive interaction between students and instructors for CBE programs, including direct assessment programs?**

**A10**   We do not consider interaction that is wholly optional or initiated primarily by the student to be regular and substantive interaction between students and instructors.  Interaction that occurs only upon the request of the student (either

EDU001113

Page 7

electronically or otherwise) would not be considered regular and substantive interaction.

Some institutions design their CBE programs using a faculty model where no single faculty member is responsible for all aspects of a given course or competency.  In these models, different instructors might perform different roles: for example, some working with students to develop and implement an academic action plan, others evaluating assessments and providing substantive feedback (merely grading a test or paper would not be substantive interaction), and still others responding to content questions.

Such a model may be used to ensure regular and substantive interaction between students and instructors.  However, in applying such a model, an institution must ensure that the interaction is provided by institutional staff who meet accrediting agency standards for providing instruction in the subject matter being discussed, that the interaction is regular, and that the amount of faculty resources dedicated to the program is sufficient in the judgment of the accrediting agency.  Interactions between a student and personnel who do not meet accrediting agency standards for providing instruction in the subject area would not be considered substantive interaction with an instructor.

**Q11**  **How are the quantitative and qualitative components of the satisfactory academic progress (SAP) requirements handled for students in CBE programs?**

**A11**  Satisfactory academic progress (SAP) is treated the same way in a CBE program as it would be for other Title IV-eligible programs under 34 CFR 668.34.

An institution's SAP policy must specify the pace at which a student is expected to progress through the CBE program to ensure that the student will complete the program within 150% of the published length of the educational program (also known as the "quantitative measure").  Because CBE programs are generally self-paced, students may graduate earlier than the published length of the program, but the institution must make a reasonable determination regarding the normal time to completion and use that determination as its published length.

If a CBE program is measured in credit hours, or if the institution uses credit hour equivalencies for a direct assessment program, then the institution must evaluate a student's pace under the requirements for credit hour programs in 34 CFR 668.34(a)(5) and 668.34(b).  Pace in a credit hour program must be calculated by

EDU001114

Page 8

dividing the cumulative number of hours the student has successfully completed by the cumulative number of hours the student has attempted.

An institution's SAP policy must also specify a qualitative measure that a student must achieve at each evaluation. If grade point average is not an appropriate qualitative measure, a comparable assessment measured against a norm may fulfill this requirement. If an institution documents that the degree of mastery necessary to complete a competency in a CBE program equals or exceeds the equivalent of a "C" grade in a traditional program, then it may consider a student to have met the SAP qualitative measure as long as that student has an academic standing consistent with the institution's requirements for graduation from the program.

**Q12** **Do the Return of Title IV Funds regulations (34 CFR 668.22) apply to CBE programs?**

**A12** Institutions offering CBE programs must follow all current regulations and guidance related to the Return of Title IV Funds (R2T4) requirements. Institutions should refer to the regulations at 34 CFR 668.22 and Volume 5 of the Federal Student Aid Handbook for complete requirements and guidance.

**Q13** **Since students generally progress in competency-based programs at their own pace, how are the Return of Title IV Funds (R2T4) provisions to be implemented when there are no established start and end dates for competencies?**

**A13** Because of the self-paced nature of CBE programs, we consider the time when a student is enrolled in a competency to be, for Title IV R2T4 purposes, a module. We consider a CBE module to have begun when the student began working toward demonstrating mastery of the competency and ending when the student has successfully demonstrated mastery. An institution must have a mechanism for determining and documenting that a student has begun attendance in a payment period by working toward one or more competencies.

When a student demonstrates mastery or otherwise ceases enrollment in all competencies without beginning another competency during a payment period or period of enrollment, the institution must follow the same R2T4 provisions that apply to a student who was enrolled in modules in a more traditional program to determine if the student is considered to have withdrawn, including a procedure

**R9 - 10 of 13**

EDU001115

Page 9

for identifying students who have unofficially withdrawn.  See the regulations at 34 CFR 668.22(a)(2).

