GOVERNMENT
EXHIBIT

AA

UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF HEARINGS AND APPEALS

| | | |
|---|---|---|
| ***In the Matter of*** | ) | **Docket No. 22-58-SP** |
| | ) | |
| **Ashland University,** | ) | **Federal Student Aid** |
| | ) | **Proceeding** |
| **Respondent.** | ) | |
| | ) | **PRCN: 2021-4-05-30426** |

### RESPONDENT ASHLAND UNIVERSITY'S REPLY

The Respondent Ashland University ("Ashland"), by and through its undersigned counsel, hereby submits its Reply to the Brief submitted by the U.S. Department of Education (the "Department") on March 6, 2023, pursuant to 34 C.F.R. Part 668, Subpart H and the Order Governing Proceeding dated November 21, 2022. Ashland incorporates by reference its initial Request for Review filed October 24, 2022, and its Brief filed on January 21, 2023.

### INTRODUCTION

On fifteen (15) separate occasions in its Brief, the Department refers to Ashland's "SCP Program."[1]  ***Ashland has never had an "SCP Program."***  Instead, Ashland has five (5) separate "educational programs," all of which are Pell "eligible programs," in which in the "Pell for Students Who Are Incarcerated" experiment ("Second Chance Pell" or "SCP") students are enrolled as a part of the Experimental Site Initiative ("ESI").[2]  A Pell "eligible program," defined at 34 C.F.R. 668.8(a)(h), is an "educational program" which satisfies the requirements of 34 C.F.R.

---

[1] The Department's erroneous references to a fictitious "Second Chance Pell program" at Ashland throughout its Brief begin on E.D. Br. at 2.

[2] SCP students were enrolled in educational programs resulting in either a Bachelor of Arts in Applied Communications, Interdisciplinary Studies, or Business Administration, a Bachelor of Science in Multidisciplinary Studies, or an Associate of Arts in General Studies and Business Cognate.  Resp. Br. at R2, p. 4, ¶16.

EDU001304

668.8.[3] An "educational program," as set out in 34 C.F.R. 600.2, is "[a] legally authorized postsecondary program of organized instruction or study that...," in this case, "leads to a[n] … academic, professional, or vocational degree."[4] Thus, every eligible program must be a legally authorized educational program of postsecondary instruction. All Ashland students select and enroll in an educational program which requires completion of the requisite courses, in the right combination and order according to the institutional and accreditation standards, to satisfactorily complete their educational program and earn their degree. Courses are offered in a myriad of modalities and structures, but the courses are not *the* educational program.

The Department's regulations require Pell awards to be calculated based upon the eligible program in which a student is enrolled.[5] Those awards are not based upon the individual courses within an educational program in which a student is enrolled. Likewise, a student's eligibility to receive Pell awards does ***not*** automatically create a separate "educational program" or "eligible program" for their selected courses. To suggest the same would collapse all universally recognized programmatic approval processes in higher education and would mean nearly every institution across the country has a separate "program" any time a course was compressed or delivered in an accelerated format.

Ashland's participation in SCP under the ESI did not create a separate "educational program." Instead, Ashland offered Pell grants to incarcerated students pursuing degrees in five (5) Pell eligible programs which were already established as educational programs at Ashland and in which other, non-incarcerated students are enrolled pursuant to *the same academic standards*

---

[3] Ashland's five (5) Pell eligible programs at issue in the FPRD satisfy all of the requirements of 34 C.F.R. 668.8, and the Department has never contended otherwise.
[4] 34 C.F.R. 600.2.
[5] 34 C.F.R. 690.63(a)(1)(i).

EDU001305

*and requirements as incarcerated students*.[6] This distinction remains the fundamental disconnect in resolving this dispute and the basis for the various inaccurate positions taken by the Department with respect to these highly successful and life-changing educational opportunities afforded to incarcerated persons.[7]

In addition to the foregoing, and as detailed herein, Ashland maintains that it properly disbursed the Title IV funds and the Department erred in assessing the subject liabilities because:

(I)      Ashland does not have a separate "SCP Program" simply because it offers the same courses in different formats within its legally authorized <u>educational programs</u>;

(II)     the Department's dismissal of the Ohio Department of Higher Education's ("ODHE") binding authority in approving Ashland's <u>educational programs</u>, the only entity that can legally authorize Ashland's <u>educational programs</u>, fails to recognize and apply the Department's own regulations as to who authorizes "<u>educational programs</u>" which qualify as "<u>eligible programs</u>" for Pell awards;