When the competencies in a term-based CBE program do not have specified start and end dates and students are enrolled to complete as many competencies as they can during the term – as in a program using "subscription periods," as described in Q&A #6 above – students are considered to be scheduled to attend for the entire term/payment period.  When, for R2T4 purposes, an institution determines the total number of calendar days in the payment period or period of enrollment for a program offered in modules, that calculation does not include any scheduled breaks of at least five consecutive days and days when the student is not enrolled in any competency/module or in any other course offered during that period of time (34 CFR 668.22(f)(2)(ii)(B)).  Therefore, when a student withdraws from a CBE program where the student is expected to complete as many competencies as possible in a term, the total number of calendar days in the denominator of the R2T4 calculation would include all of the days in the term/payment period, less any institutionally scheduled breaks of at least five consecutive days and any days during which the student was not enrolled in any particular competency, module, or course.

If an institution's CBE program is a credit hour non-term program the institution must establish a reasonable policy for determining the likely timeframe for when a withdrawn student would have completed the payment period or period of enrollment based on that student's progress prior to withdrawal. (See *Percentage of Title IV aid earned for withdrawal from a credit-hour non-term program* in Volume 5 of the Federal Student Aid Handbook.)

**Q14**  **Students in CBE programs may be able to demonstrate mastery of a competency at an accelerated pace because of prior knowledge or experience.  May the credit for such mastery be used in the determination of a student's Title IV eligibility even if the institution provides no instruction to the student?**

**A14**  No.  Credit that is based solely on prior learning may not be incorporated into a student's enrollment status for Title IV purposes in a term-based program, nor may it be considered to apply toward a student's completion of a payment period or academic year in a non-term program.

The definition of an educational program, including a CBE program, in the regulations at 34 CFR 600.2, and the direct assessment regulation at 34 CFR

EDU001116

Page 10

668.10(a)(3)(iii) and (f), provide that an institution may not include for Title IV purposes learning or mastery of competencies that occurred prior to enrollment in the program or from tests of learning that are not associated with educational activities overseen by the institution.

Thus, an institution may not provide Title IV funds for an evaluation of a student's learning without the student having engaged in substantial educational activity at the institution.  An institution must be able to demonstrate that it has separated credit hours earned as a result of prior learning from hours earned as a result of educational activity at the institution.

For example, consider an institution that permits a student to earn credit or demonstrate competency after taking an examination or other assessment without the student having been engaged in any educational activity.  While, consistent with the institution's academic policy, such a student would be able to receive academic credit toward completion of his/her program, the institution could not include that academic credit for Title IV purposes.

**Q15  What are accrediting agencies' roles with respect to CBE programs?**

**A15**  Since offering a program using competency-based education for the first time would be considered a substantive change to an institution's offerings of educational programs, pursuant to the regulations at 34 CFR 602.22, the institution must first obtain its accrediting agency's approval of the change before Title IV aid can be provided to students enrolled in a competency-based program.

Additionally, as described in Q&A #3, under 34 CFR 602.24(f), when an institution's accrediting agency reviews an institution for initial accreditation, renewal of accreditation, or for a substantive change under 34 CFR 602.22, the agency must include in that review, the institution's policy for determining credit hours for its CBE programs to ensure that those policies conform to commonly accepted practice in higher education.  Accrediting agencies should also ensure during such reviews that the instructors used in a CBE program meet accrediting agency standards and that the institution devotes sufficient faculty resources to the program.

**Q16  Are there additional accrediting agency requirements for CBE programs that are offered using direct assessment?**

**R9 - 12 of 13**

EDU001117

Page 11

**A16**   An institutional accrediting agency has a number of additional roles to play in approving a direct assessment program before Title IV funds may be awarded in such a program.  In order for a direct assessment program to be approved by the Department, the institution's accrediting agency must evaluate and specifically approve the program and include the program in the institution's accreditation. Additionally, the accrediting agency must review and approve the institution's methodology for determining the credit hour equivalence for the institution's direct assessment measures.

When an institution applies to the Secretary to award Title IV funds in a direct assessment program, it must submit documentation from its accrediting agency that the agency has evaluated the institution's offering of the direct assessment program and approved both the program in general and the institution's methodology for determining credit hour equivalence.  The Department will then review the documentation submitted by the institution to ensure that the appropriate approvals have been provided and that the program otherwise meets the requirements for Title IV eligibility.

EDU001118