(III)    the Department continues to disregard that it wrongfully assessed liabilities in the Final Program Review Determination ("FPRD"), applying a regulatory analysis which was inapplicable during the program review periods and thus arbitrary, capricious, and fundamentally unfair; and

(IV)    the Department has, for the first time in the review process or on appeal, alleged a "harm" to incarcerated students which is inaccurate and wholly disregards that the Department is basing such a harm on its unilateral and unjustified creation of an

---

[6] Resp. Br. at R2, pp. 2-3, ¶¶9-11. *See,* Resp. Br. at R3, pp. 4-5, ¶19.
[7] As noted on page 11 below, four (4) of Ashland's SCP students have graduated as valedictorian of their <u>educational program.</u> *See also*, Resp. Br. at p. 2, R3, p. 4, ¶17.

EDU001306

"SCP program" when the SCP students have received the benefits of the respective educational programs under which they were awarded.

### I – Individual Courses Do Not Create Separate Educational Programs

There is no circumstance under which the Department can establish an educational program for Ashland. That action can only be taken by Ashland with the approval of the ODHE. The Department certainly cannot establish a separate educational program on behalf of Ashland simply because it has failed to promulgate regulations addressing the issue of variation in delivery between courses within a legally established and Pell eligible program.  If the Department believes that individual course delivery formats within an eligible program should require a different "academic term" be applied for the Pell payment period, it is axiomatic that the Department must promulgate regulations to that effect before institutions can be held accountable to such a standard. It has not done so.

Of course, there are established regulations which address this very issue and which were appropriately followed by Ashland.   Indeed, the Department has adopted (and now misapplied) regulations that require an institution to undertake a two-step analysis in determining the applicable Pell awards to be made to students.  The regulations required that Ashland determine that the student was enrolled in an eligible program and determine whether that eligible program uses at least thirty (30) weeks of instructional time.[8] That is precisely what Ashland did.  Its five (5) educational programs at issue in the FPRD are all Pell eligible programs, and all five (5) use an academic calendar that provides at least thirty (30) weeks of instructional time.[9] As a result, Ashland was entitled to use the formula contained in 34 C.F.R. 690.63(b) ("Formula 1") to

---

[8] 34 C.F.R. 690.63(a)(1)(i) and (ii).
[9] As the Department correctly notes in its Brief, multiple Ashland staff confirmed that non-incarcerated Ashland students had academic programs that constituted sixteen (16) weeks of instruction per semester. E.D. Br. at 7.

EDU001307

calculate the Pell awards for students enrolled in those five (5) eligible programs. Furthermore, Ashland was required to use the Formula 1 for all students – both SCP students and non-incarcerated students – enrolled in those five (5) eligible programs.[10]

Moreover, the courses within those five (5) educational programs were provided to SCP and non-SCP students pursuant to the same academic standards and requirements, regardless of the modality of instruction.[11] SCP and non-SCP students taking courses in the same educational program "received the same content, the student learning objectives, the amount of class time, the resulting transcript entries, and the degrees earned by students are the same for both SCP and non-SCP students."[12] The only distinction, as explained by Ashland staff to FSA, were the limitations because of SCP students' incarceration.[13] As such, SCP courses received the same credit hours according to Ashland's Credit Hour Policy ("Policy") which adheres to the Higher Learning Commissions standards, requiring that "…courses offered in online, hybrid, or accelerated formats shall be consistent in quality, assessment, learning outcomes, and requirements as course of the same departmental prefix, number, credit hours, and title taught in a traditional semester structure."[14] Ashland provided courses to SCP students pursuant to the Policy which met the same standards as the identical courses taken by non-incarcerated students within the same educational program, and accordingly, Ashland awarded course credit and for some students, their degree pursuant to such standards.[15]

---

[10] Resp. Br. at R3, pp. 3-4, ¶12 and ¶16. *See also,* Ashland's discussion on page 8 below regarding FSA's guidance (which was attached to Ashland's Brief at R-4, pp. 8-9) on the application of one formula to all students in a program.
[11] Resp. Br. at R2, pp. 2-3, ¶ ¶9-11. *See also*, Resp. Br. at R3, pp. 4-5, ¶19.
[12] Resp. Br. at R3, pp. 4-5, ¶19.
[13] E.D. Br. at 7. As Ashland staff explained to FSA and the Department notes in its Brief, the only distinction or limitation between the courses an incarcerated student and non-incarcerated student could enroll in was because, "by virtue of their incarceration, [incarcerated students] are not permitted to have contact with anyone other than their instructors[.]" and as such, non-incarcerated students and SCP students could take the same course as non-incarcerated students, but not be in the same class. *Id.* (*citing* ED-7).
[14] Resp. Br. at R2, p. 3, ¶¶10-11.
[15] Resp. Br. at R3, p. 4, ¶15. As of March 2, 2022, Ashland had awarded over 1,500 undergraduate degrees to SCP students since 2016. *Id.*

EDU001308

Contrary to the assertions of the Department, Ashland's Course Catalogs for 2019-2020 and 2020-2021("Catalogs") identified these educational programs as the same educational programs in which all students could enroll and could be awarded the same degrees, if they met the degree requirements as set out in the Catalogs.[16]  It is undisputed that the program length for each of the respective programs was published, and the academic course requirements for each degree were set out in each Catalog. The Catalogs reflect that there were only three educational programs for a Bachelor of Arts in Applied Communications, Interdisciplinary Studies, or Business Administration, only one educational program for a Bachelor of Science in Multidisciplinary Studies, and only one educational program for an Associate of Arts in General Studies and Business Cognate at Ashland.   However, the Department attempts to create a non-existent, separate program simply by virtue of each student's Pell eligibility under the ESI SCP federal program.[17]  SCP students were enrolled in the same educational program as all other students at Ashland, and the Department's attempts to conflate individual class schedules with the program length requirements published in the Catalogs is misleading.[18]

Similarly, the Department's reliance on statements made by Ashland's staff to FSA's personnel or use of the word "program" in various materials is wholly irrelevant as proof of an "educational program" under the Department's own regulations. The cited uses of term "program" were used in an everyday language manner, and they do not constitute any form of regulatory analysis where everyday words are sometimes given very precise regulatory meanings. These contentions should be disregarded consistent with the ruling *In the Matter of Borricua College*,

---

[16] Ashland's archived Catalogs are available online: 2019-2020:  https://www.ashland.edu/sites/default/files/2022-11/19-20_au_catalog_0.pdf (last visited 03/17/2023) and 2020-2021: https://www2.ashland.edu/administration/sites/ashland.edu.administration/files/2020-2021_academic_catalog.pdf?t=1597444778 (last visited 03/17/2023).
[17] E.D. Br. at pp. 11-12.
[18] Resp. Br. at R2, p. 2, ¶9.

EDU001309

wherein similar statements related to "additional location" as a term of art were disregarded, as "[a]n inartful statement made by Boricua staff without the benefit of legal counsel does not bind or prejudice Boricua. The statement is not an admission of fact.…"[19] References to the SCP students' "program" does not establish an educational program at an institution and such statements are not admissions of fact. Likewise, a syllabus class schedule or best practices list for instructors teaching students in a prison-setting, do not establish, approve, or authorize "eligible programs." As such, they should be disregarded.

In addition, the Department's nod to *In the Matter of Butte Academy of Beauty Culture* further illustrates the conflation of courses and educational programs by the Department, and the decision is not applicable to the matter at hand.[20] To begin, *Butte* addressed a clock-hour cosmetology program which purported to be sixteen (16) months over two (2) years and, instead, was a twelve (12) month program in which the Butte monetarily penalized its students for each hour not completed within the twelve (12) month period. Moreover, the requirements for institutions offering clock-hour programs to define an academic year for each program based upon the required clock hours and weeks of instruction simply has no relevance to this case.

Significantly, not only does Ashland not have some "SCP program" as alleged by the Department, but the eligible programs in which SCP students were enrolled were educational programs that (a) resulted in bachelor or associate degrees, (b) were measured in credit hours, and (c) had academic terms. By contrast, in *Butte,* students were permitted to, subject to monetary penalty, complete their cosmetology program clock-hours however they desired. *Butte* is wholly inapplicable, further demonstrating the Department's continued error in (a) construing courses taken by SCP students as a wholly separate "program" distinct from the educational program in

---

[19] Docket No. 19-52-SP, US Department of Education (August 23, 2021).
[20] Docket No. 96-136-SP, US Department of Education (May 23, 1997).

EDU001310

which they were actually enrolled and (b) attempting to apply a program length requirement based upon length of particular courses in which the incarcerated SCP students were enrolled.

Finally, in its Brief, the Department cites "claims" by Ashland to the effect that ODHE's approval of an educational program required Ashland to use the same academic year definition for all students enrolled in the same Pell eligible program.  However, the language cited is not an Ashland claim.  Rather, that language is actually a requirement from FSA's guidance in the FSA Handbook submitted as R-4, pp. 8-9.   Those instructions, together with the language of 34 C.F.R. 690.63(a), **_required_** Ashland to use Formula 1 for the SCP students since they were all enrolled in educational programs which were legally authorized by ODHE and in which all other students' Pell awards were calculated using Formula 1.[21]

In summary, the Department's Brief provides absolutely no statutory or regulatory support for the Department's fundamental conclusion in the FPRD.  Ashland did not have an SCP program. Instead, Ashland has demonstrated that it had five (5) educational programs in which all of the SCP students were enrolled.  All of those five (5) educational programs were Pell eligible programs for which funding based on Formula 1 was appropriate.   Consequently, the Department's $6,133,790.46 assessment must be reversed.

**II - Ashland's State Approval Agency Was Improperly Disregarded by the Department**

The Department has asserted that the approval of Ashland's educational programs by the ODHE is immaterial.[22] However, this is in contravention of Federal Student Aid's ("FSA") own guidance _and_ the Department's own regulations. While the Department seeks to dismiss ODHE's

---

[21] Resp. Br. at R-4, pp. 8-9. Institutions of higher education can elect to create separate versions of the same educational program and treat students enrolled in the same educational program differently, but Ashland made no such election. Since Ashland made no such election, it "must use the same academic year definition for **all** FSA awards for students enrolled in a particular program, and for all other FSA program purposes." _Id._

[22] E.D. Br. at 15.

EDU001311

role, each <u>eligible program</u> must be legally authorized as an <u>educational program</u> under 34 C.F.R. 600.2 as the first step to qualify for Pell funds.

The only entity that legally authorizes <u>educational programs</u> for Ashland is ODHE, and the programs which ODHE authorized are the programs in which SCP students were enrolled. Notably, ODHE did not authorize a separate "SCP program" despite the Department's fifteen (15) references to such a program. The FSA's own regulations belie the Department's fallacious position that Ashland had a separate SCP "program." In fact, those regulations require <u>educational programs</u> to be legally authorized, in Ashland's case, by the ODHE.[23]

Furthermore, the Department's arguments about irrelevancy and immateriality of the ODHE approval suggests that FSA does not want to acknowledge the critically important role of the state agency or live within the bounds of its own regulations.[24] In a proceeding under Subpart H, pursuant to 34 C.F.R. 668.113(d), the Secretary relies on the state approval agency or the institution's accrediting agency with respect to the qualifications for instruction and amount of work associated with the institutions credit hour designation. To that point, while Ashland acknowledges that pursuant to 20 U.S.C. 1099c-1, the Department is authorized to conduct program reviews to ensure compliance, the Department's Brief fails to acknowledge that such reviews are limited by 20 U.S.C. 3403(b) as to the curricular and programmatic autonomy of institutions, state agencies and accreditors.[25] In fact, 20 U.S.C. 1099c-1(e) explicitly provides that the only exception to the §3403(b) limitations are determinations concerning the "…appropriate length of instruction for programs **measured in clock hours**[.]" *not* credit hour <u>educational programs like Ashland's</u>.[26] Moreover, since ODHE is the only entity that legally authorizes

---

[23] 34 C.F.R. 600.2.
[24] E.D. Br. at 15.
[25] E.D. Br. at 15.
[26] 20 U.S.C. 3403(b) and 20 U.S.C. 1099c-1(e) (*emphasis added*)

EDU001312

Ashland's programs, the Department's position that Ashland had a separate "SCP program" fails to recognize its own regulations as to who authorizes "educational programs" under which Pell can be awarded.

### III - The Department Applied Regulations *Ex Post Facto*

The Department's Brief further fails to address FSA's mistaken assessment of liabilities in the FPRD on the basis of a regulatory analysis which was inapplicable during the program review periods and was, as a result, fundamentally unfair.  When calculating awards during the years reviewed, Ashland was required by 34 C.F.R. 690.63(g)(3) (2012) to define each program's "academic year" using credit hours and weeks of instruction, according to 34 C.F.R. 668.3 (2006) and as amended in 34 C.F.R. 668.3 (2020). Neither version included the term "academic engagement," as it was not yet defined in 34 C.F.R. 600.2.[27]  Moreover, the Department has not addressed FSA's guidance published in the 2019 "FSA Handbook" providing that for distance education, a week of instructional time was subject to the directive in "Q8" of the "Dear Colleague Letter" published December 18, 2014.  That directive, stated in relevant part that "there is no requirement that the institution be able to document academic engagement for each student for every week of instructional time" so long as instruction materials and faculty support were available to support engagement.[28]

In addition, while the Department relies heavily on individual class schedules contained in course syllabi in discussing weeks of "academic engagement," this reliance is in complete disregard of Ashland's central position and FSA's own guidance. Ashland does not have a separate

---

[27] Despite Ashland addressing this in its Brief, the Department has failed to address it. *See* Resp. Br. at 3, fn. 7.  The Department's amendment of 34 C.F.R. 600.2 adding the term "academic engagement" did not take effect until after the award years subject to FSA's review.
[28] *See also,* Resp. Br. at 10, fn. 31 (*citing* R8, p 1, (emphasis added) and R9, pp.5-6 (emphasis added)).

EDU001313

"SCP program" and the Department cannot create programs because it does not agree with individual class schedules. The five (5) eligible programs available to SCP students were the same eligible programs which meet the thirty (30) week minimum requirement. In any event, as outlined in the Request for Review, Ashland's Response to the PRR, and Ashland's Brief, the structure of the course delivery to SCP students included three (3) additional weeks of academic engagement as defined in 34 C.F.R. 600.2 (2021), outside of the twelve (12) weeks identified by FSA in the FPRD.[29]

## IV – Second Chance Pell Students Were Not Harmed

The Department has, for the first time in the program review process or on appeal, alleged a "harm" to incarcerated students which is inaccurate. The allegation of harm wholly disregards that the Department has demanded a form of relief which does not benefit the students or which would cure the alleged harm. Instead, the Department has alleged that students suffered a harm which they did not suffer, presumably to bolster their assessment of liabilities which is otherwise unfounded. SCP students who were recipients of Pell funds under the ESI were enrolled in and have been awarded degrees in the same five (5) educational programs at Ashland as all other the "traditional" students in that same educational program. SCP students not only received the benefit of their educational programs, some SCP students, have even outperformed their "traditional" counterparts and in four (4) instances, SCP students graduated as valedictorian of their graduating class.[30]

---

[29] FPRD at pp. 10-11.
[30] Resp. Br. at 2; R3, p. 4, ¶17.

EDU001314

**CONCLUSION**

Ashland properly disbursed Title IV funds according to the Pell eligible, educational program in which SCP students were enrolled. Ashland did not establish a "SCP program" in which the only differentiating factor is the fact that students are incarcerated, SCP students. Instead, despite having no authority to do so, the Department has wrongfully attempted to unilaterally create such a "program." The Department has attempted to create a new "program" based on courses available to students under a recognized eligible program, and in doing so, it attempts to baselessly create a new "educational program," for which it is attempting to impose considerable and crippling liabilities.

When 34 C.F.R. 690.63(a)(1) is appropriately applied, it is clear that Ashland was legally entitled to use Formula 1 and that it made proper Pell awards to SCP students, despite FSA's erroneous conclusions to the contrary. Given that the liabilities assessed in Finding 2 are dependent upon FSA's flawed analysis in Finding 1, Ashland seeks reversal of both Findings 1 and 2 and a determination that the liabilities which FSA imposed on Ashland must be withdrawn.

As a result of (a) the complexity of the regulatory analysis, (b) the seemingly extensive lack of connection between the parties' arguments, and (c) the magnitude of the assessed liability, pursuant to 34 C.F.R. 668.116(g), Ashland respectfully requests the Chief Judge consider granting the parties an opportunity for oral arguments in this matter to clarify the issues and positions of the parties. To date, Ashland has had to bear the burden of the alleged liabilities in this case for approximately fourteen (14) months. Despite numerous attempts by Ashland, FSA and the Department have refused to engage in meaningful settlement discussions or provide any clarification as to their legal conclusion that Ashland had an "SCP program" which would merit

EDU001315

the assessed liabilities. Oral arguments should help to expedite the resolution of this matter for the

benefit of both parties.

Respectfully submitted,

_____
Jim Newberry
Kalynn G. Walls
Susan L. Deniker
Steptoe & Johnson PLLC
*Counsel for Respondent Ashland*

Dated: March 20, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on this, a true and correct copy of the foregoing Reply by Respondent

Ashland University was filed on March 20, 2023, through the Office of Hearings & Appeals

Electronic Filing System (OES) and served by electronic mail on:

Raziya Brumfield, Esq.
Office of General Counsel
U.S. Department of Education
400 Maryland Avenue, S.W., Room 6E214
Washington, D.C. 20202
Phone: (202) 453-6531
E-Mail: raziya.brumfield@ed.gov

Donna Mangold, Esq.
Acting Deputy Assistant General Counsel
Office of General Counsel
US Department of Education
400 Maryland Avenue, S.W.
Washington, D.C. 20202
E-Mail: Donna.Mangold@ed.gov

_____
Jim Newberry
Kalynn G. Walls
Susan L. Deniker
Steptoe & Johnson PLLC
*Counsel for Respondent Ashland*

Page **13** of **13**

EDU001316